I25QOTTc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

JONATHAN OTTO

        Plaintiff

       v.                     17 Civ. 4712 (GHW)
                         Conference

HEARST COMMUNICATIONS, INC.

        Defendant

------------------------------x

                     New York, N.Y.
                     February 5, 2017
                     4:00 p.m.

Before:

           HON. GREGORY H. WOODS

                     District Judge

             APPEARANCES

LIEBOWITZ LAW FIRM
    Attorney for Plaintiff
JAMES FREEMAN

HEARST CORPORATION
OFFICE OF GENERAL COUNSEL

    Attorneys for Defendant
JENNIFER BISHOP
RAVI V. SITWALA

I25QOTTc1

1                    (In open court; case called)

2                    THE COURT:  Counsel, state your names for the record.

3                    MR. FREEMAN:  Good afternoon, your Honor.

4                    James Freeman, Liebowitz law firm on behalf of

5     plaintiff, Jonathan Otto.

6                    MS. BISHOP:  Good afternoon, your Honor.

7                    Jennifer Bishop.  I'm inhouse counsel for Hearst

8     Communications, Inc.  I'm here with my colleague Ravi Sitwala.

9                    THE COURT:  Thank you so much.  Thank you all for

10    being here.

11                   We are here for a status conference with respect to

12    this matter, also to discuss the parties' proposed motions for

13    summary with respect to this case.

14                   First, counsel for plaintiff, thank you for your

15    letter.  You did miss the deadline, but I will permit the

16    motion on the last.

17                   So let's hear from each of the parties regarding your

18    views on the status of the case, and then we'll talk about the

19    proposed motions.

20                   Counsel for plaintiff, what can you tell me about the

21    status of the case as a whole?

22                   MR. FREEMAN:  In terms of settlement or just in terms

23    of status period?  The status is we've completed discovery in

24    terms of document disclosure, in terms of fact witnesses.

25    They've also produced two expert reports, but there was no

I25QOTTc1

depositions of the expert witnesses.

We are essentially prepared to brief the summary judgment motion.  The principal issue is likely to be fair use. They do have other affirmative defenses that they've asserted in their answer, most of which are boilerplate, such as estoppel and waiver.  They've also challenged the validity of the copyright registration, but there is no evidence on the record that my client defrauded the copyright office.  In fact, our law office was the one that handled the copyright registration, so we don't think that there's going to be much of a challenge to validity.

As your Honor may know, there's two elements to a copyright infringement claim:  Valid ownership and copying. They've already admitted the second element and the first element, as I just mentioned, is probably not subject to challenge.

So we are really looking at the affirmative defense of fair use.  In that sense, it seems to be an epic battle in this particular case because the plaintiff is just an ordinary guy who happened to be at a wedding where Donald Trump showed up, crashed the wedding.  He took out his iPhone like everybody else, took a photograph.  Ended up that there were several media outlets that, you know, commercially exploited the photograph, hers being one of them.  CBS exploited it.  TMZ, which is Warner Brothers exploited it.  Yahoo.  We've settled

I25QOTTc1

1    against all the other defendants, but Hearst is, I guess,

2    prepared to test the boundaries of the fair use doctrine.

3           Essentially, it's really a case about the

4    democratization of technology because in this day and age

5    everybody has access to an iPhone.  Everyone has access to

6    become an author of a photograph, and the real question, sort

7    of the general question is does the Copyright Act protect the

8    works of those who might not be in the industry of publishing

9    photographs.  And we believe it should be extended to ordinary

10   people who just happen to be at the right place at the right

11   time.  They too deserve protection.

12          And it's also notable here that the article in

13   question incorporates several different photographs of Donald

14   Trump at the wedding.  So they didn't actually have to take my

15   client's photograph and exploit it, but they chose to for no

16   other reason than to enhance their article.  I think the case

17   law is pretty clear --

18          THE COURT:  Thank you.  Let me just pause you, because

19   I will dedicate discussion specifically to the proposed motion.

20          Is there anything else you'd like to tell me about the

21   status of the case as a whole?

22          MR. FREEMAN:  I think that covered it.

23          THE COURT:  Thank you.

24          Counsel for defendant, what would you like to tell me

25   about the status of the case?

I25QOTTc1

1          MS. BISHOP:  Thank you, your Honor.

2          We pretty much agree with counsel for plaintiff's

3    assessment of the status.  We've completed fact discovery.  I

4    just wanted to correct that we actually disclosed three experts

5    on the issue of damages, not two, but otherwise that was

6    accurate.  And we are ready to move forward with cross motions

7    for summary judgment.

8          THE COURT:  Thank you.

9          Let me hear from counsel for the defendant in the

10   first instance regarding the proposed motion and the basis for

11   it.

12         MS. BISHOP:  Sure.

13         As counsel for plaintiff indicated, we do believe the

14   primary issue here is going to be fair use on these cross

15   motions, and we're going to move for summary judgment on our

16   fair use defense.  You know, as counsel for plaintiff pointed

17   out, the plaintiff here was not a professional photographer,

18   but this case is different than a lot of other photograph

19   copyrights for a number of other reasons, including that this

20   plaintiff has testified very clearly and very specifically that

21   he took this photograph just for his own personal use.  He

22   never had any intention of licensing it or disseminating it for

23   any reporting use purposes.  So when my client used it in that

24   way, my client really did transform it into a totally different

25   use and totally different purpose in connection with a

I25QOTTc1

news-worthy article about the President's actions.

THE COURT:  I'm sorry.  Why does this go to transformation as opposed to damages?

MS. BISHOP:  Because plaintiff and defendant used -- plaintiff took the photograph for one purpose, which was for his own personal use and explicitly not for licensing or dissemination, and Hearst used it specifically for news reporting which is one of the preamble -- one of the classic fair uses listed in the preamble of the --

THE COURT:  So is it defendant's view that it is transformative whenever an image that was not intended to be published is then published for news purposes?

MS. BISHOP:  No, not in every instance, but we think in this instance when you consider all four of the fair use factors, it is.  Part of that does involve a consideration of the fourth fair use factor of the impact on any market, again, where plaintiff testified that he never -- there was never any market, but he nonetheless gave the photograph to a person who he didn't know how that other person was going to use the photograph which led to it being available publicly, and so we think that also factor four weighs in favor of a finding of fair use here.

THE COURT:  Thank you.

Can you expand on that somewhat?  Factor four is, as you've recited in your letter, the effect of the use upon the

I25QOTTc1

1    potential market for value of the copyrighted work.

2            MS. BISHOP:  Right.

3            THE COURT:  Why does the test include whether or not

4    the author intended themselves to avail themselves of the

5    potential market for or value of the --

6            MS. BISHOP:  Sure.  There's actually Second Circuit

7    case law that speaks very clearly to this point that holds that

8    where a copyright defendant used a work in a market that the

9    copyright owner has no intent to occupy in the first place,

10   that there has not been an impact on the actual or potential

11   market for the copyrighted right.  It's in -- Second Circuit.

12   I don't have the citation in front of me.

13           THE COURT:  Thank you.  Proceed.

14           MS. BISHOP:  We also believe that factor two also

15   weighs in favor of a finding of fair use here.  That's the

16   consideration of the nature of the copyrighted work where

17   courts generally look to how factual on the one hand a work is

18   and how creative on the other hand it is.  In this case, the

19   plaintiff testified that he basically did not exercise any

20   creative judgment.  He just, as soon as the president entered

21   the room, he started taking serial photos probably in a burst

22   fashion on his cell phone.  We think factor two weighs strongly

23   in Hearst's favor.

24           We also recognize that while some courts have not

25   given as much weight to this factor, again, as counsel for

I25QOTTc1

1    plaintiff pointed out, technology has changed, and we think in

2    a world where everyone has a camera in their cell phone,

3    putting more weight on factor two is appropriate.

4            And with respect to the third factor, the amount of

5    substantiality of the work that was used, that is really

6    neutral in this instance because it would not be possible to

7    use this photograph for adverse purposes without using all of

8    it or without using most of it, and there is clear case law on

9    that point as well where in order to use the work in a

10   transformative way, you have to use all of it and this factor

11   is neutral.

12           THE COURT:  Did I miss it, did you address the first

13   factor?

14           MS. BISHOP:  That was my opening on transformativeness

15   purposes.  It's our position that -- well, the fact that there

16   is clear Second Circuit law that says that when a defendant's

17   use is within one of the preamble uses listed in the beginning

18   of Section 107 of the Copyright Act, there's a presumption that

19   factor one weighs in favor of the defendant.

20           That's only all the more clear here because, again,

21   the plaintiff testified very clearly what his purpose was in

22   taking the photo, and Hearst used it for an entirely different

23   purpose, and did add to it with an entire article on commentary

24   and was reporting on very timely events concerning the

25   president.

I25QOTTc1

1          THE COURT:  Than you.

2          Can you expand on that argument?  I'll see your

3     briefing on it, but I understand this is arguably a newsworthy

4     topic and that an article accompanied the image.  But why is

5     the fact that the subject matter of the photograph was

6     newsworthy and the fact that an article was written to

7     accompany the work sufficient to establish transformative use?

8          MS. BISHOP:  Well, your Honor, I'm not sure that, you

9     know, in a different case it necessarily would be, but in this

10    case where, again, the purpose that the plaintiff had in taking

11    the photo and using the photo himself was so different, fair

12    use case law does look very much to the express purpose of both

13    parties and the reason that they're using the image, or other

14    copyrighted work.  And in this instance Hearst used it in a

15    completely different way than plaintiff did.

16         THE COURT:  And different use you understand to

17    establish that per se transformative use?

18         MS. BISHOP:  A use for a different purpose also

19    adding, again, substance in the form of a news article and

20    reporting on the President's actions.

21         THE COURT:  Thank you.

22         What is the case law that you point me to for that

23    argument?

24         MS. BISHOP:  The *Nunez* case out of the First Circuit,

25    which we cited in our letter is on point as was the District of

I25QOTTc1

1    Virginia case we cited.  There is more.  There is an Eleventh

2    Circuit case.  I don't have that cite in front of me, but we

3    will fully brief this issue.

4         THE COURT:  Why do you think that this is an issue

5    that is appropriately before the Court on summary judgment?

6         MS. BISHOP:  The facts are not -- I don't believe the

7    key underlying facts are in dispute here, and as your Honor is

8    well aware, balancing for fair use can be resolved in summary

9    judgment where the underlying material facts are not in

10   dispute.  So the parties have taken the position that this can

11   be resolved as a matter of law.

12        While we recognize that may not be the case, your

13   Honor may find factual issues or some balancing of these

14   factors where it really cannot be determined without serving it

15   to a jury, we do think that there's enough here that weighs in

16   our favor that this could be found as fair use as a matter of

17   law.

18        THE COURT:  Thank you.

19        Could counsel for plaintiff, what's your view

20   regarding the fair use defense?  And then I'd like to invite

21   you to speak regarding the basis for your alternative motion.

22        MR. FREEMAN:  Sure.  Thank you, your Honor.

23        With respect to the first factor, there's actually

24   three sub-factors.  The first is the transformative use.  The

25   second is whether or not the purpose is commercial or

I25QOTTc1

1    non-commercial.  And there is actually a third sub-factor,

2    which is whether or not the image was taken in bad faith.

3            Now, your Honor can find with respect to the third

4    sub-factor that when Hearst posts a photograph to esquire.com,

5    in this case, the editor has to fill out a form online which

6    identifies the copyright holder as well as the name of the

7    photographer.  I'm holding the document here which they

8    produced.  The editor in this case, Peter Wade, he didn't fill

9    out the copyright holder.  He made no investigation whatsoever

10   as to who the copyright holder was.  He didn't fill out the

11   photographer name.  He just appropriated it right from

12   Instagram and published it to the world.  That in my view,

13   because the fair use doctrine implies good faith and fair

14   dealing.  The Supreme Court has held that.  There is no good

15   faith and fair dealing when you haven't made any inquiry

16   whatsoever with respect to the copyright holder's name.

17           In terms of transformativeness, which is the first

18   sub-factor, when you look at the body of law on

19   transformativeless starting with the Supreme Court case in

20   *Acuff-Rose v. Campbell*, which was a case involving the a

21   hip-hop group who did a parody of the Roy Orbison song *Pretty*

22   *Woman*.  You're talking about the transformative of the work

23   itself.  You're not talking about whether or not you're

24   transforming it from a non-commercial use to commercial use.

25   Same thing in *Cariou v. Prince*.  That's a Second Circuit

I25QOTTc1

holding.  They're talking about an appropriation artist who

took a photograph of a Rastafarian and essentially did like a

collage or applied spray paint to it and transformed the work

itself.

        Here, they haven't done anything.  This is an article

about Donald Trump crashing a wedding.  My client took the

photograph because it was a picture of Donald Trump crashing a

wedding.  That's just -- I mean, it's a visceral reaction for

him to take the photograph, and he certainly did publish it.

He shared it with another guest at the wedding.  Whether or not

he intended to commercially exploit it or not is beside the

point.

        They seem to be conflating two factors here.  They're

basically saying it's transformative because they've

"transformed it from a non-commercial newsworthy purpose to a

commercial newsworthy purpose," and that in my view does not

fit the criteria.

        The cases they're citing *Nunez* and *Philpot*, both of

them involve professional photographers.  In *Nunez*, which is a

classic case, it's a First Circuit says from about 20 years

ago, involved naked photographs of Ms. Universe or Ms. Puerto

Rico Universe and, you know, she took the photographs before

she was awarded the crown, and then once she was awarded the

crown, it became this huge controversy over whether or not she

was qualified to be Ms. Puerto Rico because she had posed in

I25QOTTc1

1    the nude.

2         So the defendant newspaper in that case had published

3    the photograph even though it was initially intended for a

4    modeling portfolio because it wanted to report on the

5    controversy surrounding whether or not Ms. Puerto Rico was

6    qualified to hold the crown.  I agree that's fair use because

7    it's in the public interest to know what Ms. Puerto Rico was

8    doing prior to her being awarded the crown.

9         Here again, they're just using the photograph to tell

10   the story of Donald Trump crashing a wedding, and my client was

11   the one who captured that photograph, and for whatever

12   reason -- they could say he's not a pro -- his photograph

13   resonated with the market.  There was an actual market which

14   works into the fourth factor because Yahoo published it, TMZ

15   published it, CBS published it.  So there was a market demand

16   for the photograph regardless of whether or not he intended it

17   to be used for commercial purposes.

18        And the copyright clause talks about authors.  It

19   doesn't talk about professional authors.  Anybody can be an

20   author.  It's a democracy.  So the idea that a large scale

21   media conglomerate can simply exploit whatever photograph it

22   wants that it obtains from social media just because it's a

23   picture of the President, that's not fair use.  It takes it --

24   you know, it takes the fair use doctrine -- it extends it too

25   far.

I25QOTTc1

1          So we believe that, I think that the fair use doctrine

2     here need to be dismissed, and to set sort of a precedent, and

3     I think there really isn't a clear-cut precedent in a case like

4     this that everyday, ordinary people who just happen to be in

5     the right place at the right time, whether it be taking a

6     picture of the President or taking picture of a terrorist

7     attack or taking a picture of a celebrity or whatever it is,

8     that if their photograph finds residence in the actual

9     marketplace of ideas, that there's an audience for their work,

10    that they deserve to be compensated even if they my have

11    another occupation.

12          THE COURT:  We will have the opportunity to discuss

13    all of this in depth later.  I understand the photograph was

14    posted on Instagram.  Is that right?

15          MR. FREEMAN:  Yes, your Honor.  It appears that the

16    photograph was -- after my client disseminated it to other

17    wedding guests, it ended up in the hands of the sister of the

18    bride.  Then the sister of the bride posted it to her Instagram

19    account; and then Peter Wade, who is the author of the

20    Esquire.com article, he located it at the Instagram page of the

21    sister of bride.  Like I said, he made no other inquiry.  He

22    just appropriated it, published it.

23          There's also a line of cases which holds that if

24    you're going to argue the fair use doctrine in court, there

25    needs to be some sort of analysis before the work is published

I25QOTTc1

as to whether or not it's fair use.  In other words, did Peter

Wade send an email to the inhouse counsel saying, hey, is this

fair use, can I publish this?  There has to be some sort of

investigation.  Particularly when you're talking about a very

sophisticated publisher who has an entire protocol in place as

to how you license paragraphs for purposes of commercial

exploitation.  It's clear here that was not done.

So they're really raising the fair use defense ex post

facto to skirt liability rather than in the manner it is

supposed is to be raised, whereas, you know, clients come to us

all the time and they say "I want to use this document in a

documentary.  Can we do it?  Is it fair use or do we have to

get a license?"  You have to have some sort of inquiry inhouse.

That didn't happen here.  They just published it.

THE COURT:  Thank you.

Out of curiosity, does it make a difference where the

average person photographer makes the image available?  So in

this instance he thought they made the image available on

Instagram, so it was at least available to set of friends.

Would it make a difference if the image had been posted in a

more public way accessible to a broader public than the

Instagram followers of the individual author?

MR. FREEMAN:  It's an interesting issue.  It's a very

nuanced issue because the Copyright Act in Section 1 is defined

as publication means.  There's actually two definitions.  The

I25QOTTc1

first one is you have to have some sort of commercial intent to

sale or license your work.  But there's a second definition.

The second sentence says that all you have to do is share with

a group of persons, so there doesn't have to be some sort of

commercial intent.

          But to answer your question, I don't think there's

much of a difference.  I've seen courts sort of parse it out.

I know Judge Kaplan has a decision where he says the copyright

holder has to have a commercial intent, but that's not what

Congress intended because you can just share something with

your friends and it can still be considered published.  The

only time something wouldn't be published, for example, is if

you put the photograph on display in your home or in an art

gallery and you might have invited people to come in and

display it, that might not be considered publication.  But as

long as it meets the definition of publication, and also in

this case my client swiftly moved to register his work within

two or three days after the wedding.  The wedding was on a

Saturday.  It was published on a Sunday.  He was registering on

Monday when he found out that it was published commercially.

So it was a visceral reaction.  I think any jury is going to

relate to that because if you take a photograph and then you

wake up the next morning and find out it's being commercially

exploited by every media conglomerate in the United States.

You're going to take some action.  You're going to say, "Hey,

I25QOTTc1

1    where's my cut?  How about me?"  Not to mention, this

2    photograph didn't even attribute my client.  I mean, with fair

3    use, at the very least you should at least give fair

4    attribution to the creator of the work, but again, they didn't

5    make that step here.

6         In terms of publication, it's an excellent question

7    that your Honor asked.  I don't think the law is well settled

8    in that area, and I think that this case is going to help

9    provide some clarity to that in terms of publication, is it the

10   copyrighted holder's intent in terms of publication?  What

11   happens when he just gives it to one person and that person

12   publishes it to the world?  Is the intent going to be measured

13   at the time that it is published in Instagram or is the intent

14   going to be measured at the time when he disseminated the

15   photograph to the one wedding guest?  I honestly don't have an

16   answer for that because the case law hasn't addressed this

17   particular factual scenario.

18        THE COURT:  Thank you.

19        I ask counsel for plaintiff what view he was

20   regarding, whether the Court is able to or will be able to

21   decide this issue on summary judgment.  My understanding is

22   that the parties agree regarding the facts relevant to this

23   issue such that the Court can properly weigh the factors on its

24   own and make a determination regarding whether the fair use

25   defense is available.  What's your view?

1          MR. FREEMAN:  The fair use doctrine is an expression

2     of law and fact.  There are cases where there might be certain

3     factual issues that the jury has to decide.  But I would say

4     that 90 percent of the cases, particularly in this district in

5     this circuit, the fair use case is decided as a matter of law

6     on summary judgment every now and then on Rule 12, although

7     that's not relevant here.  I haven't seen a Rule 56.1 yet.  I

8     don't know if there's going to be a lot of fact -- I don't

9     think there's going to be many factual issues in dispute in

10    this case.  There might be.  I will need to see their brief.

11         I'm confident that your Honor can decide the fair use

12    defense on summary judgment.  I have different views, however,

13    on the issue of willfulness, which they raise in their letter

14    where they are saying willfulness is the state of mind of

15    defendant.  But when Hearst gets sued for copyright

16    infringement case, they're sort of walking into court crippled

17    because there's a whole slew of cases that say as long as

18    you're in the business of exploiting copyrighted material,

19    you're charged with knowledge of U.S. copyright law and of

20    licensing procedures, and if you fail to abide by them, that's

21    reckless disregard for the copyright holder's rights.

22         Of course, as we pointed out earlier, we also had

23    documentary evidence showing that Peter Wade, the editor of the

24    article, did not follow Hearst's own procedures in terms of

25    entering the copyright claimant and author.

1        So we don't think willfulness stands a chance on

2    summary judgment.  They've intended to make that argument and

3    we will certainly oppose.

4        THE COURT:  Thank you.

5        Let me hear from counsel for defendant about the

6    proposed motion for summary judgment regarding the lack of

7    evidence of willfulness.

8        Counsel?

9        MR. FREEMAN:  Sure, your Honor.

10        I think plaintiff's counsel said it very well in that

11    their motion or their opposition -- our motion is going to be

12    based on the fact that there is simply not enough evidence for

13    any reasonable juror to conclude that this was willful.

14        Plaintiff's position is essentially that just because

15    Hearst is a mass media company that has been sued for copyright

16    infringement before, it is essentially always on the hook for

17    willfulness damages.  We don't believe there is any case law

18    that says that that alone is sufficient.  It might be a

19    consideration, but standing alone, it's not sufficient.

20        And notwithstanding counsel's representation that

21    there are documents, there's no evidence in the record speaking

22    as to what Hearst policies and practices are nor to what that

23    particular is document is gesturing to means as to how it

24    should be interpreted.  So it is our position that there is

25    actually insufficient evidence in the record of which anyone

I25QOTTc1

1    can make a finding of willfulness.

2                    THE COURT:  Thank you.

3                    Is the existence of the document that counsel for

4    plaintiff alluded to in dispute?  In other words, what he

5    proffered was that there's a document which an editor is

6    supposed to complete with the information regarding copyright

7    holder for any particular image that was not completed here.

8                    MS. BISHOP:  The document exists and we produced it,

9    but his interpretation of the document we have a disagreement

10   about.

11                   THE COURT:  Thank you.

12                   And that document and its existence does not in

13   defendant's view give rise to a material issue of fact that

14   would preclude summary judgment on this issue?

15                   MR. FREEMAN:  No.

16                   THE COURT:  Thank you.  Good.

17                   Counsel for plaintiff, what's your view on the

18   willfulness?  You've already spoken some on the topic.  Any

19   further comments?

20                   MR. FREEMAN:  I would just say I think the document

21   speaks for itself and the fact that it's clear there's a field

22   on the computer which the editor needs to enter information

23   into, one of which says "copyright" and then it has like a down

24   arrow, and they are supposed to enter the term, it's blank.

25   The next one is "photographer name," and he fills it out

1    "Instagram@LauraMP11."  Well, that's not a photographer's name.

2    I think any fact finder could look at this and say, well, this

3    guy, he jumped the gun.  He did not complete this form, which

4    is clearly a part of Hearst's ordinary practices.  And their

5    expert witness has testified in his report over and over that

6    it's their ordinary course of business to license photographs.

7    That's what they do.  They're in the business of licensing

8    creative content.  So this is obviously a field that needed to

9    be completed, and we think that any fact finder can find that

10   this is an incomplete form.  There's no copyright holder

11   listed.  There's no photographer name listed.  Even when it

12   says "image rights," he fills in "no rights."  I mean, that's

13   clearly an issue of fact.  In terms of their statement that,

14   well, just because we're in the industry of exploiting

15   copyrights doesn't mean that we're automatically willful.

16   Well, I'm not going to say, you know, I don't think that it's a

17   per se finding, but I could literally cite dozens of cases

18   where the fact that Hearst has been sued over 12 times in this

19   district alone in the last three years for copyright

20   infringement, and the fact that they are a sophisticated

21   publisher that has inhouse counsel, they're charged with

22   knowledge of copyright law.  And willfulness, we have to

23   remember, it doesn't mean bad faith.  It doesn't mean they're

24   conniving or anything like that.  All it means that they're

25   willfully blind or acted in reckless disregard for the

I25QOTTc1

1    copyright holder's rights.  Just the mere fact they didn't

2    identify who the copyright holder was before they published

3    this photograph, in my view certainly satisfies that standard.

4    And if it doesn't, it certainly is enough to get to a fact

5    finder.

6            THE COURT:  Thank you.

7            Counsel for plaintiff, I understand that you also seek

8    summary judgment with respect to the infringement claim itself?

9            MS. BISHOP:  Correct.

10           THE COURT:  Can you speak to that?

11           MS. BISHOP:  Yes.  There's two elements.  There is the

12   validity of the copyright, which talks about the ownership and

13   originality, and the second element is actual copy.  Here

14   they've already admitted in their answer that they actually

15   copied the photograph, and so we don't even need to make -- you

16   know, that's a couple lines in our brief in terms of second

17   element.

18           In terms of the first element, like I say, we have our

19   firm we represent a lot of photographers, and we actually have

20   three full-time employees nine to five who all day every day

21   fill out copyright registration forms.  With this particular

22   photograph, they registered it.  We have copies of the deposit

23   that was put on to the U.S. Copyright office.  We obviously

24   have the certificate of registration, which because it was

25   within the last five years, we're entitled to the presumption

of validity.  The burden, therefore, shifts, so there's a

rebuttable presumption that the copyright registration is

valid.  The burden then shifts to Hearst to prove that it was

invalid.

How do you prove it's invalid?  Well, essentially, the

cases hold that you have to show that Jonathan Otto defrauded

the copyright office.  Now, it's remarkable that in this case

and many other cases we often sue and sometimes they challenge

validity, but, look, the copyright materials that are on

deposit with the copyright office, they're a matter of public

record.  All they got to do is fill out a form and pay a

hundred bucks, and they can get a certified copy from the U.S.

Copyright Office to determine whether or not the photograph's

on deposit.  They haven't done that here, and that's their

burden because they have to prove invalidity.  All we need to

do is come into court with a copy of the certificate and an

affidavit from the client saying, yes, we registered, and then

the burden shifts to them.  So they haven't satisfied their

burden.  You know, there's no evidence on the record whatsoever

that my client defrauded the copyright office.  There was in

deposition testimony where they inquired as to my client's

knowledge about the actual process of registering the

photograph.  He's a lay person.  He didn't really know.  He

says, well, my lawyers did it, but that's not going to be

enough evidence to prove that it's an invalid copyright.  So I

I25QOTTc1

 1  think with respect to the first element, we prove it hands

 2  down.  Second element, it's been admitted.  We shift right to

 3  the affirmative defenses.

 4            THE COURT:  Thank you.

 5            So I've reviewed the proposed briefing schedule for

 6  the motion.  The deadlines that are proposed would have

 7  plaintiff's opening brief presumably limited to the issue of

 8  liability be due on February 19.  The defendant's opening in

 9  opposition, presumably in opposition with respect to the

10  liability issue to the extent that they have one independent

11  fair use defense, and then opening with respect to the

12  willfulness and fair use defense are due a month thereafter.

13            The parties have proposed that defendant's brief would

14  be 50 pages long.  Why so many pages, counsel?

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I25QOTTc1

1    MS. BISHOP:  That was actually plaintiff's counsel

2    initial proposal, which we agreed to; but I believe it is the

3    combination of the two 25-page brief that we would be entitled

4    to if they were separate briefs.

5    THE COURT:  So no more than 25 pages will be dedicated

6    to imposing the liability issue and approximately 25 pages will

7    be dedicated to the fair use and willfulness arguments?

8    MS. BISHOP:  That's correct, but I very much doubt

9    we'll use all 50 pages.

10    THE COURT:  Good.  Thank you.

11    With that understanding, I am happy to endorse the

12    proposed page limits and the proposed schedule.

13    Counsel for plaintiff has suggested that he does not

14    yet know what is going to be in the defendant's 56.1 statement.

15    I understand that that will not be prepared most likely until

16    around the time that the defendant's opening is due.  I am

17    happy for to us proceed in the ordinary course.  This may be a

18    situation in which essentially a stipulated set of facts would

19    be valuable.  I am not going to require that you present me

20    with one, but I just ask to the extent possible that you confer

21    to the extent that there are disputed issues in advance to the

22    extent that those may make it difficult or impossible for me to

23    rule on this in the context of summary judgment motion.  In any

24    event, I will endorse the schedule as proposed.  I will endorse

25    the page limits that the parties have proposed.

1            Let me refer to my rules for 56.1 statements and

2    district's rules.  My rules are not that unique.  Basically

3    they require that the party who is opposing a 56.1 statement

4    cut and paste the opposing side's statements and paste beneath

5    their statements your statement of fact.  Remember the 56.1

6    statement is not an answer so you cannot simply deny an

7    asserted statement of fact by the opposing side.  If you simply

8    say "deny," I will treat it as an admission.  Instead, in the

9    same way that the moving party has an obligation to point the

10   Court to record evidence in support of their statement, you

11   should state in opposition what specifically your view is

12   regarding the relevant fact and you should point me to record

13   evidence that supports your view.  If you fail to point me to

14   record evidence that supports your view and instead simply give

15   me a categorical denial without reference to record evidence,

16   as I say I will treat that as an admission of the relevant

17   fact.

18            Please, when you are providing me with your papers

19   give me full copies of the depositions in text searchable

20   format to the extent that you provide me with depositions.

21   Please review my individual rules regarding courtesy copies.

22   They require that you give me two courtesy copies of everything

23   in binders with tabs marking each of the relevant exhibits and

24   affidavits.

25            Is there anything else that we should talk about

I25QOTTc1

1    before we adjourn?  I do want to raise with the parties whether

2    there is anything I can do to help facilitate a resolution of

3    the case.  Summary judgment motion practice is generally

4    speaking expensive and time-consuming.  This is a good

5    opportunity for the parties to engage substantively in a

6    discussion about resolving the case.

7              How can I help with that, counsel for defendant?

8              MS. BISHOP:  Thank you, your Honor.

9              We actually had a settlement conference back in

10   October before Judge Cott, which did not result in a

11   settlement.  At this point we are not optimistic that the

12   parties are close enough together to have a more productive

13   settlement talk at this point.  We are of course willing and

14   always are willing to continue discussing settlement informally

15   and open to hearing new demands and making new offers as things

16   proceed.

17             You also asked if we had anything else to raise and

18   there was one issue we wanted to raise just briefly before your

19   Honor.  At the end of fact discovery, we learned of some

20   misconduct by plaintiff and counsel that began during the

21   initial October settlement conference with Judge Cott and

22   continued throughout the discovery period.  We believe we need

23   to raise this issue with the Court, but given that it commenced

24   during the confidential session with Judge Cott, we thought

25   that it would be best raised before him --

I25QOTTc1

1          THE COURT:  Thank you.

2          MS. BISHOP:  -- in the first instance.

3          THE COURT:  Let me just take that up.

4          Yes, to the extent that the issue arises from conduct

5   during the mediation session, I will request that you take it

6   up with Judge Cott in the first instance.  I say that first

7   because the those conferences are confidential.  I don't know

8   of any fact that it was not successful what happened during it.

9   I don't need to know what happened during it and will not

10  inquire.  So to the extent there is an issue that you want to

11  bring up with respect to this issue, please do bring it to

12  Judge Cott in the first instance.

13          To the extent that the issue is -- I will call it --

14  broader than what happened this context of the mediation

15  itself, it may be that the issue falls outside of the scope of

16  my current reference to Judge Cote in which case I will

17  consider.  If the parties think it is appropriate, and in

18  particular if Judge Cott thinks it is appropriate, referring

19  the entire issue to him for resolution.

20          Let me ask this question:  Is this an issue that can

21  be worked on and resolved in parallel to the substantive

22  litigation of the issues that we have been discussing?

23          MS. BISHOP:  We believe so.  It doesn't impact the

24  grounds for summary judgment that both parties intend to move

25  on.

I25QOTTc1

1          THE COURT:  Thank you.

2          Do you know what the issue is, counsel for plaintiff?

3          MR. FREEMAN:  I do and I would like to make a

4  preliminary note that I made a notice of appearance in this

5  case in November and that settlement conference and the

6  plaintiff's counsel that they are referring to was original

7  Richard Liebowitz.  So I want to make that point of

8  clarification.

9          THE COURT:  Fine.

10          MR. FREEMAN:  I am aware of it, but it is dealing with

11  an interpretation of a settlement agreement and how it relates

12  to a licensing agreement.  So it is a damages issue.

13          THE COURT:  I don't need to know anything more about

14  the substances of it.

15          The one thing I would suggest is to the extent this is

16  properly framed like a motion for sanctions with respect to

17  discovery, that most likely falls outside the scope of my

18  current reference to Judge Cote.  In order for me to put that

19  in front of him more formally, I would ask that you request

20  that I refer that issue to Judge Cott so that I can do so.  To

21  the extent that this is not going to impact the litigation of

22  the substance of the case going forward before me, I think it

23  properly would make sense for me to refer to Judge Cott so that

24  you can handle this issue before him on a separate track.

25          Counsel for plaintiff, anything further?

I25QOTTc1

1          MR. FREEMAN:  That's it, your Honor.

2          THE COURT:  Counsel for defendant, anything further?

3          MS. BISHOP:  No, your Honor.

4          THE COURT:  Thank you all.

5          This proceeding is adjourned.

6                             o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25