I25QOTTc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

JONATHAN OTTO

              Plaintiff

        v.                   17 Civ. 4712 (GHW)
                              Conference

HEARST COMMUNICATIONS, INC.

              Defendant

------------------------------x

                       New York, N.Y.
                       February 5, 2017
                       4:00 p.m.

Before:

               HON. GREGORY H. WOODS

                       District Judge

                APPEARANCES

LIEBOWITZ LAW FIRM
    Attorney for Plaintiff
JAMES FREEMAN

HEARST CORPORATION
OFFICE OF GENERAL COUNSEL

      Attorneys for Defendant
JENNIFER BISHOP
RAVI V. SITWALA

1          (In open court; case called)

2          THE COURT:  Counsel, state your names for the record.

3          MR. FREEMAN:  Good afternoon, your Honor.

4          James Freeman, Liebowitz law firm on behalf of

5     plaintiff, Jonathan Otto.

6          MS. BISHOP:  Good afternoon, your Honor.

7          Jennifer Bishop.  I'm inhouse counsel for Hearst

8     Communications, Inc.  I'm here with my colleague Ravi Sitwala.

9          THE COURT:  Thank you so much.  Thank you all for

10    being here.

11         We are here for a status conference with respect to

12    this matter, also to discuss the parties' proposed motions for

13    summary with respect to this case.

14         First, counsel for plaintiff, thank you for your

15    letter.  You did miss the deadline, but I will permit the

16    motion on the last.

17         So let's hear from each of the parties regarding your

18    views on the status of the case, and then we'll talk about the

19    proposed motions.

20         Counsel for plaintiff, what can you tell me about the

21    status of the case as a whole?

22         MR. FREEMAN:  In terms of settlement or just in terms

23    of status period?  The status is we've completed discovery in

24    terms of document disclosure, in terms of fact witnesses.

25    They've also produced two expert reports, but there was no

1    depositions of the expert witnesses.

2         We are essentially prepared to brief the summary

3    judgment motion.  The principal issue is likely to be fair use.

4    They do have other affirmative defenses that they've asserted

5    in their answer, most of which are boilerplate, such as

6    estoppel and waiver.  They've also challenged the validity of

7    the copyright registration, but there is no evidence on the

8    record that my client defrauded the copyright office.  In fact,

9    our law office was the one that handled the copyright

10   registration, so we don't think that there's going to be much

11   of a challenge to validity.

12        As your Honor may know, there's two elements to a

13   copyright infringement claim:  Valid ownership and copying.

14   They've already admitted the second element and the first

15   element, as I just mentioned, is probably not subject to

16   challenge.

17        So we are really looking at the affirmative defense of

18   fair use.  In that sense, it seems to be an epic battle in this

19   particular case because the plaintiff is just an ordinary guy

20   who happened to be at a wedding where Donald Trump showed up,

21   crashed the wedding.  He took out his iPhone like everybody

22   else, took a photograph.  Ended up that there were several

23   media outlets that, you know, commercially exploited the

24   photograph, hers being one of them.  CBS exploited it.  TMZ,

25   which is Warner Brothers exploited it.  Yahoo.  We've settled

I25QOTTc1

1    against all the other defendants, but Hearst is, I guess,

2    prepared to test the boundaries of the fair use doctrine.

3            Essentially, it's really a case about the

4    democratization of technology because in this day and age

5    everybody has access to an iPhone.  Everyone has access to

6    become an author of a photograph, and the real question, sort

7    of the general question is does the Copyright Act protect the

8    works of those who might not be in the industry of publishing

9    photographs.  And we believe it should be extended to ordinary

10   people who just happen to be at the right place at the right

11   time.  They too deserve protection.

12           And it's also notable here that the article in

13   question incorporates several different photographs of Donald

14   Trump at the wedding.  So they didn't actually have to take my

15   client's photograph and exploit it, but they chose to for no

16   other reason than to enhance their article.  I think the case

17   law is pretty clear --

18           THE COURT:  Thank you.  Let me just pause you, because

19   I will dedicate discussion specifically to the proposed motion.

20           Is there anything else you'd like to tell me about the

21   status of the case as a whole?

22           MR. FREEMAN:  I think that covered it.

23           THE COURT:  Thank you.

24           Counsel for defendant, what would you like to tell me

25   about the status of the case?

1          MS. BISHOP:  Thank you, your Honor.

2          We pretty much agree with counsel for plaintiff's

3   assessment of the status.  We've completed fact discovery.  I

4   just wanted to correct that we actually disclosed three experts

5   on the issue of damages, not two, but otherwise that was

6   accurate.  And we are ready to move forward with cross motions

7   for summary judgment.

8          THE COURT:  Thank you.

9          Let me hear from counsel for the defendant in the

10  first instance regarding the proposed motion and the basis for

11  it.

12          MS. BISHOP:  Sure.

13          As counsel for plaintiff indicated, we do believe the

14  primary issue here is going to be fair use on these cross

15  motions, and we're going to move for summary judgment on our

16  fair use defense.  You know, as counsel for plaintiff pointed

17  out, the plaintiff here was not a professional photographer,

18  but this case is different than a lot of other photograph

19  copyrights for a number of other reasons, including that this

20  plaintiff has testified very clearly and very specifically that

21  he took this photograph just for his own personal use.  He

22  never had any intention of licensing it or disseminating it for

23  any reporting use purposes.  So when my client used it in that

24  way, my client really did transform it into a totally different

25  use and totally different purpose in connection with a

1    news-worthy article about the President's actions.

2            THE COURT:  I'm sorry.  Why does this go to

3    transformation as opposed to damages?

4            MS. BISHOP:  Because plaintiff and defendant used --

5    plaintiff took the photograph for one purpose, which was for

6    his own personal use and explicitly not for licensing or

7    dissemination, and Hearst used it specifically for news

8    reporting which is one of the preamble -- one of the classic

9    fair uses listed in the preamble of the --

10           THE COURT:  So is it defendant's view that it is

11   transformative whenever an image that was not intended to be

12   published is then published for news purposes?

13           MS. BISHOP:  No, not in every instance, but we think

14   in this instance when you consider all four of the fair use

15   factors, it is.  Part of that does involve a consideration of

16   the fourth fair use factor of the impact on any market, again,

17   where plaintiff testified that he never -- there was never any

18   market, but he nonetheless gave the photograph to a person who

19   he didn't know how that other person was going to use the

20   photograph which led to it being available publicly, and so we

21   think that also factor four weighs in favor of a finding of

22   fair use here.

23           THE COURT:  Thank you.

24           Can you expand on that somewhat?  Factor four is, as

25   you've recited in your letter, the effect of the use upon the

1   potential market for value of the copyrighted work.

2           MS. BISHOP:  Right.

3           THE COURT:  Why does the test include whether or not

4   the author intended themselves to avail themselves of the

5   potential market for or value of the --

6           MS. BISHOP:  Sure.  There's actually Second Circuit

7   case law that speaks very clearly to this point that holds that

8   where a copyright defendant used a work in a market that the

9   copyright owner has no intent to occupy in the first place,

10  that there has not been an impact on the actual or potential

11  market for the copyrighted right.  It's in -- Second Circuit.

12  I don't have the citation in front of me.

13          THE COURT:  Thank you.  Proceed.

14          MS. BISHOP:  We also believe that factor two also

15  weighs in favor of a finding of fair use here.  That's the

16  consideration of the nature of the copyrighted work where

17  courts generally look to how factual on the one hand a work is

18  and how creative on the other hand it is.  In this case, the

19  plaintiff testified that he basically did not exercise any

20  creative judgment.  He just, as soon as the president entered

21  the room, he started taking serial photos probably in a burst

22  fashion on his cell phone.  We think factor two weighs strongly

23  in Hearst's favor.

24          We also recognize that while some courts have not

25  given as much weight to this factor, again, as counsel for

1   plaintiff pointed out, technology has changed, and we think in

2   a world where everyone has a camera in their cell phone,

3   putting more weight on factor two is appropriate.

4           And with respect to the third factor, the amount of

5   substantiality of the work that was used, that is really

6   neutral in this instance because it would not be possible to

7   use this photograph for adverse purposes without using all of

8   it or without using most of it, and there is clear case law on

9   that point as well where in order to use the work in a

10  transformative way, you have to use all of it and this factor

11  is neutral.

12          THE COURT:  Did I miss it, did you address the first

13  factor?

14          MS. BISHOP:  That was my opening on transformativeness

15  purposes.  It's our position that -- well, the fact that there

16  is clear Second Circuit law that says that when a defendant's

17  use is within one of the preamble uses listed in the beginning

18  of Section 107 of the Copyright Act, there's a presumption that

19  factor one weighs in favor of the defendant.

20          That's only all the more clear here because, again,

21  the plaintiff testified very clearly what his purpose was in

22  taking the photo, and Hearst used it for an entirely different

23  purpose, and did add to it with an entire article on commentary

24  and was reporting on very timely events concerning the

25  president.

 1          THE COURT:  Than you.

 2          Can you expand on that argument?  I'll see your

 3  briefing on it, but I understand this is arguably a newsworthy

 4  topic and that an article accompanied the image.  But why is

 5  the fact that the subject matter of the photograph was

 6  newsworthy and the fact that an article was written to

 7  accompany the work sufficient to establish transformative use?

 8          MS. BISHOP:  Well, your Honor, I'm not sure that, you

 9  know, in a different case it necessarily would be, but in this

10  case where, again, the purpose that the plaintiff had in taking

11  the photo and using the photo himself was so different, fair

12  use case law does look very much to the express purpose of both

13  parties and the reason that they're using the image, or other

14  copyrighted work.  And in this instance Hearst used it in a

15  completely different way than plaintiff did.

16          THE COURT:  And different use you understand to

17  establish that per se transformative use?

18          MS. BISHOP:  A use for a different purpose also

19  adding, again, substance in the form of a news article and

20  reporting on the President's actions.

21          THE COURT:  Thank you.

22          What is the case law that you point me to for that

23  argument?

24          MS. BISHOP:  The *Nunez* case out of the First Circuit,

25  which we cited in our letter is on point as was the District of

1    Virginia case we cited.  There is more.  There is an Eleventh

2    Circuit case.  I don't have that cite in front of me, but we

3    will fully brief this issue.

4              THE COURT:  Why do you think that this is an issue

5    that is appropriately before the Court on summary judgment?

6              MS. BISHOP:  The facts are not -- I don't believe the

7    key underlying facts are in dispute here, and as your Honor is

8    well aware, balancing for fair use can be resolved in summary

9    judgment where the underlying material facts are not in

10   dispute.  So the parties have taken the position that this can

11   be resolved as a matter of law.

12             While we recognize that may not be the case, your

13   Honor may find factual issues or some balancing of these

14   factors where it really cannot be determined without serving it

15   to a jury, we do think that there's enough here that weighs in

16   our favor that this could be found as fair use as a matter of

17   law.

18             THE COURT:  Thank you.

19             Could counsel for plaintiff, what's your view

20   regarding the fair use defense?  And then I'd like to invite

21   you to speak regarding the basis for your alternative motion.

22             MR. FREEMAN:  Sure.  Thank you, your Honor.

23             With respect to the first factor, there's actually

24   three sub-factors.  The first is the transformative use.  The

25   second is whether or not the purpose is commercial or

1    non-commercial.  And there is actually a third sub-factor,

2    which is whether or not the image was taken in bad faith.

3          Now, your Honor can find with respect to the third

4    sub-factor that when Hearst posts a photograph to esquire.com,

5    in this case, the editor has to fill out a form online which

6    identifies the copyright holder as well as the name of the

7    photographer.  I'm holding the document here which they

8    produced.  The editor in this case, Peter Wade, he didn't fill

9    out the copyright holder.  He made no investigation whatsoever

10   as to who the copyright holder was.  He didn't fill out the

11   photographer name.  He just appropriated it right from

12   Instagram and published it to the world.  That in my view,

13   because the fair use doctrine implies good faith and fair

14   dealing.  The Supreme Court has held that.  There is no good

15   faith and fair dealing when you haven't made any inquiry

16   whatsoever with respect to the copyright holder's name.

17         In terms of transformativeness, which is the first

18   sub-factor, when you look at the body of law on

19   transformativeless starting with the Supreme Court case in

20   *Acuff-Rose v. Campbell*, which was a case involving the a

21   hip-hop group who did a parody of the Roy Orbison song *Pretty*

22   *Woman*.  You're talking about the transformative of the work

23   itself.  You're not talking about whether or not you're

24   transforming it from a non-commercial use to commercial use.

25   Same thing in *Cariou v. Prince*.  That's a Second Circuit

holding.  They're talking about an appropriation artist who took a photograph of a Rastafarian and essentially did like a collage or applied spray paint to it and transformed the work itself.

Here, they haven't done anything.  This is an article about Donald Trump crashing a wedding.  My client took the photograph because it was a picture of Donald Trump crashing a wedding.  That's just -- I mean, it's a visceral reaction for him to take the photograph, and he certainly did publish it. He shared it with another guest at the wedding.  Whether or not he intended to commercially exploit it or not is beside the point.

They seem to be conflating two factors here.  They're basically saying it's transformative because they've "transformed it from a non-commercial newsworthy purpose to a commercial newsworthy purpose," and that in my view does not fit the criteria.

The cases they're citing *Nunez* and *Philpot*, both of them involve professional photographers.  In *Nunez*, which is a classic case, it's a First Circuit says from about 20 years ago, involved naked photographs of Ms. Universe or Ms. Puerto Rico Universe and, you know, she took the photographs before she was awarded the crown, and then once she was awarded the crown, it became this huge controversy over whether or not she was qualified to be Ms. Puerto Rico because she had posed in

I25QOTTc1

1      the nude.

2             So the defendant newspaper in that case had published

3      the photograph even though it was initially intended for a

4      modeling portfolio because it wanted to report on the

5      controversy surrounding whether or not Ms. Puerto Rico was

6      qualified to hold the crown.  I agree that's fair use because

7      it's in the public interest to know what Ms. Puerto Rico was

8      doing prior to her being awarded the crown.

9             Here again, they're just using the photograph to tell

10     the story of Donald Trump crashing a wedding, and my client was

11     the one who captured that photograph, and for whatever

12     reason -- they could say he's not a pro -- his photograph

13     resonated with the market.  There was an actual market which

14     works into the fourth factor because Yahoo published it, TMZ

15     published it, CBS published it.  So there was a market demand

16     for the photograph regardless of whether or not he intended it

17     to be used for commercial purposes.

18            And the copyright clause talks about authors.  It

19     doesn't talk about professional authors.  Anybody can be an

20     author.  It's a democracy.  So the idea that a large scale

21     media conglomerate can simply exploit whatever photograph it

22     wants that it obtains from social media just because it's a

23     picture of the President, that's not fair use.  It takes it --

24     you know, it takes the fair use doctrine -- it extends it too

25     far.

I25QOTTc1

```
1          So we believe that, I think that the fair use doctrine
2     here need to be dismissed, and to set sort of a precedent, and
3     I think there really isn't a clear-cut precedent in a case like
4     this that everyday, ordinary people who just happen to be in
5     the right place at the right time, whether it be taking a
6     picture of the President or taking picture of a terrorist
7     attack or taking a picture of a celebrity or whatever it is,
8     that if their photograph finds residence in the actual
9     marketplace of ideas, that there's an audience for their work,
10    that they deserve to be compensated even if they my have
11    another occupation.
12         THE COURT:  We will have the opportunity to discuss
13    all of this in depth later.  I understand the photograph was
14    posted on Instagram.  Is that right?
15         MR. FREEMAN:  Yes, your Honor.  It appears that the
16    photograph was -- after my client disseminated it to other
17    wedding guests, it ended up in the hands of the sister of the
18    bride.  Then the sister of the bride posted it to her Instagram
19    account; and then Peter Wade, who is the author of the
20    Esquire.com article, he located it at the Instagram page of the
21    sister of bride.  Like I said, he made no other inquiry.  He
22    just appropriated it, published it.
23         There's also a line of cases which holds that if
24    you're going to argue the fair use doctrine in court, there
25    needs to be some sort of analysis before the work is published
```

```
 1    as to whether or not it's fair use.  In other words, did Peter
 2    Wade send an email to the inhouse counsel saying, hey, is this
 3    fair use, can I publish this?  There has to be some sort of
 4    investigation.  Particularly when you're talking about a very
 5    sophisticated publisher who has an entire protocol in place as
 6    to how you license paragraphs for purposes of commercial
 7    exploitation.  It's clear here that was not done.
 8              So they're really raising the fair use defense ex post
 9    facto to skirt liability rather than in the manner it is
10    supposed is to be raised, whereas, you know, clients come to us
11    all the time and they say "I want to use this document in a
12    documentary.  Can we do it?  Is it fair use or do we have to
13    get a license?"  You have to have some sort of inquiry inhouse.
14    That didn't happen here.  They just published it.
15              THE COURT:  Thank you.
16              Out of curiosity, does it make a difference where the
17    average person photographer makes the image available?  So in
18    this instance he thought they made the image available on
19    Instagram, so it was at least available to set of friends.
20    Would it make a difference if the image had been posted in a
21    more public way accessible to a broader public than the
22    Instagram followers of the individual author?
23              MR. FREEMAN:  It's an interesting issue.  It's a very
24    nuanced issue because the Copyright Act in Section 1 is defined
25    as publication means.  There's actually two definitions.  The
```

I25QOTTc1

1    first one is you have to have some sort of commercial intent to

2    sale or license your work.  But there's a second definition.

3    The second sentence says that all you have to do is share with

4    a group of persons, so there doesn't have to be some sort of

5    commercial intent.

6           But to answer your question, I don't think there's

7    much of a difference.  I've seen courts sort of parse it out.

8    I know Judge Kaplan has a decision where he says the copyright

9    holder has to have a commercial intent, but that's not what

10   Congress intended because you can just share something with

11   your friends and it can still be considered published.  The

12   only time something wouldn't be published, for example, is if

13   you put the photograph on display in your home or in an art

14   gallery and you might have invited people to come in and

15   display it, that might not be considered publication.  But as

16   long as it meets the definition of publication, and also in

17   this case my client swiftly moved to register his work within

18   two or three days after the wedding.  The wedding was on a

19   Saturday.  It was published on a Sunday.  He was registering on

20   Monday when he found out that it was published commercially.

21   So it was a visceral reaction.  I think any jury is going to

22   relate to that because if you take a photograph and then you

23   wake up the next morning and find out it's being commercially

24   exploited by every media conglomerate in the United States.

25   You're going to take some action.  You're going to say, "Hey,

I25QOTTc1

1    where's my cut?  How about me?"  Not to mention, this

2    photograph didn't even attribute my client.  I mean, with fair

3    use, at the very least you should at least give fair

4    attribution to the creator of the work, but again, they didn't

5    make that step here.

6            In terms of publication, it's an excellent question

7    that your Honor asked.  I don't think the law is well settled

8    in that area, and I think that this case is going to help

9    provide some clarity to that in terms of publication, is it the

10   copyrighted holder's intent in terms of publication?  What

11   happens when he just gives it to one person and that person

12   publishes it to the world?  Is the intent going to be measured

13   at the time that it is published in Instagram or is the intent

14   going to be measured at the time when he disseminated the

15   photograph to the one wedding guest?  I honestly don't have an

16   answer for that because the case law hasn't addressed this

17   particular factual scenario.

18            THE COURT:  Thank you.

19            I ask counsel for plaintiff what view he was

20   regarding, whether the Court is able to or will be able to

21   decide this issue on summary judgment.  My understanding is

22   that the parties agree regarding the facts relevant to this

23   issue such that the Court can properly weigh the factors on its

24   own and make a determination regarding whether the fair use

25   defense is available.  What's your view?

1          MR. FREEMAN:  The fair use doctrine is an expression

2     of law and fact.  There are cases where there might be certain

3     factual issues that the jury has to decide.  But I would say

4     that 90 percent of the cases, particularly in this district in

5     this circuit, the fair use case is decided as a matter of law

6     on summary judgment every now and then on Rule 12, although

7     that's not relevant here.  I haven't seen a Rule 56.1 yet.  I

8     don't know if there's going to be a lot of fact -- I don't

9     think there's going to be many factual issues in dispute in

10    this case.  There might be.  I will need to see their brief.

11         I'm confident that your Honor can decide the fair use

12    defense on summary judgment.  I have different views, however,

13    on the issue of willfulness, which they raise in their letter

14    where they are saying willfulness is the state of mind of

15    defendant.  But when Hearst gets sued for copyright

16    infringement case, they're sort of walking into court crippled

17    because there's a whole slew of cases that say as long as

18    you're in the business of exploiting copyrighted material,

19    you're charged with knowledge of U.S. copyright law and of

20    licensing procedures, and if you fail to abide by them, that's

21    reckless disregard for the copyright holder's rights.

22         Of course, as we pointed out earlier, we also had

23    documentary evidence showing that Peter Wade, the editor of the

24    article, did not follow Hearst's own procedures in terms of

25    entering the copyright claimant and author.

I25QOTTc1

1          So we don't think willfulness stands a chance on

2     summary judgment.  They've intended to make that argument and

3     we will certainly oppose.

4          THE COURT:  Thank you.

5          Let me hear from counsel for defendant about the

6     proposed motion for summary judgment regarding the lack of

7     evidence of willfulness.

8          Counsel?

9          MR. FREEMAN:  Sure, your Honor.

10          I think plaintiff's counsel said it very well in that

11     their motion or their opposition -- our motion is going to be

12     based on the fact that there is simply not enough evidence for

13     any reasonable juror to conclude that this was willful.

14          Plaintiff's position is essentially that just because

15     Hearst is a mass media company that has been sued for copyright

16     infringement before, it is essentially always on the hook for

17     willfulness damages.  We don't believe there is any case law

18     that says that that alone is sufficient.  It might be a

19     consideration, but standing alone, it's not sufficient.

20          And notwithstanding counsel's representation that

21     there are documents, there's no evidence in the record speaking

22     as to what Hearst policies and practices are nor to what that

23     particular is document is gesturing to means as to how it

24     should be interpreted.  So it is our position that there is

25     actually insufficient evidence in the record of which anyone

can make a finding of willfulness.

THE COURT:  Thank you.

Is the existence of the document that counsel for plaintiff alluded to in dispute?  In other words, what he proffered was that there's a document which an editor is supposed to complete with the information regarding copyright holder for any particular image that was not completed here.

MS. BISHOP:  The document exists and we produced it, but his interpretation of the document we have a disagreement about.

THE COURT:  Thank you.

And that document and its existence does not in defendant's view give rise to a material issue of fact that would preclude summary judgment on this issue?

MR. FREEMAN:  No.

THE COURT:  Thank you.  Good.

Counsel for plaintiff, what's your view on the willfulness?  You've already spoken some on the topic.  Any further comments?

MR. FREEMAN:  I would just say I think the document speaks for itself and the fact that it's clear there's a field on the computer which the editor needs to enter information into, one of which says "copyright" and then it has like a down arrow, and they are supposed to enter the term, it's blank. The next one is "photographer name," and he fills it out

1   "Instagram@LauraMP11."  Well, that's not a photographer's name.

2   I think any fact finder could look at this and say, well, this

3   guy, he jumped the gun.  He did not complete this form, which

4   is clearly a part of Hearst's ordinary practices.  And their

5   expert witness has testified in his report over and over that

6   it's their ordinary course of business to license photographs.

7   That's what they do.  They're in the business of licensing

8   creative content.  So this is obviously a field that needed to

9   be completed, and we think that any fact finder can find that

10  this is an incomplete form.  There's no copyright holder

11  listed.  There's no photographer name listed.  Even when it

12  says "image rights," he fills in "no rights."  I mean, that's

13  clearly an issue of fact.  In terms of their statement that,

14  well, just because we're in the industry of exploiting

15  copyrights doesn't mean that we're automatically willful.

16  Well, I'm not going to say, you know, I don't think that it's a

17  per se finding, but I could literally cite dozens of cases

18  where the fact that Hearst has been sued over 12 times in this

19  district alone in the last three years for copyright

20  infringement, and the fact that they are a sophisticated

21  publisher that has inhouse counsel, they're charged with

22  knowledge of copyright law.  And willfulness, we have to

23  remember, it doesn't mean bad faith.  It doesn't mean they're

24  conniving or anything like that.  All it means that they're

25  willfully blind or acted in reckless disregard for the

1  copyright holder's rights.  Just the mere fact they didn't

2  identify who the copyright holder was before they published

3  this photograph, in my view certainly satisfies that standard.

4  And if it doesn't, it certainly is enough to get to a fact

5  finder.

6          THE COURT:  Thank you.

7          Counsel for plaintiff, I understand that you also seek

8  summary judgment with respect to the infringement claim itself?

9          MS. BISHOP:  Correct.

10          THE COURT:  Can you speak to that?

11          MS. BISHOP:  Yes.  There's two elements.  There is the

12  validity of the copyright, which talks about the ownership and

13  originality, and the second element is actual copy.  Here

14  they've already admitted in their answer that they actually

15  copied the photograph, and so we don't even need to make -- you

16  know, that's a couple lines in our brief in terms of second

17  element.

18          In terms of the first element, like I say, we have our

19  firm we represent a lot of photographers, and we actually have

20  three full-time employees nine to five who all day every day

21  fill out copyright registration forms.  With this particular

22  photograph, they registered it.  We have copies of the deposit

23  that was put on to the U.S. Copyright office.  We obviously

24  have the certificate of registration, which because it was

25  within the last five years, we're entitled to the presumption

I25QOTTc1

1    of validity.  The burden, therefore, shifts, so there's a

2    rebuttable presumption that the copyright registration is

3    valid.  The burden then shifts to Hearst to prove that it was

4    invalid.

5             How do you prove it's invalid?  Well, essentially, the

6    cases hold that you have to show that Jonathan Otto defrauded

7    the copyright office.  Now, it's remarkable that in this case

8    and many other cases we often sue and sometimes they challenge

9    validity, but, look, the copyright materials that are on

10   deposit with the copyright office, they're a matter of public

11   record.  All they got to do is fill out a form and pay a

12   hundred bucks, and they can get a certified copy from the U.S.

13   Copyright Office to determine whether or not the photograph's

14   on deposit.  They haven't done that here, and that's their

15   burden because they have to prove invalidity.  All we need to

16   do is come into court with a copy of the certificate and an

17   affidavit from the client saying, yes, we registered, and then

18   the burden shifts to them.  So they haven't satisfied their

19   burden.  You know, there's no evidence on the record whatsoever

20   that my client defrauded the copyright office.  There was in

21   deposition testimony where they inquired as to my client's

22   knowledge about the actual process of registering the

23   photograph.  He's a lay person.  He didn't really know.  He

24   says, well, my lawyers did it, but that's not going to be

25   enough evidence to prove that it's an invalid copyright.  So I

I25QOTTc1

1    think with respect to the first element, we prove it hands

2    down.  Second element, it's been admitted.  We shift right to

3    the affirmative defenses.

4              THE COURT:  Thank you.

5         So I've reviewed the proposed briefing schedule for

6    the motion.  The deadlines that are proposed would have

7    plaintiff's opening brief presumably limited to the issue of

8    liability be due on February 19.  The defendant's opening in

9    opposition, presumably in opposition with respect to the

10   liability issue to the extent that they have one independent

11   fair use defense, and then opening with respect to the

12   willfulness and fair use defense are due a month thereafter.

13        The parties have proposed that defendant's brief would

14   be 50 pages long.  Why so many pages, counsel?

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        MS. BISHOP:  That was actually plaintiff's counsel

2   initial proposal, which we agreed to; but I believe it is the

3   combination of the two 25-page brief that we would be entitled

4   to if they were separate briefs.

5        THE COURT:  So no more than 25 pages will be dedicated

6   to imposing the liability issue and approximately 25 pages will

7   be dedicated to the fair use and willfulness arguments?

8        MS. BISHOP:  That's correct, but I very much doubt

9   we'll use all 50 pages.

10        THE COURT:  Good.  Thank you.

11        With that understanding, I am happy to endorse the

12   proposed page limits and the proposed schedule.

13        Counsel for plaintiff has suggested that he does not

14   yet know what is going to be in the defendant's 56.1 statement.

15   I understand that that will not be prepared most likely until

16   around the time that the defendant's opening is due.  I am

17   happy for to us proceed in the ordinary course.  This may be a

18   situation in which essentially a stipulated set of facts would

19   be valuable.  I am not going to require that you present me

20   with one, but I just ask to the extent possible that you confer

21   to the extent that there are disputed issues in advance to the

22   extent that those may make it difficult or impossible for me to

23   rule on this in the context of summary judgment motion.  In any

24   event, I will endorse the schedule as proposed.  I will endorse

25   the page limits that the parties have proposed.

I25QOTTc1

```
1          Let me refer to my rules for 56.1 statements and
2    district's rules.  My rules are not that unique.  Basically
3    they require that the party who is opposing a 56.1 statement
4    cut and paste the opposing side's statements and paste beneath
5    their statements your statement of fact.  Remember the 56.1
6    statement is not an answer so you cannot simply deny an
7    asserted statement of fact by the opposing side.  If you simply
8    say "deny," I will treat it as an admission.  Instead, in the
9    same way that the moving party has an obligation to point the
10   Court to record evidence in support of their statement, you
11   should state in opposition what specifically your view is
12   regarding the relevant fact and you should point me to record
13   evidence that supports your view.  If you fail to point me to
14   record evidence that supports your view and instead simply give
15   me a categorical denial without reference to record evidence,
16   as I say I will treat that as an admission of the relevant
17   fact.
18          Please, when you are providing me with your papers
19   give me full copies of the depositions in text searchable
20   format to the extent that you provide me with depositions.
21   Please review my individual rules regarding courtesy copies.
22   They require that you give me two courtesy copies of everything
23   in binders with tabs marking each of the relevant exhibits and
24   affidavits.
25          Is there anything else that we should talk about
```

I25QOTTc1

before we adjourn?  I do want to raise with the parties whether
there is anything I can do to help facilitate a resolution of
the case.  Summary judgment motion practice is generally
speaking expensive and time-consuming.  This is a good
opportunity for the parties to engage substantively in a
discussion about resolving the case.

             How can I help with that, counsel for defendant?

             MS. BISHOP:  Thank you, your Honor.

             We actually had a settlement conference back in
October before Judge Cott, which did not result in a
settlement.  At this point we are not optimistic that the
parties are close enough together to have a more productive
settlement talk at this point.  We are of course willing and
always are willing to continue discussing settlement informally
and open to hearing new demands and making new offers as things
proceed.

             You also asked if we had anything else to raise and
there was one issue we wanted to raise just briefly before your
Honor.  At the end of fact discovery, we learned of some
misconduct by plaintiff and counsel that began during the
initial October settlement conference with Judge Cott and
continued throughout the discovery period.  We believe we need
to raise this issue with the Court, but given that it commenced
during the confidential session with Judge Cott, we thought
that it would be best raised before him --

1          THE COURT:  Thank you.

2          MS. BISHOP:  -- in the first instance.

3          THE COURT:  Let me just take that up.

4          Yes, to the extent that the issue arises from conduct

5    during the mediation session, I will request that you take it

6    up with Judge Cott in the first instance.  I say that first

7    because the those conferences are confidential.  I don't know

8    of any fact that it was not successful what happened during it.

9    I don't need to know what happened during it and will not

10   inquire.  So to the extent there is an issue that you want to

11   bring up with respect to this issue, please do bring it to

12   Judge Cott in the first instance.

13         To the extent that the issue is -- I will call it --

14   broader than what happened this context of the mediation

15   itself, it may be that the issue falls outside of the scope of

16   my current reference to Judge Cote in which case I will

17   consider.  If the parties think it is appropriate, and in

18   particular if Judge Cott thinks it is appropriate, referring

19   the entire issue to him for resolution.

20         Let me ask this question:  Is this an issue that can

21   be worked on and resolved in parallel to the substantive

22   litigation of the issues that we have been discussing?

23         MS. BISHOP:  We believe so.  It doesn't impact the

24   grounds for summary judgment that both parties intend to move

25   on.

1          THE COURT:  Thank you.

2          Do you know what the issue is, counsel for plaintiff?

3          MR. FREEMAN:  I do and I would like to make a

4    preliminary note that I made a notice of appearance in this

5    case in November and that settlement conference and the

6    plaintiff's counsel that they are referring to was original

7    Richard Liebowitz.  So I want to make that point of

8    clarification.

9          THE COURT:  Fine.

10         MR. FREEMAN:  I am aware of it, but it is dealing with

11   an interpretation of a settlement agreement and how it relates

12   to a licensing agreement.  So it is a damages issue.

13         THE COURT:  I don't need to know anything more about

14   the substances of it.

15         The one thing I would suggest is to the extent this is

16   properly framed like a motion for sanctions with respect to

17   discovery, that most likely falls outside the scope of my

18   current reference to Judge Cote.  In order for me to put that

19   in front of him more formally, I would ask that you request

20   that I refer that issue to Judge Cott so that I can do so.  To

21   the extent that this is not going to impact the litigation of

22   the substance of the case going forward before me, I think it

23   properly would make sense for me to refer to Judge Cott so that

24   you can handle this issue before him on a separate track.

25         Counsel for plaintiff, anything further?

I25QOTTc1

1              MR. FREEMAN:  That's it, your Honor.

2              THE COURT:  Counsel for defendant, anything further?

3              MS. BISHOP:  No, your Honor.

4              THE COURT:  Thank you all.

5              This proceeding is adjourned.

6                               o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25