IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JONATHAN OTTO,

        Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,

        Defendant.

C.A. No. 1:17-cv-04712-GHW

**ORAL ARGUMENT REQUESTED**

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jonathan R. Donnellan
Ravi V. Sitwala
Jennifer D. Bishop
THE HEARST CORPORATION
  Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
jdonnellan@hearst.com
rsitwala@hearst.com
jbishop@hearst.com

*Counsel for Defendant Hearst
Communications, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

UNDISPUTED FACTUAL BACKGROUND.......................................................................2

    Plaintiff Jonathan Otto and the Snapshot.......................................................................2

    The Esquire.com Article .................................................................................................4

    This Lawsuit....................................................................................................................5

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT ........................................................................................................................8

    I.      HEARST'S NEWS ARTICLE IS A FAIR USE OF THE SNAPSHOT ...............8

          A.     The Purpose and Application of the Fair Use Doctrine in
               Copyright Law ...........................................................................................8

          B.     The Purpose and Character of Hearst's News Reporting and
               Commentary Strongly Favors a Finding of Fair Use.................................11

               1.     Hearst used the Snapshot for news reporting and
                      commentary....................................................................................11

               2.     Hearst's use of the Snapshot was transformative .........................13

                     i.     Hearst used the Snapshot for a new purpose,
                           adding new context and meaning......................................13

                     ii.    The Court should reject Plaintiff's unprecedented and
                          limited theory of transformative use in news reporting.....17

                 3.     Hearst's for-profit status is irrelevant ...........................................20

                 4.     Plaintiff's allegations of bad faith are factually and legally
                        misplaced ......................................................................................21

          C.     The Published, Factual Nature of the Snapshot Weighs Heavily in
                Favor of Fair Use ......................................................................................24

                 1.     The Snapshot is published and is factual, not creative .................24

2.    The candid, factual nature of the Snapshot is integral to the fair use analysis, particularly in the context of Hearst's news reporting use ..........................................................26

D.    The Article's Use of the Majority of the Snapshot Was Reasonable in Light of its Purpose, and Does Not Favor Either Party ........................28

E.    The Article Had No Effect Upon Plaintiff's Market for the Snapshot—No Such Market Even Exists ..................................................30

1.    There is no presumption of market harm applicable in this case ........................................................................................31

2.    There is no market harm because Plaintiff never intended to enter the licensing or publishing marker for the Snapshot ...................32

3.    Even if Plaintiff intended to market the Snapshot, there is no evidence of cognizable market harm caused by Hearst's transformative use ............................................................................34

F.    The Balance of the Factors, and the Purpose of Copyright, Establish that Hearst's Article Was a Fair Use ................................................................35

II.    OTHER ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFF ON LIABILITY ................................................37

III.    PLAINTIFF CANNOT ESTABLISH WILLFUL INFRINGEMENT .................40

CONCLUSION ................................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................7

*Ascend Health Corp., UHP, LP v. Wells*,
  No. 4:12-cv-00083, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013)......................................15

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
  931 F. Supp. 2d 537 (S.D.N.Y. 2013)......................................................19, 20, 33

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)............................................................................ *passim*

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)..............................................................8, 9, 20, 30

*Baez v. JetBlue Airways Corp.*,
  793 F.3d 269 (2d Cir. 2015)...............................................................................7

*Balsley v. LFP, Inc.*,
  691 F.3d 747 (6th Cir. 2012) ..........................................................................19

*Barcroft Media Ltd. v. Coed Media Grp., LLC*,
  No. 16-CV-7634 (JMF), 2017 WL 5032993 (S.D.N.Y. Nov. 2, 2017)......................... *passim*

*Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*,
  386 F. Supp. 2d 324 (S.D.N.Y. 2005)........................................................12, 35

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)........................................................................ *passim*

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)........................................................................ *passim*

*Bollea v. Gawker Media, LLC*,
  913 F. Supp. 2d 1325 (M.D. Fla. 2012).......................................................20, 31

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) .......................................................................15, 29

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F. Supp. 3d 395 (S.D.N.Y. 2016).......................................................12, 16, 19

*Calkins v. Playboy Enters. Int'l, Inc.,*
   561 F. Supp. 2d 1136 (E.D. Cal. 2008)................................................................14, 16, 29, 32

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994).............................................................................................. *passim*

*Cariou v. Prince,*
   714 F.3d 694 (2d Cir. 2013)..........................................................................17, 28, 31, 32

*Castle Rock Entm't v. Carol Publ'g Grp., Inc.,*
   150 F.3d 132 (2d Cir. 1998)........................................................................................20

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..............................................................................................7, 40

*Cleveland v. Policy Mgmt. Sys. Corp.,*
   526 U.S. 795 (1999)...................................................................................................15

*Dedyo v. Baker Eng'g N.Y., Inc.,*
   No. 96 Civ. 7152 (LBS), 1998 WL 9376 (S.D.N.Y. Jan. 13, 1998).......................................40

*Dhillon v. Does 1-10,*
   No. C 13-01465 SI, 2014 WL 722592 (N.D. Cal. Feb. 25, 2014)................................. *passim*

*Dillon v. Morano,*
   497 F.3d 247 (2d Cir. 2007)........................................................................................38

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)............................................................................................8, 9, 36

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991)....................................................................................................9

*Fitzgerald v. CBS Broadcasting, Inc.,*
   491 F. Supp. 2d 177 (D. Mass. 2007)............................................................12, 19, 25, 33

*Galvin v. Ill. Republican Party,*
   130 F. Supp. 3d 1187 (N.D. Ill. 2015).............................................................15, 25, 30

*Goenaga v. March of Dimes Birth Defects Found.,*
   51 F.3d 14 (2d Cir. 1995).............................................................................................7

*Golan v. Holder,*
   565 U.S. 302 (2012)...................................................................................................9

*Gottlieb v. Cty. of Orange,*
   84 F.3d 511 (2d Cir. 1996)...........................................................................................7

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985).............................................................................................10, 22, 23

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998)...............................................................................................19

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005)...............................................................................................40

*Jeffreys v. City of N.Y.*,
  426 F.3d 549 (2d Cir. 2005)..................................................................................................7

*Katz v. Google, Inc.*,
  802 F.3d 1178 (11th Cir. 2015) ..........................................................................14, 25, 28, 29

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ...............................................................................................29

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
  143 F. Supp. 3d 898 (E.D. Mo. 2015)..................................................................................14

*Kienitz v. Sconnie Nation LLC*,
  766 F.3d 756 (7th Cir. 2014) ...............................................................................................30

*L.A. News Serv. v. KCAL-TV Channel 9*,
  108 F.3d 1119 (9th Cir. 1997) .............................................................................................19

*Lebada v. N.Y.C. Dep't of Educ.*,
  No. 14 Civ. 758 (LAK) (GWG), 2016 WL 626059 (S.D.N.Y. Feb. 8, 2016).......................38

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998)...............................................................................................27

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
  No. 13 C 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014) ..................................................15

*Liebovitz v. Paramount Pictures Corp.*,
  No. 94-cv-9144, 2000 WL 1010830 (S.D.N.Y. 2000) ...........................................................26

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995)..................................................................................................40

*Louise Paris, Ltd. v. Standard Fabrics Int'l, Inc.*,
  No. 15 Civ. 3250 (PKC), 2016 WL 4203548 (S.D.N.Y. Aug. 8, 2016)..................................37

*Mathieson v. Associated Press*,
  No. 90 Civ. 6945 (LMM), 1992 WL 164447 (S.D.N.Y. June 25, 1992)..............12, 14, 20, 22

*Mavrix Photographs LLC v. Sandra Rose LLC*,
  No. 2:15-cv-00596-CBM-AGRx, 2016 WL 6246408 (C.D. Cal. Apr. 6, 2016)...................19

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007).............................................................................................7

*Monge v. Maya Magazines, Inc.*,
  688 F.3d 1164 (9th Cir. 2012) ...................................................................................24, 30

*Monster Communications, Inc. v. Turner Broadcasting System, Inc.*,
  935 F. Supp. 490 (S.D.N.Y. 1996)....................................................................................26

*Murphy v. Millennium Radio Grp. LLC*,
  650 F.3d 295 (3d Cir. 2011)..............................................................................................19

*New Era Publ'ns Int'l ApS v. Carol Publ'g Grp.*,
  904 F.2d 152 (2d Cir. 1990).............................................................................................27

*North Jersey Media Grp. Inc. v. Pirro*,
  74 F. Supp. 3d 605 (S.D.N.Y. 2015).................................................................................25

*Nunez v. Caribbean Int'l News Corp.*,
  235 F.3d 18 (1st Cir. 2000)...........................................................................14, 16, 29, 30

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004)............................................................................11, 12, 20, 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .....................................................................................14, 29

*Philpot v. Media Research Center Inc.*,
  279 F. Supp. 3d 708 (E.D. Va. 2018) .......................................................................14, 16, 33

*Psihoyos v. Nat'l Examiner*,
  No. 97 Civ. 7624 (JSM), 1998 WL 336655 (S.D.N.Y. June 22, 1998)............................19, 30

*Psihoyos v. Nat'l Geographic Soc'y*,
  409 F. Supp. 2d 268 (S.D.N.Y. 2005)................................................................................25

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) .........................................................................................25

*Reynolds v. Hearst Commc'ns, Inc.*,
  No. 17-cv-6720 (DLC), 2018 WL 1229840 (S.D.N.Y. Mar. 5, 2018) .............................39, 41

*Richard Feiner & Co., Inc. v. H.R. Industries, Inc.*,
  10 F. Supp. 2d 310 (S.D.N.Y. 1998)..................................................................................20

*Richard Feiner & Co., Inc. v. H.R. Industries, Inc.*,
    182 F.3d 901 (2d Cir. 1999)..............................................................................20

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
    521 F. Supp. 2d 188 (E.D.N.Y. 2007) ......................................................11, 28

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
    489 F.3d 474 (2d Cir. 2007)..................................................................................9

*Satava v. Lowry*,
    323 F.3d 805 (9th Cir. 2003) ..............................................................................25

*Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*,
    No. C 09-1468 (SBA), 2009 WL 2157573 (N.D. Cal. July 17, 2009) ..............15, 29

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ............................................................................28

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).......................................................................................20, 31

*Star Ins. Co. v. Hazardous Elimination Corp.*,
    No. 05-4762, 2007 WL 316569 (E.D.N.Y. Jan. 30, 2007) ...................................40

*Suntrust Bank v. Houghton Mifflin Co.*,
    268 F.3d 1257 (11th Cir. 2001) ............................................................................9

*Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg, L.P.*,
    756 F.3d 73 (2d Cir. 2014) .........................................................................*passim*

*Time, Inc. v. Bernard Geis Assocs.*,
    293 F. Supp. 130 (S.D.N.Y. 1968)..........................................................13, 33, 34

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)........................................................................32, 41

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ..............................................................................14

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*,
    No. 98 Civ. 7128 (BSJ), 2001 WL 1518264 (S.D.N.Y. Nov. 28, 2001) ..............12, 16, 30, 35

*Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*,
    707 F.2d 680 (2d Cir. 1983)................................................................................39

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991).......................................................................*passim*

*Zomba Enters., Inc. v. Panorama Records, Inc.*,
491 F.3d 574 (6th Cir. 2007) ................................................... 23

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
No. 16 Civ. 6110 (AKH), 2017 WL 2829517 (S.D.N.Y. June 29, 2017) .............................. 37

**Statutes and Rules**

17 U.S.C. § 107 ...................................................................................................... *passim*

17 U.S.C. § 410(c) ................................................................................................ 37

17 U.S.C. § 411(a) ................................................................................................ 37

17 U.S.C. § 504 .................................................................................................. 40, 41

Fed. R. Civ. P. 56 ................................................................................................ 7

**Other Authorities**

Aaron Smith, "Record shares of Americans now own smartphones, have home
broadband," Pew Research Center (Jan. 12, 2017),
http://www.pewresearch.org/fact-tank/2017/01/12/evolution-of-technology/; ..................... 27

Caroline Cakebread, "People will take 1.2 trillion digital photos this year—thanks
to smartphones," Business Insider (Aug. 31, 2017),
http://www.businessinsider.com/12-trillion-photos-to-be-taken-in-2017-
thanks-to-smartphones-chart-2017-8 ................................................. 27

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05 (2011) ............. 14, 18, 27

Mobile Fact Sheet, Pew Research Center (Feb. 5, 2018),
http://www.pewinternet.org/fact-sheet/mobile/ ..................................................... 27

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ........................... 8

Defendant Hearst Communications, Inc. ("Hearst") respectfully submits this memorandum of law in support of its accompanying Motion for Summary Judgment and in opposition to Plaintiff's Motion for Partial Summary Judgment (ECF No. 36) (the "Motion").

## INTRODUCTION

This case is an abuse of the Copyright Act.  Plaintiff Jonathan Otto ("Plaintiff") is a self-described "guy with an iPhone" (Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, ECF No. 37 ("Pl. Br.") 1) and a Vice President at Deutsche Bank who happened to be invited to a wedding at which President Trump made a surprise appearance. When the President entered the room, Plaintiff "just started taking photos" on his iPhone, intending to create snapshots "[j]ust for personal use" to capture an "important memory."  He did not intend to license or otherwise commercially exploit the images or publish them on his social media accounts, and even handed one image to another wedding guest without imposing any restrictions on that guest's dissemination of the photo.  Yet now he is trying to extract a "cut" from Hearst—of up to $150,000—based on Hearst's transformative use of that image in a news article that comments on the picture as part of a broader story about the President's apparent fondness for crashing weddings and being photographed doing so.

Unfortunately for Plaintiff, the purpose of copyright is ***not*** to allow every man on the street to claim a windfall from each random snapshot he takes on his cell phone.  Copyright exists to expand public knowledge and understanding by providing a financial incentive to create, and the fair use doctrine bars infringement suits that do not advance that purpose and would impinge the First Amendment rights of defendants.  This is just such a case, and Plaintiff is only able to argue otherwise by entirely ignoring both the text of Hearst's article and his own deposition testimony.  The actual, undisputed facts in the record make clear that imposing

liability on Hearst would only **decrease** public knowledge and expression without stimulating more creation:  among other things, Hearst's article used the image for a new and publicly beneficial purpose, whereas Plaintiff never intended to license his snapshot for news or any other purpose and plainly did not need the financial incentive of copyright to create the image. Hearst's article is thus a fair use as a matter of law, and this case should be dismissed in its entirety.

Even if Hearst's article were not a fair use (and it is), the record does not permit a grant of summary judgment for Plaintiff because it contains material questions of fact as to whether he possesses a valid copyright registration for the image at issue and whether he relinquished the right to sue Hearst.  At the same time, Hearst is entitled to partial summary judgment on Plaintiff's claim for enhanced statutory damages of up to $150,000 for willful infringement. Because the record is devoid of evidence of Hearst's subjective mental state in publishing its article, Plaintiff's claim for enhanced damages rests **exclusively** on the fact that Hearst is a mass media company that is familiar with copyright law.  This is simply not enough for any reasonable jury to find Hearst willful—if it were, then every mass media company could be deemed willful and liable for up to $150,000 in **every** case.

## UNDISPUTED FACTUAL BACKGROUND

***Plaintiff Jonathan Otto and the Snapshot.***  Plaintiff is a Vice President of Deutsche Bank.  (Defendant's Response to Plaintiff's 56.1 Statement and Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶¶ 6, 130.)  He is not, and has never been, a professional photographer or otherwise in the business of licensing photographs.  (Def. 56.1 ¶¶ 7, 8, 111, 129.)  Prior to the filing of this lawsuit, he had never licensed a photograph. (*See* Def. 56.1 ¶¶ 111-113, 129.)

On June 10, 2017, Plaintiff attended his friend Kristen Piatowski's wedding at the Trump National Golf Club in Bedminster, New Jersey (the "Wedding").  (Def. 56.1 ¶¶ 1-2, 9, 114.) President Trump made a surprise appearance at the wedding reception that night.  (Def. 56.1 ¶ 3.) When President Trump entered the reception, Plaintiff "just started taking photos" on his iPhone. (Def. 56.1 ¶¶ 115, 118.)  He captured between twenty-four and one hundred snapshots of President Trump at the reception, some of which were created using the iPhone's "burst" function.  (Def. 56.1 ¶ 116.)  One of the images that was part of an iPhone "burst" depicts the President holding hands with the bride and appearing to speak, with multiple cameras pointed in his direction (the "Snapshot").  (Def. 56.1 ¶¶ 117, 119; Compl. Ex. C.)  Plaintiff took the Snapshot "[j]ust for personal use" because he thought it was an "important memory."  (Def. 56.1 ¶¶ 120, 122.)  He did not intend to commercially exploit the Snapshot, nor to post it to his social media account.  (Def. 56.1 ¶¶ 31, 123)  He did not even intend to share it with his friends and family.  (Def. 56.1 ¶ 124.)

That night, however, Plaintiff did provide the Snapshot to another wedding guest, Sean Burke, at Mr. Burke's request.  (Def. 56.1 ¶ 36.)  At the time, Plaintiff did not know how Mr. Burke planned to use or disseminate the Snapshot, nor did he inquire.  (Def. 56.1 ¶¶ 38, 125-127.)  He placed no restrictions on Mr. Burke's use or dissemination of the Snapshot.  (Def. 56.1 ¶¶ 38, 125-127.)  He did not provide the Snapshot to anyone besides Mr. Burke, nor did he post it to his own social media accounts.  (Def. 56.1 ¶¶ 39, 128.)  The Snapshot was later published on the Instagram account of Laura Piatowski, a relative of the bride who presumably obtained the image directly or indirectly from Mr. Burke.  (Def. 56.1 ¶¶ 46, 48, 128.)  There is no evidence in the record that Plaintiff ever attempted to sell or license the Snapshot either before or

after its publication on Ms. Piatowski's Instagram, apart from licenses granted in connection with the settlement of copyright infringement claims.  (*See* Def. 56.1 ¶¶ 110, 112-13, 129, 134.)

***The Esquire.com Article.***  President Trump's appearance at the Wedding was a newsworthy event and consequently was picked up by the national news media.  (*See* Def. 56.1 ¶¶ 4, 78, 82.)  On June 11, 2017, Hearst's website Esquire.com ran an article by Peter Wade entitled "President Trump Is the Ultimate Wedding Crasher" (the "Article").  (Def. 56.1 ¶ 54.)  The Article specifically reports on the fact that images of the President at the wedding surfaced on social media and commented on the event as part of a broader trend of the President crashing weddings at his golf clubs and making himself available for photographs and autographs at such events (the "Article").  (Def. 56.1 ¶¶ 135.)  By emphasizing the President's willingness to appear in social media photographs and sign autographs, the Article also makes an implicit point about the President's desire for public adoration and publicity.  (Def. 56.1 ¶ 136.)  The full text of the Article reads as follows:

> The most recognizable guest at Kristen Piatkowski and Tucker Gladhill's wedding on Saturday night wasn't even invited. President Donald Trump crashed the couple's wedding taking place at Trump National Golf Club in Bedminster, New Jersey.
>
> Photos surfaced on Instagram showing the happy husband and wife smiling with President Trump, who apparently stopped by to greet the couple and shake hands with guests.
>
> Trump has become such a fixture at nuptials at his resorts, the Bedminster club once advertised a Trump appearance as a potential feature of booking a wedding there, according to a now-discontinued brochure obtained by the *New York Times*:
>
>> If [Trump] is on-site for your big day, he will likely stop in & congratulate the happy couple.  He may take some photos with you but we ask you and your guests to be respectful of his time & privacy.

> This was Trump's 24th visit to a golf course since he was elected.
> In addition to making an appearance, it looks like Trump also took
> the time to sign autographs for fans.  One photo showed Trump
> with a Sharpie, waving a Make America Great Again hat.

(Def. 56.1 ¶ 137.)

The Article was accompanied by the "[p]hotos [that] surfaced on Instagram" that it referenced, including a cropped version of the Snapshot.  (Def. 56.1 ¶¶ 138, 140.)  After locating certain of those images on an earlier article on *The Hill*, Hearst obtained all three images from the Instagram account of Laura Piatowski.  (Def. 56.1 ¶¶ 50, 139.)  The Article credited each image to that account with the line "Instagram/@lauramp11."  (Def. 56.1 ¶ 138.)  In addition to substantiating the Article's reporting and commentary on the Instagram images, the inclusion of the Snapshot adds to the Article's broader point about President Trump by showing him surrounded by people and cameras.  (Def. 56.1 ¶¶ 141, 142.)

Hearst does not charge for access to Esquire.com, but most of the pages on Esquire.com contain some programmatic advertisements.  (Def. 56.1 ¶¶ 157, 158.)  These ads are served to Esquire.com through a series of online ad exchanges, and Hearst receives only a tiny fraction of a cent in revenue per page view from the display of each programmatic ad.  (Def. 56.1 ¶¶ 158, 159.)  It receives the lowest as rate for content, like the Article, that is characterized as "News and Politics."  (Def. 56.1 ¶ 160.)  A conservatively high estimate of the total revenue Hearst received from ads that ran alongside the Article is $148.99; the actual amount is likely quite lower.  (Def. 56.1 ¶ 161.)

***This Lawsuit.***  After learning that some media outlets had obtained and published the Snapshot after obtaining it from Instagram, Plaintiff decided that he "want[ed] [his] cut"— notwithstanding that he had never intended to commercially exploit the Snapshot.  (Def. 56.1 ¶ 43.)  He retained the Liebowitz Law Firm on June 12, 2017, and began suing media companies

that had published the Snapshot.  (Def. 56.1 ¶¶ 83, 102-106.)  He filed this action against Hearst

on June 21, 2017, without providing Hearst with *any* pre-suit notification of his claim of

ownership in the Snapshot.  (Def. 56.1 ¶ 66.)  In his Complaint, he asserts a single count of

copyright infringement and refers to himself—counterfactually—as a "professional

photojournalist in the business of licensing his photographs to online, print, and television

stations for a fee . . . ."  (Compl. ¶ 5.)  Hearst removed the Article promptly after the lawsuit was

filed.  (Def. 56.1 ¶¶ 109, 148.)

    During discovery, Plaintiff opted not to take the deposition of any current or former

Hearst personnel, including the author of the Article.  (Mar. 26, 2018 Declaration of Jennifer D.

Bishop in Support of Defendant's Motions for Summary Judgment and to Strike and in

Opposition to Plaintiff's Motion for Partial Summary Judgment ("Bishop Decl.") ¶ 7.)  He also

repeatedly failed to comply with his own discovery obligations.  Among other things, he failed to

identify Sean Burke in his interrogatory responses, and did not do so until November 28, 2017,

less than a month before the close of fact discovery (Bishop Decl. ¶¶ 3-4, 6 & Exs. B, C, D), and

even then did not provide Mr. Burke's contact information (which he had had since the wedding)

(Bishop Decl. Ex. A at 45:23-46:6 & Ex. 8).  He never produced official deposit copies

establishing that the Snapshot is the image covered by his certification of copyright registration

No. VA 2-055-309 (the "'309 Certificate").  (Bishop Decl. ¶ 8.)  And he never identified Donna

Halperin as a person with knowledge of the case or a witness upon whom he would rely, even

though he now relies exclusively upon her testimony to establish that the Snapshot is covered by

the '309 Certificate.  (Bishop Decl. ¶¶ 3-4, 6 & Exs. B, C, D.)  He also testified falsely at his

deposition that he had a license agreement with Warner Brothers Entertainment that was

"separate" from his settlement agreement with that company, and produced a materially

incomplete version of that document in discovery.  (Bishop Decl. ¶ 9 & Ex. E; *see* Def. 56.1 ¶¶ 110, 134.)[1]

## STANDARD OF REVIEW

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A fact is 'material' when it might affect the outcome of the suit under governing law," and is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (other quotation marks and citations omitted); *see also Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).  For issues where the non-moving party would bear the burden of proof at trial, the movant need only "point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554-55 (2d Cir. 2005) (citations omitted); *see also Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Instead, he must come forward with more than a "mere . . . scintilla of evidence" upon which "the jury could ***reasonably*** find for the plaintiff."  *Jeffreys*, 426 F.3d at 554 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

---

[1] Plaintiff's actions with respect to the Warner Brothers Entertainment agreement are the subject of Hearst's forthcoming motion for sanctions.  (*See* ECF Nos. 43, 50.)

## ARGUMENT

### I.   HEARST'S NEWS ARTICLE IS A FAIR USE OF THE SNAPSHOT.

Hearst is entitled to complete dismissal of Plaintiff's copyright claim because the undisputed facts establish that the Article is a protected fair use of the Snapshot under Section 107 of the Copyright Act.  17 U.S.C. § 107.  Although fair use is a mixed question of fact and law, it can and should be resolved "at the summary judgment stage where there are no genuine issues of material fact."  *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (citation and alteration omitted); *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991).[2] And because Hearst's Article is news reporting that lies at the "core of the First Amendment," *Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg, L.P.*, 756 F.3d 73, 84 (2d Cir. 2014), Plaintiff should bear the burden of disproving fair use.[3]

### A.   The Purpose and Application of the Fair Use Doctrine in Copyright Law.

The ultimate goal of copyright is "to be the engine of free expression," *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003), and "expand public knowledge and understanding" by giving authors "a financial incentive to create informative, intellectually enriching works for public consumption," *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015) (hereinafter "*Authors Guild II*").  Copyright is intended to benefit the ***public***, not authors themselves, and it thus does not confer "on authors the absolute ownership of their creations." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94-95 (2d Cir. 2014) (hereinafter "*Authors Guild I*") (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107

---

[2] In the alternative, Hearst has at a minimum raised a genuine issue of material fact as to whether the Article is a fair use, and Plaintiff's Motion must be denied.

[3] While Hearst recognizes that the Supreme Court has described fair use as an affirmative defense, Hearst respectfully submits that it should not be treated as such where, as here, important First Amendment interests are at stake.  But even if Hearst bears the burden of proving fair use, Hearst has more than met that burden as shown herein.

(1990)); *see also Authors Guild II*, 804 F.3d at 212 (copyright's "primary intended beneficiary is the public"). "[G]iving authors *absolute* control over all copying from their works would tend in some circumstances to limit, rather than expand, public knowledge." *Authors Guild II*, 804 F.3d at 212. Moreover, copyright does not protect anything other than creative expression. *See generally Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).

The fair use doctrine was historically developed to delineate the circumstances where liability for copying creative expression would "limit, rather than expand, public knowledge." *Authors Guild II*, 804 F.3d at 212; *see also Blanch*, 467 F.3d at 250. As codified in Section 107 of the Copyright Act, it establishes a statutory exception to copyright infringement where speakers make "fair use" of another's copyrighted work "for purposes such as criticism, *comment*, [and] *news reporting* . . . ." 17 U.S.C. § 107 (emphasis added). By "guarantee[ing] . . . breathing space within the confines of copyright," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), fair use both ensures that copyright furthers its intended goals and that it does not run afoul of the First Amendment rights of speakers who use another's expression for their own message or purpose. *See Eldred*, 537 U.S. at 219-20 (fair use is a "built-in First Amendment accommodation[]"); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1260 n.3 (11th Cir. 2001) (fair use has "constitutional significance as a guarantor to access and use for First Amendment purposes").[4]

In determining whether a particular use is fair, Section 107 requires courts to analyze four guiding factors: "(1) 'the purpose and character of the use;' (2) 'the nature of the copyrighted

---

[4] Fair use is crucial to the protection of these First Amendment interests. In most copyright cases, this doctrine and similar "built-in" "safeguards" are the *only* mechanisms available for a defendant to vindicate his or her constitutional speech rights. *Eldred*, 537 U.S. at 218-21; *see also Golan v. Holder*, 565 U.S. 302, 327-30 (2012); *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 482 (2d Cir. 2007) ("[A]bsent extraordinary circumstances, the fair use doctrine encompasses all claims of First Amendment in the copyright field." (quotation marks and citation omitted)) (citing cases).

work;' (3) 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole;' and (4) 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (quoting 17 U.S.C. § 107).  However, "these four factors are non-exclusive," *Swatch Grp.*, 756 F.3d at 81, and a defendant need not prevail on each factor in order to establish fair use, *Wright*, 953 F.2d at 740.  There are no "bright-line rules;" a fair use determination requires "case-by-case analysis." *Campbell*, 510 U.S. at 577-78; *see also Blanch*, 467 F.3d at 251 (characterizing the inquiry as "open-ended" and "context-sensitive").

Ultimately, fair use requires a court to determine whether allowing, rather than preventing, the use will better serve "the purposes of copyright," *Campbell*, 510 U.S. at 578—and the First Amendment interests that are furthered by that purpose.  "All [factors] are to be explored, and the results weighed together" with any other relevant considerations, *id.*, to determine whether allowing the use will "increase and not . . . impede the harvest of knowledge." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985).

As applied, the doctrine is accordingly sensitive to attempts to use copyright to restrict news reporting and analogous activity at the core of the First Amendment.  *See Swatch Grp.*, 756 F.3d at 84 (explaining that "deliver[ing] newsworthy . . . information . . . lies at the core of the First Amendment," and "the need to convey information to the public accurately may . . . make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration").  For example, "a book reviewer may . . . quote from an original work in order to ***illustrate a point*** and substantiate criticisms, and . . . [a] newspaper can publish a copyrighted photograph . . . (taken for a modeling portfolio) in order to ***inform*** and entertain the newspaper's readership about a news story." *Authors Guild I*, 755 F.3d at 95 (emphasis added).

10

**B.     The Purpose and Character of Hearst's News Reporting and Commentary Strongly Favors a Finding of Fair Use.**

Here, there can be no genuine dispute that the Article's "purpose and character" weighs strongly in favor of fair use.  This first statutory factor is "[t]he heart of the fair use inquiry . . . ." *Blanch*, 467 F.3d at 251 (citation omitted).[5]  In applying it, courts are guided by three salient aspects of the defendant's use:  (1) whether it was for any of the favored purposes explicitly mentioned in § 107, and (2) whether it was for a materially different or "transformative" purpose than the purpose for which the work was originally created.  If either is true, then (3) whether defendant is a commercial entity deserves little weight.  *Campbell*, 510 U.S. at 578-79; *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004).  These guidelines overwhelmingly favor a finding of fair use here, as a matter of law, because the Article used the Snapshot as part of news reporting and commentary about the President's proclivity for crashing weddings and appearing in guest photos—as specifically evidenced by the Snapshot—and in doing so transformed the Snapshot beyond its original purpose and meaning.

**1.   Hearst used the Snapshot for news reporting and commentary.**

The Article indisputably reports about the President's actions at the wedding, including that he appeared in guest photos that circulated on Instagram, and comments on that event within a broader trend in the President's behavior.  (Def. 56.1 ¶¶ 135-137; *see supra* at 4-5.)  Its incorporation of the Snapshot substantiates and illustrates its points.  (Def. 56.1 ¶¶ 141-142; *see supra* at 4-5.)  In other words, Hearst used the Snapshot for exactly the sort of "news reporting" and "comment" that the Copyright Act identifies as likely fair use.  17 U.S.C. § 107.

---

[5] However, courts can and do find fair use as a matter of law where this factor weighs against a defendant.  *See, e.g.*, *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 214-15 (E.D.N.Y. 2007) (dismissing case on fair use grounds where defendant's use was not transformative and the first factor weighed against fair use).

This alone is sufficient for the Court to find that the first statutory factor favors fair use. The Second Circuit has repeatedly held that there is a "***strong presumption*** that factor one favors the defendant" where its use is one of those identified in § 107. *Wright*, 953 F.2d at 736 (emphasis added); *see also NXIVM*, 364 F.3d at 477 (same); *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, No. 98 Civ. 7128 (BSJ), 2001 WL 1518264, at *6 (S.D.N.Y. Nov. 28, 2001) (same). That is plainly the case here, notwithstanding Plaintiff's (incorrect) assertion that Hearst's use somehow does not qualify as news reporting because it did not report directly on "the copyrighted work itself." (Pl. Br. 10-11.) As an initial matter, the Article ***did*** report on the Snapshot: it reported and commented on the fact that the President made himself available for pictures that later surfaced on Instagram, including the Snapshot. (Def. 56.1 ¶¶ 135, 137.)[6] But it was not required to do so in order to merit a presumption on the first factor. *See, e.g.*, *Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 328-29 (S.D.N.Y. 2005) (use of images in biographical work created strong presumption that the first factor favored the defendant); *accord Fitzgerald v. CBS Broadcasting, Inc.*, 491 F. Supp. 2d 177, 184-85 (D. Mass. 2007).[7]

In fact, the Article's important "public purpose" of reporting and commenting about the President carries especially strong weight here because it did no harm to Plaintiff's "legitimate copyright interests." *Swatch Grp.*, 756 F.3d at 82-87. As set forth above, Plaintiff did not take

---

[6] This is no different than the sort of commentary present in other cases where courts have applied a presumption on the first fair use factor. *See, e.g.*, *Video-Cinema Films*, 2001 WL 1518264, at *6 (presumption applied to use of clips of *G.I. Joe* in Robert Mitchum obituaries, where obituaries briefly mentioned fact that Mitchum was nominated for an Oscar for his role in the movie); *Mathieson v. Associated Press*, No. 90 Civ. 6945 (LMM), 1992 WL 164447, at *2-3 (S.D.N.Y. June 25, 1992) (presumption applied to news reporting use of brochure cover in an article about the business venture that was advertised in the brochure, where article only briefly mentioned the brochure itself).

[7] In support of this novel proposition, Plaintiff cites only two decisions that do not even address the presumption afforded to § 107 uses on the first factor and instead turn on the transformativeness of the defendant's use. This is a separate consideration under the first factor, which is addressed in Part I.B.2, *infra*. *See Barcroft Media Ltd. v. Coed Media Grp., LLC*, No. 16-CV-7634 (JMF), 2017 WL 5032993, at *5-6 (S.D.N.Y. Nov. 2, 2017); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 403-05 (S.D.N.Y. 2016).

the Snapshot with the intent to license or otherwise exploit it, instead intending to keep it as an "important memory" for "personal use." (Def. 56.1 ¶¶ 120, 122.) Because Plaintiff's ability to use the Snapshot in this way could not possibly have been affected by the Article, the Article "caused no harm to [his] copyright interests." *Swatch Grp.*, 756 F.3d at 85-86.[8] On these facts, the first factor favors a finding of fair use "regardless of how transformative the use is." *Id.* at 85; *see also Time, Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (use of images of Kennedy assassination was fair because there was "a public interest in having the fullest information available on the murder of President Kennedy" and the use caused "little, if any, injury to plaintiff").

### 2.   Hearst's use of the Snapshot was transformative.

#### i.   *Hearst used the Snapshot for a new purpose, adding new context and meaning.*

As the Supreme Court has explained, a "transformative" use is one that "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. . . ." *Campbell*, 510 U.S. at 579. The Article's inclusion of the Snapshot for news reporting and commentary did just that—it used the Snapshot for a different purpose than the one for which it was created, adding new context and new meaning.

Physical alteration is not necessary for a finding of transformation. *See Swatch Grp.*, 756 F.3d at 84. Rather, changing the purpose, function, or context of the original work amounts to transformative use, particularly in the context of "news reporting and analogous activities . . . ." *Id.*; *see also Bill Graham Archives*, 448 F.3d at 608-10 (finding transformative use where

---

[8] On this point, the facts of *Swatch Group* are particularly instructive. The Second Circuit found that Bloomberg's publication of the entirety of Swatch's copyrighted recording of its earnings call "caused no harm to Swatch's copyright interests" because Swatch had admitted that it "did not seek to profit from the publication of the [recording]" and Bloomberg's publication of the recording did not diminish Swatch's ability to use its earnings call as originally intended: to communicate with analysts. *Swatch Grp.*, 756 F.3d at 85-86.

defendant's "purpose . . . is plainly different from the original purpose for which [the works] were created").[9]  In the specific context of still images, courts have found transformative:

- Using images that were originally created for expressive and promotional purposes as illustration in a later biographical work, *Bill Graham Archives*, 448 F.3d at 608-10;

- Using a candid image of businessman in conjunction with criticism and commentary about that businessman's character, *Katz v. Google, Inc.*, 802 F.3d 1178, 1182-83 (11th Cir. 2015);

- Using images that were originally created for inclusion in modeling portfolios in conjunction with news reporting and editorial commentary, *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22-23 (1st Cir. 2000);

- Using photographs taken for the cover of a sales brochure to illustrate a news article about a new business venture that was advertised in the brochure and depicted in the photographs, *Mathieson*, 1992 WL 164447, at *1, *3;

- Using a photo that was originally taken for the limited purpose "of being used as a gift" in conjunction with a magazine profile with the purpose of "inform[ing] and entertain[ing]" magazine readers, *Calkins v. Playboy Enters. Int'l, Inc.*, 561 F. Supp. 2d 1136, 1141 (E.D. Cal. 2008);

- Using a headshot that was originally commissioned for use in professional and political marketing in connection with an article criticizing the subject's political views, *Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592, at *5 (N.D. Cal. Feb. 25, 2014);

- Using 169 photographs that were originally intended to be stand-alone photographs as part of proposed advertisements, *Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 910-11 (E.D. Mo. 2015);

- Using photographs that were originally taken for purposes of depicting musicians in concert for purposes of reporting about pro-life celebrities and conservative celebrities running for political office, *Philpot v. Media Research Center Inc.*, 279 F. Supp. 3d 708, 715-18 (E.D. Va. 2018);

---

[9] *See also, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work." (citation omitted)); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009) ("A 'transformative use' is one that employ[s] quoted matter in a different manner or for a different purpose" (alteration in original) (citation omitted)); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][1] at 13-212 to 13-213 (2011) ("[I]f, regardless of medium, defendant's work performs a different function from plaintiff's, then notwithstanding its use of substantially similar material, the defense of fair use may prevail.").

- Using a photograph shot for use on the cover of a record alum and DVD to illustrate and help explain an article about a lawsuit concerning the DVD, *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C 4664, 2014 WL 3368893, at *10 (N.D. Ill. July 8, 2014); and

- Using images of corporate executives that were originally taken for promotional purposes in conjunction with criticism of them and their employer, *Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*, No. C 09-1468 (SBA), 2009 WL 2157573, at *4-5 (N.D. Cal. July 17, 2009).[10]

Like the uses at issue in all of these cases, Hearst's Article used the Snapshot for a new purpose, adding context and insights that are absent when viewing the Snapshot alone.  Putting aside the self-serving assertions in Plaintiff's briefing (which the Court should ignore),[11] Plaintiff took the Snapshot solely for "personal use" to save an "important memory" with no intention of distributing it (Def. 56.1 ¶¶ 120, 122-124); on its own, the Snapshot merely preserves Plaintiff's memory of the President holding hands with his friend at her wedding (*see* Def. 56.1 ¶¶ 28).  In contrast, Hearst's Article used the Snapshot for reporting and commenting on the President's pattern of crashing weddings and taking photos with guests, placing the Snapshot amid factual context that is essential to understand the significance of the event depicted, as well as its place in a larger story about the President's behavior.

---

[10] *See also, e.g.*, *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 940 (4th Cir. 2013) (use of a team logo to tell factual historical stories was transformative because logo's original purpose was to be used as a brand symbol); *Galvin v. Ill. Republican Party*, 130 F. Supp. 3d 1187, 1192-93 (N.D. Ill. 2015) (use of photograph to lambast a politician was transformative where photograph was originally created for purpose of documenting a campaign parade); *Ascend Health Corp., UHP, LP v. Wells*, No. 4:12-cv-00083, 2013 WL 1010589, at *12-14 (E.D.N.C. Mar. 14, 2013) (defendant's use of photos of psychiatric facility was transformative where images were originally created "to convey that they provide quality healthcare services to attract potential customers" and defendant used them in conjunction with criticism of the company).

[11] Recognizing that his original purpose in creating the Snapshot is central to the transformative use issue, Plaintiff now asserts in his summary judgment papers that he created the Snapshot "on account of its newsworthiness."  (Pl. Br. 15.)  But this claim is not supported by any record evidence—not even his own recent declaration (*see* Def. 56.1 ¶ 33; Feb. 24, 2018 Decl. of Jonathan Otto in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 38) ¶ 7)—and it contradicts his clear testimony that he took the Snapshot "just for personal use" because he thought it was "an important memory" and did not intend to exploit or publish it (Def. 56.1 ¶ 120, 122-124).  It is black-letter law that Plaintiff "cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  Moreover, even if Plaintiff did take the Snapshot on account of its newsworthiness—whatever that means— it is still undisputed that he never intended to publish or license it as part of any news story, much less one that comments on the President's actions in the same manner as the Article.

In fact, the Article is ***more*** transformative than many of the uses that courts have already found fair.  Unlike the images at issue in *Dhillon*, *Sedgwick Claims Management*, and *Philpot*, for example, the Snapshot itself is integral to the Article's reporting on the existence of the Instagram photos and its commentary about the President's apparent eagerness to appear ***and be photographed*** at weddings at his clubs, which in turn add new insights to a reader's experience of the Snapshot.  The Snapshot serves as evidence and illustration that substantiates that commentary—not merely, as Plaintiff contends (*see* Pl. Br. 12-15), to depict the simple fact that the President appeared at the wedding.

The Article is thus akin to the image use at issue in *Calkins*, where a photograph was incorporated in an article to substantiate and further an insight being made about the subject of the article as depicted in the image.  561 F. Supp. 2d at 1141-42 (photograph used in conjunction with other elements in a magazine article to "personaliz[e] [the subject] by providing insight into her life").  It is also akin to the use at issue in *Nunez*, where arguably scandalous photos taken for purposes of inclusion in a modeling portfolio were used to substantiate and contextualize reporting about the fact that the photographs existed and commentary about what the photographs said about their subject.  235 F.3d at 21-23.[12]  And it is a far cry from the cases relied on by Plaintiff, in which defendants used news photographs for the very same purpose for which they were created, *see infra* Part I.B.2.ii (discussing cases), and often added ***no*** new information or meaning whatsoever to those images, *see, e.g.*, *Barcroft Media*, 2017 WL 5032993, at *6 (noting that defendant "points to no new information it infused" into the images at issue); *BWP Media USA*, 196 F. Supp. at 404-05 (noting that defendant made no comment at

---

[12] Similar illustrative uses have also been found fair in the video context.  *See, e.g.*, *Video-Cinema Films,* 2001 WL 1518264, at *6 (first factor favored defendant where it used clips originally intended to entertain for purposes of reporting on actor's death and illustrating his impact on the arts).

all about the images at issue).  Within the context of the Article, and *only* within the context of

the Article, the Snapshot is transformed from a personal keepsake into part of a story about the

President of the United States' apparent desire to be photographed in certain settings.  *C.f.*

*Swatch Grp.*, 756 F.3d at 84 (explaining that courts often find complete copies transformative

based on "the altered purpose or context of the work, as evidenced by surrounding commentary

or criticism").[13]

### ii.   *The Court should reject Plaintiff's unprecedented and limited theory of transformative use in news reporting.*

In addition to ignoring the Article's actual content and his own testimony discussed

above, Plaintiff's attempt to skirt around the transformative nature of Hearst's use also rests on a

misreading of the relevant law.  He advances an unprecedented and exceedingly narrow

interpretation of "transformative" use, under which a news report could *only* transform a

copyrighted work if that work itself was the center of the news story.  (Pl. Br. 11-14.)  While

even this reading of the law would favor Hearst in this case because the Article *does* comment

and report directly on the Snapshot, *see supra* at 4-5, the Court should decline Plaintiff's

invitation to so drastically limit fair use.

The Second Circuit has never sanctioned such a categorical rule in news reporting or any

other context.  To the contrary, it has explicitly stated that "[t]he law imposes no requirement

that a work comment on the original or its author in order to be considered transformative,"

*Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013), and has repeatedly approved of news and

similar uses that did not directly comment on the underlying work, *see Swatch Grp.*, 756 F.3d at

---

[13] Plaintiff's further argument that Hearst did not transform the Snapshot beyond its initial publication on Laura
Piatowski's Instagram (Pl. Br. 14-15) fails for the additional reason that it attempts to compare the Article to an
entirely separate third party's use.  In analyzing whether the Article is transformative, the Court must compare the
Article to Plaintiff's *own* use of the image and its intended purpose.

84 (use of complete audio recording for news reporting without providing additional commentary or analysis); *Bill Graham Archives*, 448 F.3d. at 609-10 (rejecting argument that "each reproduced image should have been accompanied by comment or criticism related to the artistic nature of the image").  In these cases, as already explained, the relevant question is whether the defendant's news or commentary purpose is "separate and distinct from the original . . . purpose for which the images were created."  *Id.*

Accordingly, a news use of an image may not be transformative where the image was **_originally taken_** for the purpose of news reporting or news licensing.  *See generally* Nimmer & Nimmer, *supra*, § 13.05[A][1][a] at 13-164 (noting that "the news media may have a lesser claim to fair use **_when appropriating the product of journalists_**" (emphasis added)).  That was the factual scenario in the cases Plaintiff cites in support of his rigid interpretation of the law, which involved paparazzi or other news media photos.  Indeed, the case cited most heavily by Plaintiff—*Barcroft Media Ltd. v. Coed Media Group, LLC*—is explicit that its holding on transformative use depended on these facts:

> CMG's use of the Images had no transformative effect because it displayed the Images in the same manner and for the same purpose as they were originally intended to be used.   Paparazzi photographs—the bulk of the Images [at issue]—are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and news articles about their lives. . . . The purposes for which CMG used the Images—to serve as banner images and thumbnails for "Daily Dumps" of celebrity news . . . ; to accompany articles about celebrity gossip and human interest stories . . . ; and to be included in roundups of celebrity fashion trends . . .—are all consistent with the original intent behind taking and copyrighting the images.  Thus, CMG's use was not transformative.

*Barcroft Media*, 2017 WL 5032993, at *6;[14] *see also BWP Media USA*, 196 F. Supp. 3d at 405,

407 (paparazzi photos "taken to be used by celebrity news outlets reporting on [celebrities]"

were used by other media "for the precise reason [they were] created"); *Fitzgerald*, 491 F. Supp.

2d at 180 (photograph taken on assignment for the Boston Globe was reused in CBS

broadcast).[15]

　　　But those weren't the facts in the many fair use decisions discussed in Part I.B.2.i, *supra*,

where the photos' original purpose was for something other than the news reporting,

commentary, or biography for which they were later used.  Nor is it the case here, where Plaintiff

never intended to use the Snapshot for news reporting, commentary, or even broad public

dissemination.  (*See supra* at 3.)  The Court should not adopt Plaintiff's selective reading of

*Barcroft* to change the outcome of the first fair use factor in cases where the news media has

"provide[d] [a] social benefit," *Campbell*, 510 U.S. at 579, by transforming a work created for a

non-news purpose into an integral part of news reporting and commentary.

---

[14] While *Barcroft* does later note that "[d]isplay of a copyrighted image or video ***may*** be transformative where the use serves to illustrate criticism, commentary, or a news story about that work," it did so only in the context of rejecting CMG's argument that the news reporting nature of its use superseded the fact that it was not transformative in purpose.  2017 WL 5032993, at *6.

[15] *See also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 306-08 (3d Cir. 2011) (image created of radio hosts created to illustrate announcement of an award republished for the same purpose without any broader commentary); *Mavrix Photographs LLC v. Sandra Rose LLC*, No. 2:15-cv-00596-CBM-AGRx, 2016 WL 6246408 (C.D. Cal. Apr. 6, 2016) (paparazzi photographs of Beyoncé used without permission on celebrity news website) (facts set forth in other court filings, *see* Dkt. Nos. 41-2, 45, Case No. 2:15-cv-00596 (C.D. Cal.)); *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1121 (9th Cir. 1997) (helicopter footage taken for news reporting purposes created and used without permission by businesses that were "both in the business of gathering and selling news"); *accord Balsley v. LFP, Inc.*, 691 F.3d 747, 759 (6th Cir. 2012) (photographs initially captured and published on the internet "to shock, arouse, and amuse" later reused in *Hustler* for the same purpose); *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552-53 (S.D.N.Y. 2013) (original news reports excerpted and disseminated by another news service); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998) (radio broadcasts created for entertainment purposes transmitted in full, unaltered format); *Psihoyos v. Nat'l Examiner*, No. 97 Civ. 7624 (JSM), 1998 WL 336655 (S.D.N.Y. June 22, 1998) (image of an art car published in a book about art cars republished in a magazine article about the same subject to show what an art car looks like).

### 3.   Hearst's for-profit status is irrelevant.

Although the first fair use factor also looks to whether the defendant's work has a commercial purpose, the Second Circuit has consistently recognized that "the most universally accepted forms of fair use, such as news reporting and commentary . . . are all normally done commercially for profit," *Authors Guild I*, 804 F.3d at 219, and has "discounted this consideration where 'the link between [the defendant]'s commercial gain and its copying is . . . attenuated' such that it would be misleading to characterize the use as 'commercial exploitation.'"  *Swatch Grp.*, 756 F.3d at 83 (alterations in original) (citation omitted); *see also Castle Rock Entm't v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) ("We . . . do not give much weight to the fact that the secondary use was for commercial gain."); *Wright*, 953 F.2d at 736-37 (similar); *NXIVM*, 364 F. 3d at 477 (similar).

While it is true that Hearst is a for-profit company and displayed web advertising alongside the Article (Def. 56.1 ¶¶ 11, 56, 158; *see* Pl. Br. 16), this is insufficient to find in Plaintiff's favor on this factor.[16]  Hearst does not charge for access to Esquire.com, and its advertising on that website created only the potential for limited, indirect revenue to Hearst as a result of page views of the Article.  (Def. 56.1 ¶¶ 157-161.)  "This is true . . . with respect to any information posted online by any media outlet and is distinguishable from ***selling*** access to the [Snapshot] for the purpose of commercial gain" or other forms of ***direct*** commercialization. *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325, 1328 (M.D. Fla. 2012) (citation omitted);

---

[16] Plaintiff's citation to *Richard Feiner & Co., Inc. v. H.R. Industries, Inc.*, 10 F. Supp. 2d 310, 314 (S.D.N.Y. 1998) is inapposite because the image at issue in that case was used to introduce a section for special effects advertisers and not for any of the preamble uses in § 107 of the Copyright Act, and in any event that decision was vacated by *Richard Feiner & Co., Inc. v. H.R. Industries, Inc.*, 182 F.3d 901 (2d Cir. 1999).  Plaintiff's citation to *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 250 (1984) to claim a presumption against any commercial use (Pl. Br. 16 n.9) is also misplaced—as explained *infra* Part I.E.1, such a presumption was rejected by the Supreme Court in *Campbell*.  Finally, *Associated Press* is of no help to Plaintiff on this issue, as the Court in that case was focused on "***direct[]***" commercial gain from the sale of access to the copyrighted works—which Hearst's advertising revenue is not.  931 F. Supp. 2d at 552 (emphasis added).

*see also Bill Graham Archives*, 448 F.3d at 612 (finding "[s]ignificant[]" that defendant did not use any of the images at issue "in its commercial advertising or in any other way to promote the sale of [its] book").  Because any revenue Hearst received from the Article is "attenuated" at best, it does not amount to "commercial exploitation."  *Swatch Grp.*, 756 F.3d at 83.

Moreover, where, as here, the allegedly infringing work is transformative, any "commercial" aspect is of even lesser significance.  Courts in this Circuit repeatedly have held this factor largely irrelevant to the analysis where a work was transformative.  *See, e.g.*, *Blanch*, 467 F.3d at 254 (where the new work was substantially transformative, "[w]e therefore discount the secondary commercial nature of the use." (quotation and citation omitted)).

### 4.   **Plaintiff's allegations of bad faith are factually and legally misplaced.**

Plaintiff's argument that the Court should consider Hearst's supposed bad faith as a "sub-factor" in evaluating the purpose and character of the Article (Pl. Br. 10, 16-18) is based on misleading descriptions of law and facts, and the Court should disregard it.  The Second Circuit has never held that a defendant's scienter is as important as the sub-factors already discussed; while a court must consider claims of bad faith, even a clear finding of bad faith does not bar a holding that the first factor favors a defendant.  *NXIVM*, 364 F.3d at 478-79; *see also Blanch*, 467 F.3d at 255-56; *Swatch Grp.*, 756 F.3d at 83-84.

The Second Circuit has also consistently held that bad faith does ***not*** mean the failure to ask for permission for copying, because "'[i]f the use is otherwise fair, then no permission need be sought or granted.'"  *Blanch*, 467 F.3d at 256. (quoting *Campbell*, 510 U.S. at 585 n.18); *see also Wright*, 953 F.2d at 737 ("lack of permission is 'beside the point'").  Nor is bad faith established even when a defendant initially seeks permission—indicating a belief that such permission is necessary—but fails to secure it and then proceeds with publication.  *See Bill*

*Graham Archives*, 448 F.3d at 607, 614-15.  Bad faith in this context requires much more:  a situation akin to the facts in *Harper & Row*, where the defendant "knowingly exploited a purloined [and unpublished] manuscript" with the "intended purpose" of "scooping" the copyright owner and "supplanting [his] commercially valuable right of first publication.  471 U.S. at 562-63; *see Swatch Grp.*, 756 F.3d at 83-84 (rejecting claims of bad faith where facts did not mirror *Harper & Row*).

There is no evidence whatsoever of that sort of conduct here.  As in *Swatch Group*, Hearst's "overriding purpose" was "simply to deliver newsworthy information" and commentary, not to "scoop" Plaintiff or anyone else.  The Snapshot had already been published by TMZ and Laura Piatowski, and Plaintiff himself had given the Snapshot to Mr. Burke and never intended to license or publish it himself.  (Def. 56.1 ¶¶ 31, 42, 48, 50, 122-124.)

Plaintiff's arguments that Hearst nonetheless acted in bad faith ignore the governing law and would require Hearst to go to unprecedented lengths to establish good faith instead of the absence of *Harper & Row*-level bad faith.  (Pl. Br. 17-18.)  Plaintiff first argues that bad faith is established because the Article did not credit him and Hearst supposedly did not do enough "due diligence" to determine his identity,[17] but requiring such disclosure or investigation would be no different than requiring permission, and countless fair uses have been made without identifying the author of the underlying work.  *See Blanch*, 467 F.3d at 256, 261; *Mathieson*, 1992 WL 164447, at *4 (rejecting similar argument).  In any event, Hearst's ***good faith*** on this front is indicated by the fact that—far from "tearing the copyright mark off" (Pl. Br. 17)—Hearst ***did*** clearly identify the source of the Snapshot in the Article.  (Def. 56.1 ¶¶ 138-139.)

---

[17] In any event, as discussed *infra* in Part III, Plaintiff's claims about Hearst's "due diligence" are entirely without evidentiary basis, and rely solely on his own inadmissible and unsupported reading of Hearst's records.

Nor is bad faith established by Hearst's removal of the Article, as Plaintiff contends. While Hearst believes strongly that its use was fair, it chose to remove the Article out of good faith respect for Plaintiff's copyright claim, *see infra* Part III, and to mitigate any eventual damages in the event the Court disagrees with its defense. It should not be faulted for doing so.[18]

Equally spurious is Plaintiff's final argument that the "purpose and character" of the Article weighs against Hearst because there is no record evidence that its in-house counsel reviewed the Article prior to publication. (Pl. Br. 17-18.) In addition to being unsupported,[19] such a rule would harm the goals of copyright (*see supra* at I.A) by effectively denying the benefit of fair use to authors who lack constant access to counsel and by creating a legal bottleneck on the media's dissemination of news reporting, commentary, and other expression. Moreover, the mere ***absence*** of evidence on this point—due in large part to Plaintiff's own failure to pursue discovery and Hearst's attorney-client privilege—is a far cry from the intentional "scoop" at issue in *Harper & Row.*

In sum, there is simply no record evidence that establishes the sort of scienter—or, indeed, any other fact—that could tip the first § 107 factor in Plaintiff's favor. The "purpose and character" of Hearst's transformative reporting and commentary favors a finding of fair use.

---

[18] Plaintiff's citation to *Barcroft Media* on this point (Pl. Br. 17) actually supports Hearst. There, the Court found relevant to a ***license*** defense that the defendant had removed images from his website because it belied defendant's claim that the parties had reached a meeting of the minds on its authorization to use the images—an element of the license defense. 2017 WL 5032993, at *4. But the Court did not consider that fact when analyzing the defendant's ***fair use*** defense because (unlike with the license) it does not undercut any of the elements of that defense.

[19] The cases Plaintiff cites deal with overcoming a showing of willfulness in the event fair use is ***not*** established, and in any event, only stand for the proposition that a defendant cannot overcome a showing of willfulness based on a good faith belief in a fair use defense if it (a) waits a year into litigation to raise a fair use defense, *and* (b) a court orders a consent decree that suspends the fair use defense, *and* (c) there is no evidence that the defendant *ever* discussed the defense with an attorney. *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 584-85 & n.9 (6th Cir. 2007).

### C.      **The Published, Factual Nature of the Snapshot Weighs Heavily in Favor of Fair Use.**

The second § 107 factor looks to the nature of the plaintiff's work and "recogni[zes] that some works are closer to the core of intended copyright protection than others . . . ." *Campbell*, 510 U.S. at 586.  In analyzing this factor, courts consider "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256 (citation omitted).  Both elements favor Hearst here, and the non-creative nature of the Snapshot—which has only thin copyright protection in the first place—weighs sharply in favor of a finding of fair use.

#### 1.   The Snapshot is published and is factual, not creative.

It is undisputed that the Image was published prior to the Article.  (Pl. Br. 18; Def. 56.1 ¶¶ 48-49.)[20]  And while Plaintiff asserts *ipse dixit* that the Snapshot is "creative" and this factor thus "neutral," the undisputed facts tell a different story:  Plaintiff did not stage the Snapshot; he "just started taking photos" on his iPhone when the President entered the room.  (Def. 56.1 ¶¶ 115-118.)

This makes all the difference under the second § 107 factor.  Courts in this Circuit and others have consistently held that candid or in-the-moment photographs of real events are more

---

[20] Throughout his brief, Plaintiff relies on the Ninth Circuit's decision in *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012), but the court's overall analysis in that case depended heavily on the fact that—unlike here— the plaintiffs had tried to keep the photos at issue unpublished and secret, and the defendant had "supplanted Plaintiffs' right to control the first public appearance of the photographs."  *Id.* at 1178 (citation omitted).  To the extent that case stands for a limited interpretation of transformativeness under the first factor, it is inconsistent with the Second Circuit's later direction in *Swatch* that "[i]n the context of news reporting . . . the need to convey information to the public accurately" may require "a defendant to faithfully reproduce an original work without alteration" and even no commentary, and that too narrow a view of the fair use factors in the context of news reporting would implicate important First Amendment concerns.  *Swatch Grp.*, 756 F.3d at 81-85.

factual than creative and weigh in favor of fair use—even when shot by a professional

photojournalist, which is not the case here.  As the Eleventh Circuit explained in *Katz*,

"fortuitous" timing "alone [is] not enough to make the creative gilt of [a candid photo]

predominate over its plainly factual elements."  802 F.3d at 1183 (photograph at issue was

"merely a candid shot in a public setting" and there was "no evidence in the record that [the

photographer] attempted to convey ideas, emotions, or in any way influence [the subject's] pose,

expression, or clothing"); *see also, e.g.*, *North Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d

605, 619-20 (S.D.N.Y. 2015) (photograph of the attacks on the World Trade Center were "a non-

fictional rendering" "created for . . . non-artistic purposes" and thus the second factor weighed

heavily "in favor of fair use."); *Galvin*, 130 F. Supp. 3d at 1195 ("candid image taken of a

politician at a political event" was "obviously . . . not stage[d]" and "primarily factual in nature"

and second factor favored the defendant) (citation omitted); *Fitzgerald*, 491 F. Supp. 2d at 188

(similar).  Indeed, precisely because photographs of real events, things, and places as they occur

in the world involve few creative choices, such photographs have only "thin" copyright

protection in the first place.  *See generally Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120 (9th

Cir. 2018) (explaining that "[s]ome photographs are entitled to only thin protection because the

range of creative choices available in selecting and arranging the photo's elements is quite

limited"); *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (the scope of protection for

"realistic depictions of live animals" is narrow); *Psihoyos v. Nat'l Geographic Soc'y*, 409 F.

Supp. 2d 268, 275 (S.D.N.Y. 2005) (characteristics captured in photographs of objects as they

occur in nature are not protectable); *c.f. Swatch Grp.*, 756 F.3d at 87, 89 ("thin" copyright

protection tilts the second fair use factor towards the defendant).

*Monster Communications, Inc. v. Turner Broadcasting System, Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996), cited by Plaintiff, only confirms that the nature of the Snapshot weighs in favor of fair use.  While the Court in that case noted that ***some*** photographic depictions of actual places and events—such as work of Ansel Adams and the classic image of Marines raising the flag on Iwo Jima—"***may*** be as creative . . . as purely fanciful creations," it also made clear that "[t]he more newsworthy the person or event depicted, the greater the concern that too narrow a view of the fair use defense will deprive the public of significant information."  *Id.* at 494, 498 (emphasis added).  The Snapshot conveys factual information that is significant to the Article's news reporting and commentary about the President as discussed above, and, to be blunt, it is nothing like an Ansel Adams or the iconic historical photographs mentioned in *Monster*.

### 2. The candid, factual nature of the Snapshot is integral to the fair use analysis, particularly in the context of Hearst's news reporting use.

Because the second fair use factor so clearly favors Hearst, Plaintiff resorts to arguing that it is simply "not very important" to the analysis (Pl. Br. 18), but the case law does not support his categorical dismissal of this factor.  The Supreme Court has expressly mandated that courts explore ***all*** the factors and weigh them together "in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78.  Following these instructions, the Second Circuit has at times considered the second factor alongside the first, observing that a work's "***creative***" nature may be "of limited usefulness" where the use at issue is transformative.  *Bill Graham Archives*, 448 F.3d at 612 (emphasis added); *see also Campbell*, 510 U.S. at 586 (holding that the second factor is "not much help" in "a parody case" because "parodies almost invariably copy publicly known, expressive works").[21]  But this does not mean that a work's overwhelmingly ***factual*** nature has

---

[21] *Liebovitz v. Paramount Pictures Corp.*, No. 94-cv-9144, 2000 WL 1010830, at *4 (S.D.N.Y. 2000), cited by Plaintiff, is consistent; there, relying on the language from *Campbell* cited above, the Court stated that "the second

little impact on the determination of fair use.  To the contrary, the Second Circuit has been clear that "the scope of fair use is greater with respect to factual than non-factual works."  *New Era Publ'ns Int'l ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 157 (2d Cir. 1990); *see also* Nimmer & Nimmer, *supra*, § 13.05[A][2][a] at 13-186 ("[T]he more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense."); *Swatch Grp.*, 756 F.3d at 89.

On the facts of this case—which, again, involves a spontaneous picture taken on an iPhone by a wedding guest and later used by Hearst for news reporting—the factual nature of the Snapshot is particularly important to the overall analysis.  Today, 77% of Americans own a smartphone, according to the Pew Research Center.[22]  All of these people walking around with cameras in their pocket are making increasing use of those cameras, very often to take spontaneous snapshots of people, places, and events happening around them simply for purposes of preserving memories or showing their friends, family, and social networks—just as Plaintiff did when he took the Snapshot.  (*See* Def. 56.1 ¶¶ 120.)  Many people now communicate facts in large part ***through*** smartphone photographs—one only need to scroll through social media channels to see this form of communication at work.  In short, we as a society are generating an ever-increasing body of ***factual*** photographs ***without*** financial incentive to do so.[23]

Where a picture taken spontaneously on a smartphone is truly factual, involves essentially zero creativity or effort, and needed no financial incentive to be created, it is hard to

---

factor . . . is not very important to the fair use analysis" ***in a parody case*** where the defendant otherwise established fair use.  *See also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113, 115 (2d Cir. 1998).

[22] *See* Aaron Smith, "Record shares of Americans now own smartphones, have home broadband," Pew Research Center (Jan. 12, 2017), http://www.pewresearch.org/fact-tank/2017/01/12/evolution-of-technology/; Mobile Fact Sheet, Pew Research Center (Feb. 5, 2018), http://www.pewinternet.org/fact-sheet/mobile/.

[23] *See* Caroline Cakebread, "People will take 1.2 trillion digital photos this year—thanks to smartphones," Business Insider (Aug. 31, 2017), http://www.businessinsider.com/12-trillion-photos-to-be-taken-in-2017-thanks-to-smartphones-chart-2017-8.

see how copyright's function as the "engine of free expression" is best served by preventing media from disseminating it as part of news reporting and commentary that increases public knowledge. *See supra* Part I.A. The second factor should therefore weigh heavily in the overall fair use analysis where, as here, such a snapshot has been used for purposes of reporting and commentary on a matter of public concern.

### D.   The Article's Use of the Majority of the Snapshot Was Reasonable in Light of its Purpose, and Does Not Favor Either Party.

The third statutory fair use factor—the amount and substantiality of the portion used—looks to whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying," and "varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87 (citation omitted). Accordingly, and contrary to Plaintiff's assertion (Pl. Br. 19), "copying [an entire work] does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives*, 448 F.3d at 613. Nor does the law strictly "require that the secondary artist may take no more than is necessary," *Cariou*, 714 F.3d at 710, as Plaintiff suggests (Pl. Br. 19).

Instead, where copying the entirety of a work is "reasonable in light of [the defendant's] purpose," the third factor is at worst neutral. *Swatch Grp.*, 756 F.3d at 90; *see also Authors Guild I*, 755 F.3d at 98-99 (where use of entire work was "reasonably necessary" to defendant's purpose, third factor weighed in favor of defendant). And in the specific context of photographs and drawings (as opposed to, say, text, music, or video), courts have routinely recognized that fair use very often reasonably requires copying "all or most of the work . . . in order to preserve any meaning [from the original] at all." *Katz*, 802 F.3d at 1183-84 (quotation marks and citation omitted); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) ("[U]nlike an episode of the Ed Sullivan show or a book manuscript, [a drawing] is not meaningfully divisible."); *S&L*

*Vitamins, Inc.*, 521 F. Supp. 2d at 215 (visual "artwork is not easily severable, like a literary piece, video or song.").[24]

That is the case here.  The Article's use of the majority—though not all—of the Snapshot was reasonable in light of the Article's reporting and commentary purpose discussed in Part I.B, *supra*.  If the Article used materially less of the Snapshot, it would not have conveyed that the President made himself available for photos in front of a swarm of cameras, and the "picture [would be] useless to the story."  *Nunez*, 235 F.3d at 24; *see also Calkins*, 561 F. Supp. 2d at 1143 (holding that use of an entire photograph of a Playboy model was necessary to "personalize [the model] by showing Playboy readers how [she] looked as a high school senior," and that using "a lesser portion . . . would have defeated [Playboy's] purpose for using it").  On these facts, as in similar cases, the third factor is neutral and does not tip the fair use balance.[25]

Plaintiff's arguments to the contrary—that Hearst "could have" published a text-only article or different images (Pl. Br. 20)[26]—entirely ignore Hearst's purpose for using the Snapshot (*see supra* at 4-5 & Part I.B.2.i) and overstate the legal requirements for fair use.  The mere fact that different images of Trump's attendance are available does not make Hearst's use any less fair—use of particular images need not "be essential or an actual necessity to qualify as fair use."

---

[24] *Accord Bouchat*, 737 F.3d at 943, 949 (explaining that "[i]t would be senseless to permit the NFL to use [a copyrighted drawing] for factual, historical purposes, but permit it to show only a half, or two-thirds of it" and holding that the third factor is "of no help to plaintiff"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003) ("If [defendant] only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of [the defendant's transformative use]."); *Perfect 10, Inc.*, 508 F.3d at 1167-68 (same).

[25] *See also, e.g.*, *Katz*, 802 F.3d at 1183-84 (third factor neutral and "weighs less" where defendant displayed entirety of photograph alongside criticism of its subject); *Sedgwick Claims Mgmt. Serv.*, 2009 WL 2157573, at *6 (third factor was neutral where defendant displayed entirety of photographs to mimic a "WANTED" poster because displaying only a portion of the images "would have undermined that purpose"); *Dhillon*, 2014 WL 722592, at *5 (third factor neutral where defendant posted entire photograph and "it would not have been feasible in these circumstances for the defendant to have copied less than the entire photo").

[26] Plaintiff's additional arguments that Hearst could have engaged its own photographer to take a photo at the wedding or obtained a license from Plaintiff (Pl. Br. 20) are spurious.  Hearst obviously did not have advance notice of the wedding or Trump's surprise appearance at the wedding, nor is there any evidence that it knew that Plaintiff was the author of the Snapshot.  (*See* Def. 56.1 ¶ 149.)

*Video-Cinema Films*, 2001 WL 1518264, at *5 (rejecting plaintiff's argument that the

availability of public domain images of Robert Mitchum doomed networks' claim that their use

of different images of Mitchum in connection with his obituaries was fair).  And a text-only

article would not adequately substantiate and illustrate Hearst's commentary about the

President's availability for photographs that later surfaced on Instagram—if this were the

standard, a defendant could ***never*** establish news reporting, commentary, or criticism fair use of

an image or video because it would always have the option of verbally explaining the contents of

the image.  That is plainly not the law.  *See, e.g.*, *Nunez*, 235 F.3d at 24.[27]

Even assuming that Plaintiff's arguments had merit and he were able to prevail on this

single factor, the third factor alone is insufficient to tip the overall balance against fair use in a

photograph case.  *See, e.g.*, *Galvin*, 130 F. Supp. 3d at 1195.

### E.   The Article Had No Effect Upon Plaintiff's Market for the Snapshot—No Such Market Even Exists.

The fourth and final statutory factor—effect on the market for the copyrighted work—

confirms that Hearst's use of the Snapshot was fair.  This factor is closely connected to

copyright's ultimate purpose "to stimulate creativity among potential authors by enabling them

to earn money," *Authors Guild II*, 804 F.3d at 223, and it therefore requires "a balancing of the

benefit the public will derive if the use is permitted and the personal gain the copyright owner

will receive if the use is denied," *Swatch Grp.*, 756 F.3d at 90 (quoting *Bill Graham Archives*,

448 F.3d at 613).  It looks "***not*** whether the secondary use ***suppresses or even destroys*** the

---

[27] *Psihoyos*, 1998 WL 336655, (Pl. Br. 20) is inapposite because that Court's analysis of the third factor depended on its finding that—unlike here—the defendant used the photo for "a central purpose for which it was created," *id.* at *3-4 (citation omitted).  Regardless, that case—like *Monge* (*see supra* nn.20)—was decided prior to the Second Circuit's clear holding in *Swatch Group* that news reporting uses may warrant reproduction of an entire original work without alteration and even no commentary.  *Swatch Grp.*, 756 F.3d at 81-85.  Plaintiff's further citation to *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014)—which upheld a finding of fair use—is inapposite on this factor:  the defendants used a photograph to lampoon a mayor's policy choice, but the photograph they selected had no relationship whatsoever to their policy critique.  *Id.*  Thus, real alternatives were available.  *Id.*

market for the original work or its potential derivatives, but whether the secondary use **usurps**

the market of the original work"—which occurs only where "the infringer's target audience and

the nature of the infringing content is the same is the original." *Cariou*, 714 F.3d at 708

(emphasis added) (citation omitted).  Relatedly, "any economic 'harm' caused by transformative

uses does not count because such uses, by definition, do not serve as substitutes for the original

work." *Authors Guild I*, 755 F.3d at 99.  Here, the Article did not and could not affect Plaintiff's

market for the Snapshot because Plaintiff admits he never intended to establish such a market,

and the transformative Article's target audience is not the same as Plaintiff's.

### 1.   There is no presumption of market harm applicable in this case.

As a threshold matter, Plaintiff's claim that the Court may **presume** market harm under

*Sony Corp. of America*, 464 U.S. at 250 (Pl. Br. 21) is incorrect as a matter of law.  The Supreme

Court has stressed that "*Sony* itself called for no hard evidentiary presumption" of market harm,

and "[n]o 'presumption' or inference of market harm . . . is applicable to a case involving

something beyond mere duplication for commercial purposes." *Campbell*, 510 U.S. at 584, 591.

News reports like the Article are not so purely commercial as to warrant a presumption, even if

they include a complete copy of the underlying work.  *See, e.g.*, *Swatch Grp.*, 756 F.3d at 90-92

(fourth factor favored defendant where it had copied entirety of audio recording for news

reporting purposes, in part because of the public interest served by news reporting); *Bollea*, 913

F. Supp. 2d at 1328 (explaining that the indirect advertising profits of news media entities in

connection with online content "is distinguishable from selling access [to the content] solely for

the purpose of commercial gain" and imposing no presumption of market harm) (citation and

emphasis omitted).

As a result, market harm must be demonstrated.  *See Campbell*, 510 U.S. at 591.  Plaintiff cannot do so here.

### 2.   There is no market harm because Plaintiff never intended to enter the licensing or publishing market for the Snapshot.

Plaintiff cannot show that the Article harmed any market for the Snapshot because he has admitted there never was any actual or intended market.  It is undisputed that Plaintiff is not and has never been in the business of licensing photographs, and he took the Snapshot for his "personal use" as a memento of the wedding without any intention of publishing or exploiting it. (Def. 56.1 ¶¶ 31, 120-124.)  Consistent with that, he provided the Snapshot to Mr. Burke for free without inquiring how Mr. Burke would use or disseminate the image.  (Def. 56.1 ¶¶ 36, 38, 125-127.)  And there is no evidence that Plaintiff ever attempted to sell the Snapshot either before or after Hearst's Article was published.  In other words, Plaintiff never intended to—much less attempted to—market the Snapshot to news organizations or anyone else.

This is dispositive under the fourth factor.  There can be no market harm—and the fourth factor favors the defendant—where the defendant's work "filled a market . . . that the plaintiff simply had no interest in occupying."  *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993); *see also Cariou*, 714 F.3d at 709 (market is usurped only where "the infringer's target audience . . . is the same as the original").  By including the Snapshot in the Article, Hearst used it in the news market that Plaintiff never intended to fill and distributed it to an entirely new audience of Esquire.com readers.  This use had no demonstrable effect on Plaintiff's intended purpose for the Snapshot.  *See Calkins*, 561 F. Supp. 2d at 1143-44 (no market harm where plaintiff was "not in the business of reselling its clients' photographs to third parties" such as the defendant); *Dhillon*, 2014 WL 722592, at *6 (no market harm where plaintiff did not allege "that she ever sought or received a licensing fee from anyone at any time in

connection with the use of the [photograph at issue]" or "that she ever attempted to sell the [photograph] at any time in the past, or that she had any plans to attempt to do so in the future"); *Philpot*, 2018 WL 339142, at *8 (explaining that "use of the [photographs at issue] cannot impair the marketability of plaintiff's works where, as here, plaintiff has not actually contemplated marketing those works"); *accord Time, Inc.*, 293 F. Supp. at 146 (finding little injury to plaintiff where "[t]here is no competition between plaintiff and defendants" and plaintiff did not sell the pictures at issue).

And since Plaintiff never had any intent to license the Snapshot to the news media or disseminate it widely to the public as a news item, it is irrelevant that other media outlets also used the image **without** a license.  (*See* Pl. Br. 21-22.)  Demand in a market that Plaintiff does not intend to occupy does not establish market harm, and these unlicensed uses only underscore that Plaintiff himself was not in the direct news or news licensing market.  Nor is it relevant that those media outlets paid settlements after being sued, as litigation is not a commercial market contemplated by the Copyright Act.  *Philpot*, 2018 WL 339142, at *8 (fourth factor weighed in favor of defendant where "plaintiff admits that he has received no remuneration for use of the [photographs at issue] outside of the litigation context").[28]  Plaintiff's heavy reliance on *Fitzgerald* is misplaced because that case involved photographs taken by a professional photojournalist on assignment for *The Boston Globe* for the specific purpose of publishing those photographs in the *Globe* and potentially other news outlets.  491 F. Supp. 2d at 189.[29]

---

[28] For the same reasons, Hearst has not "concede[d]" that there was a market for Plaintiff's work by acknowledging that other news outlets published the Snapshot.  (*See* Pl. Br. 21.)  And the fact that Plaintiff has tried to get "his cut" **after** the Snapshot was picked up by *TMZ* (Pl. Br. 22; Def. 56.1 ¶¶ 43) establishes only that he wanted to try to make a quick buck by attempting to extract settlements from the media—not that he intended to market the Snapshot.  It is telling that Plaintiff has not once asserted that he made any attempt to sell the Snapshot to other media outlets even after discovering that the image had been published by *TMZ*.

[29] *Associated Press*, 931 F. Supp. 2d at 559-61, is similarly inapposite because—unlike here—the plaintiff was in the business of licensing its content to the services in the same commercial space in which the defendant operated.  *Id.* at 561.

33

Moreover, recognizing (as other courts have) that the fourth factor must favor Hearst on these facts is particularly important in light of the close relationship between the fourth factor and the underlying purposes of copyright.  *See supra* at 30.  Where, as here, a plaintiff never had any intention of selling his image in any market, it is plain that he also did not need the financial incentive of copyright to create the work.  At the same time, Hearst's Article benefited the public by disseminating newsworthy information and commentary about the President.  It would be senseless to find that Plaintiff has suffered some hypothetical market harm that counsels in favor of imposing liability on the news media where there has been no injury to either his finances or his incentive to create.  That would only ***limit*** free expression without also driving it, to the overall detriment of the public interest.  *See generally supra* Part I.A; *c.f. Swatch Grp.*, 756 F.3d at 85-86, 90-92 (where entire work was disseminated for news purposes and defendant did not intend to exploit the recording for news purposes, the use "did no harm to the legitimate copyright interests of the original author" and benefitted the public interest); *Time, Inc.*, 293 F. Supp. at 146 (similar).

### 3.  Even if Plaintiff intended to market the Snapshot, there is no evidence of cognizable market harm caused by Hearst's transformative use.

Even assuming *arguendo* that Plaintiff was a professional photojournalist or otherwise took the Snapshot with the intent of licensing it to the news media, the record is devoid of evidence of harm caused by Hearst's Article.  Plaintiff claims that Hearst's Article "made it unlikely that the market would purchase the [Snapshot] from Plaintiff," (Pl. Br. 22), but he does not explain ***why*** this would be true nor point to any supporting evidence.  In fact, the record contains no evidence that Plaintiff attempted to sell the Snapshot before or after Hearst's use, much less that any potential sales were thwarted as a result of Hearst's Article.  And to the extent that Plaintiff is arguing that his potential news licensing market was "eradicated" because

potential licensees would have no interest in paying for the Snapshot after it had already been published, that harm is attributable to Laura Piatowski's initial publication of the image on Instagram and/or the first unlicensed media use by TMZ.  (*See* Def. 56.1 ¶¶ 48-49, 42.)

In any event, any lost news licensing market would not be cognizable under the fourth fair use factor because Hearst's Article was transformative.  *See supra* Part I.B.2.  "A market harm for licensing revenues will only be recognized if the market is traditional, reasonable, or likely to be developed, ***and is not a protected transformative use.***"  *Bill Graham Archives, LLC*, 386 F. Supp. 2d at 333 (quotation marked omitted).  "[C]opyright owners may not preempt exploitation of transformative markets" by claiming that they ***could have*** tried to charge a license fee, or even "by developing or licensing a market" for such uses.  *Bill Graham Archives, LLC*, 448 F.3d at 615.  "The point of the fair use doctrine is that, in certain circumstances . . . the law will not require an infringer of a copyrighted work to obtain such a license."  *Video-Cinema Films*, 2001 WL 1518264, at *9.

### F. The Balance of the Factors, and the Purpose of Copyright, Establish that Hearst's Article Was a Fair Use.

Taking a step back, when all the relevant facts and factors are "weighed together, in light of the purposes of copyright," there is no doubt that Hearst made fair use of the Snapshot as a matter of law.  *Campbell*, 510 U.S. at 577-78.  Plaintiff is just "a guy with an iPhone" who happened to be in the right place at the right time.  (Pl. Br. 1.)  He spontaneously snapped a factual image of the President of the United States just to capture the memory, without any intention of licensing the image to the news media or even sharing it widely with others.  (Def. 56.1 ¶¶ 31, 120-124.)  There is no evidence that he attempted to sell a license to the photo or otherwise commercially exploit it.  (*See* Def. 56.1 ¶¶ 110, 112-113, 129.)  But after he noticed that the image had been transformed by the news media, including Hearst, into part of broader

35

reporting and commentary that brought new information and insights about the President to the public, he decided he would try and abuse the Copyright Act to grab a "cut."  (*See* Def. 56.1 ¶ 43.)

These undisputed facts make abundantly clear that Plaintiff did not need the financial incentive of copyright to create the Snapshot and Hearst's transformative Article will not impede Plaintiff—or others like him—from generating similar factual images for personal use in the future.  As a result, preventing Hearst's transformative use of the Snapshot on these facts—and thereby chilling similar uses—would only ***decrease*** public knowledge and expression without also stimulating more creation.  The better course is to recognize that copyright's goal of "expand[ing] public knowledge and understanding," and the public interest more generally, is best served by finding Hearst's Article a fair use.  *See supra* Part I.A (citing cases).  This is not to say that the copyright in an amateur iPhone photo can never be infringed by the news media— where such an image is creatively staged, or is taken for the purpose of news reporting or licensing, for example, the balance of factors may very well be different.  But on the facts of this case, the purpose of copyright is furthered only by allowing Hearst's use, not punishing it.

Indeed, a contrary holding would amount to an unconstitutional application of copyright's "built-in First Amendment accommodation[]."  *Eldred*, 537 U.S. at 219.  Given the lack of ***any*** actual harm to Plaintiff, imposing liability here would impermissibly restrict speech that "lies at the core of the First Amendment" without serving ***any*** countervailing interest.  *Swatch Grp.*, 756 F.3d at 84.

36

## II.      OTHER ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFF ON LIABILITY.

Even if the Court were to find that the Article was not fair use as a matter of law—which it cannot, for the reasons set forth in Part I, *supra*—other genuine issues of material fact preclude a grant of summary judgment to Plaintiff on the issue of liability.

*First*, there is a material question as to whether Plaintiff has a valid copyright registration for the Snapshot, which is an essential prerequisite to his infringement claim.  *See* 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").  A copyright claim must be dismissed unless the work at issue was the subject of a valid registration *prior* to the filing of the lawsuit.  *See, e.g.*, *Zuma Press, Inc. v. Getty Images (US), Inc.*, No. 16 Civ. 6110 (AKH), 2017 WL 2829517, at *4 (S.D.N.Y. June 29, 2017) (noting that "courts in this district are virtually unanimous on this point" and citing cases).

Plaintiff points to the '309 Certificate as evidence of his registration of the Snapshot.  (Pl. Br. 7.)  While Hearst does not dispute the authenticity of the '309 Certificate, that document serves merely as "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).  Thus, if a certificate does not clearly identify the particular work at issue, "the presumptive validity of the [certificate] has no bearing on [the] threshold issue" of whether the work at issue is registered, and the court "must examine other evidence in the record to determine whether [the plaintiff] has met its burden."  *Louise Paris, Ltd. v. Standard Fabrics Int'l, Inc.*, No. 15 Civ. 3250 (PKC), 2016 WL 4203548, at *2-3 (S.D.N.Y. Aug. 8, 2016).  Here, the '309 Certificate merely states that Plaintiff registered a photograph or group of photographs titled "Donald Trump crashes wedding at Trump Nationsl [sic] Golf Club, Bedminster, NJ."  But Plaintiff took a great many snapshots of Donald Trump at the Wedding

37

(Def. 56.1 ¶ 116), and thus the Certificate alone does not establish that the particular Snapshot at issue is covered by the registration.  Nor do Plaintiff's other documents and testimony:  Plaintiff did not produce an official deposit copy of the Snapshot from the Copyright Office, and at his deposition, he testified that he provided his counsel with "multiple images" for registration and was "not sure how" the actual registration process was handled.  (Def. 56.1 ¶¶ 131-132.)

To fill this evidentiary gap, Plaintiff relies solely on the Declaration of Donna Halperin, a previously undisclosed witness who should be precluded and in any event is not credible.  As set forth in Hearst's accompanying Motion to Strike, Plaintiff never disclosed Ms. Halperin as a witness with knowledge of Plaintiff's copyright registration, despite having several opportunities to do so, and Plaintiff should be precluded from relying on her testimony under Rule 37(c).  *See, e.g.*, *Lebada v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 758 (LAK) (GWG), 2016 WL 626059, at *4-7 (S.D.N.Y. Feb. 8, 2016) (precluding summary judgment affidavits of previously undisclosed witnesses).  Moreover, by relying on Ms. Halperin's testimony to substantiate the connection between the '309 Certificate and the Snapshot, the issue becomes one of credibility.  *See generally Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (credibility determinations are the province of the jury).  And even the face of Ms. Halperin's declaration raises questions about her testimony—the image she claims to have submitted to the Copyright Office for registration (Halperin Decl. ¶ 6 & Ex. A) is ***not*** the same "modified" version of the Snapshot that Plaintiff otherwise distributed and that Hearst used (Def. 56.1 ¶¶ 37, 42).  At a minimum, Hearst should be given the opportunity to test the credibility of Ms. Halperin's previously undisclosed testimony at trial.

***Second***, there are material questions of fact as to Hearst's affirmative defenses of waiver and consent.  Plaintiff has conceded that he provided the Snapshot to Sean Burke without

imposing *any* restrictions on Mr. Burke's use or transmission of the Snapshot. (Def. 56.1 ¶¶ 38, 125-127.) This initial handout eventually resulted in the Snapshot being published on Laura Piatowski's Instagram account and then being picked up by the media, including Hearst. (*See* Def. 56.1 ¶¶ 48, 49, 128.) Yet Plaintiff has not filed any legal action against Mr. Burke or Ms. Piatowski concerning their use and dissemination of the Snapshot. (Def. 56.1 ¶ 133.)

These record facts raise material questions about whether Plaintiff intended to relinquish his right to sue for infringement based on uses of the Snapshot—like Hearst's—that trace back to Mr. Burke's dissemination of the image. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) (discussing waiver under New York law).[30] They also raise similar questions as to whether the scope of the license Plaintiff granted to Mr. Burke included a right to further disseminate the Snapshot to others. *See Reynolds v. Hearst Commc'ns, Inc.*, No. 17-cv-6720 (DLC), 2018 WL 1229840, at *3 (S.D.N.Y. Mar. 5, 2018). Indeed, Plaintiff's course of conduct here suggests that he may very well have released the Snapshot to Mr. Burke fully intending to allow Mr. Burke to do anything he wanted with the Snapshot, and then changed his mind later when he saw that the image had been picked up by *TMZ*. (*See* Def. 56.1 ¶¶ 38, 43, 125-127.) To the extent Plaintiff now contends that he intended to limit Mr. Burke's right to use the Snapshot (without ever saying so to Mr. Burke), the jury should be permitted to weigh the credibility of that testimony against Plaintiff's contrary conduct. There is a triable issue of fact as to Plaintiff's intent in distributing the Snapshot, precluding summary judgment for Plaintiff on Hearst's defenses of waiver and consent.

---

[30] The waiver case cited by Plaintiff (Pl. Br. 24) was decided under Texas law, which is not applicable here.

### III.    PLAINTIFF CANNOT ESTABLISH WILLFUL INFRINGEMENT.

In the alternative, Hearst is entitled to a partial summary judgment determination that any infringement was not willful.[31]  Plaintiff bears the burden of establishing willfulness under the Copyright Act, 17 U.S.C. § 504(c)(2), which requires him to show Hearst's "mental state" and establish that Hearst "had knowledge that its conduct constituted infringement or showed reckless disregard for the copyright holder's rights."  *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005).  He cannot do so on this record, which is entirely devoid of evidence of the subjective mental state of the former Hearst employee who used the Snapshot—much less evidence upon which a reasonable juror could find that he used the Snapshot in knowing or reckless disregard of Plaintiff's copyright.  *See Celotex Corp.*, 477 U.S. at 322-23.

In fact, Plaintiff did not even try to develop such evidence:  he did not bother to take the deposition of the author of the Article nor any other former or current Hearst employee.  Thus, while he asserts that "Hearst made no effort to ascertain the actual identity of the copyright holder prior to publication" (Pl. Br. 4, 17), that claim—and any others he may make about Hearst's pre-publication actions or state of mind—is entirely unsupported by actual record evidence, and instead based only on Plaintiff's ***own*** inadmissible interpretation of documents produced by Hearst.[32]  This speculative claim is insufficient to create a genuine issue of fact as to

---

[31] Section 504 of the Copyright Act provides that, "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages"—which are normally capped at $30,000—"to a sum of not more than $150,000."  17 U.S.C. § 504.

[32] As set forth in Hearst's accompanying Motion to Strike and Local Civil Rule 56.1 statement, Hearst specifically objects to the paragraphs of Plaintiff's declaration in which he purports to interpret Hearst's documents as inadmissible under Federal Rule of Evidence 602 and Federal Rule of Civil Procedure 56(c)(4) because he lacks personal knowledge as to the meaning of those documents.  *See, e.g.*, *Star Ins. Co. v. Hazardous Elimination Corp.*, No. 05-4762, 2007 WL 316569, at *13 (E.D.N.Y. Jan. 30, 2007); *Dedyo v. Baker Eng'g N.Y., Inc.*, No. 96 Civ. 7152 (LBS), 1998 WL 9376, at *4 (S.D.N.Y. Jan. 13, 1998).

willfulness; all Hearst's documents actually show on their face is that the author of the Article obtained some images from the wedding from the Instagram account of Laura Piatowski, and the Article credited the Snapshot to the same Instagram account.  (*See* Def. 56.1 ¶¶ 146, 152-156.) There is no other record evidence as to Hearst's pre-publication actions, and the record is silent as to Hearst's subjective intent.

Due to this lack of evidence, it is apparent that Plaintiff will attempt to prove willfulness based ***solely*** on the fact that Hearst is a mass media company that is knowledgeable about copyrights and has been sued—but not held liable—for copyright infringement (on widely varying facts) in recent years.  (Def. 56.1 ¶¶ 11-18, 24-27.)[33]  As a matter of law, these facts alone cannot be sufficient evidence for a trier of fact to find willfulness, especially where, as here, Hearst credited its source for the Snapshot and removed the work after being notified of Plaintiff's claim.  *C.f. Twin Peaks Prod., Inc.*, 996 F.2d at 1381-82 (upholding finding of willfulness where defendant "continued publication after receiving a specific warning").  If that were enough, then *every* mass media company could be deemed willful and liable for up to $150,000 in *every* case, no matter the facts, and no employee of a major publisher could ever make a mistake without the question of willfulness being presented to the jury.  The burden would effectively be shifted to media companies to disprove willfulness.  That was plainly not Congress' intent in creating enhanced statutory damages for willful infringement—which is explicitly "the copyright owner['s] . . . burden of proving."  17 U.S.C. § 504(c)(2).

---

[33] Notably, the vast majority of Hearst's recent copyright cases were filed by Plaintiff's counsel Richard Liebowitz, who has been deemed a "copyright 'troll'" and has filed more than 500 cases in this District in the past twenty-four months.  *Reynolds*, 2018 WL 1229840, at *4.  As Judge Cote recently detailed in another case that Mr. Liebowitz filed against Hearst, "[a] number [of] Mr. Liebowitz's cases have been dismissed from the bench as frivolous."  *Id.* (citing cases).

Moreover, if willfulness damages were presumptively available in every copyright case filed against a major media company, plaintiffs could and would routinely use the threat of a $150,000 award to extract large settlements that bear no relationship to the value of their copyrighted work in cases where there is no evidence of anything other than negligence.  To some extent this is already happening, *see supra* nn.33, and the Court should take this opportunity to curb this abuse of the Copyright Act and make clear that willfulness cannot be established based on a corporate defendant's familiarity with copyright law alone.

Accordingly, this Court should hold that this sparse record presents insufficient evidence for any reasonable juror to find willful infringement, and grant partial summary judgment to Hearst on the issue of willfulness.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should grant Hearst Motion for Summary Judgment in its entirety, deny Plaintiff's Motion, and dismiss this action with prejudice.

Dated: March 26, 2018
       New York, New York

Respectfully submitted,

/s/ Jennifer D. Bishop
Jonathan R. Donnellan
Ravi V. Sitwala
Jennifer D. Bishop
The Hearst Corporation
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
jdonnellan@hearst.com
rsitwala@hearst.com
jbishop@hearst.com

*Counsel for Defendant Hearst Communications, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 26, 2018.

/s/ Jennifer D. Bishop
Jennifer D. Bishop