IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JONATHAN OTTO,

                Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,

                Defendant.

C.A. No. 1:17-cv-04712-GHW

**DECLARATION OF MICHAEL SEBASTIAN
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, MICHAEL SEBASTIAN, declare under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.      My name is Michael Sebastian, and I am over the age of 18 and fully competent

to make this Declaration.  I am the Digital Director of Esquire.com, a publication of defendant

Hearst Communications, Inc. ("Hearst"), and have been in this position since May 2017.  Prior to

that, I was News Director for Hearst's Digital Media division.  I have worked for Hearst since

July of 2015.  I submit this declaration in support of Hearst's motion for summary judgment and

in opposition to Plaintiff's motion for partial summary judgment, and I have personal knowledge

of the facts set forth herein.

***The Article At Issue***

2.      In my capacity as Digital Director of Esquire.com, I often oversee the

development of and edit articles for publication on the site.  I also have access to, and frequently

review, information about published and unpublished content for Esquire.com that is displayed

within Hearst's digital content management system ("CMS").  I am fully familiar with the various types of information stored in the CMS and the meaning and effect of that information.

3.      On the morning of June 11, 2017, Peter Wade, then Esquire.com's weekend editor, sent me a message on Slack (a messaging application) with a link to an article on *The Hill*'s website at http://thehill.com/blogs/blog-briefing-room/337295-trump-crashes-wedding-at-new-jersey-golf-club.  Mr. Wade also sent me an image of the President with a bride and groom, which I understood to have come from *The Hill*'s article, and the following text, which I understood to be a quote from *The Hill* article:  "The New Jersey golf club even touted him as a selling point in past brochures, according to the New York Times.  "If he is on-side for your big day, he will likely stop in & congratulate the happy couple.  He may take some photos with you but we ask you and your guests to be respectful of his time & privacy."  Based on these communications, I understood that Mr. Wade had first learned about President Trump crashing the wedding from *The Hill*'s article.  And based on our prior communications and practice, I understood that Mr. Wade was pitching me potential Esquire.com coverage of President Trump's appearance at the wedding and his willingness to appear in guest photos.  A true and compete copy of our Slack conversation regarding that topic is attached hereto as Exhibit A.

4.      After I asked Mr. Wade if the picture he had sent me was recent, he responded "yeah, it's from last night according to The Hill.  trying to find original source."  *See* Exhibit A.  From this message, I understood that Mr. Wade was looking for *The Hill*'s "original source" for its reporting and the image he had sent me.

5.      Mr. Wade then sent me a link to a different version of the image he had previously sent me on the Instagram account of Laura Piatkowski (@lauramp11), with the further message "oh wow.  there are a bunch of them."  *See* Exhibit A.  From this message, I

understood that Mr. Wade had located several images of President Trump at the wedding on the Instagram of Laura Piatkowski (@lauramp11).

6.  I instructed Mr. Wade to "start there" with developing an article for publication on Esquire.com.  I did so, in part, because I believed that the fact that photos of President Trump crashing a wedding had surfaced on Instagram—and that Trump clubs have *advertised* the President's willingness to appear in such photos—was notable, as it fits within the broader commentary in the news media (including several prior articles on Esquire.com) about the President's apparent desire for public adoration and publicity.

7.  Mr. Wade did not provide me with any further information about how he looked for sources of material for inclusion in an Esquire.com article about President Trump's appearance at the wedding and his willingness to take photos with guests.

8.  Subsequently, at 10:41 a.m. on June 11, 2017, Mr. Wade posted an article on Esquire.com entitled "President Trump Is the Ultimate Wedding Crasher," at the URL http://www.esquire.com/newspolitics/news/a55573/president-trump-wedding-crasher (the "Article").  A true, correct, and complete copy of the Article is attached hereto as Exhibit B.  The Article specifically reported on the fact that images of the President at the Wedding surfaced on Instagram and commented on the event as part of a broader trend of the President crashing weddings at his golf clubs and making himself available for photographs and autographs at such events.  By emphasizing the President's willingness to appear in social media photographs and sign autographs, the Article also makes an implicit point about the President's desire for public adoration and publicity.

9.  The full text of the Article reads as follows:

> The most recognizable guest at Kristen Piatkowski and Tucker
> Gladhill's wedding on Saturday night wasn't even invited.

> President Donald Trump crashed the couple's wedding taking
> place at Trump National Golf Club in Bedminster, New Jersey.
>
> Photos surfaced on Instagram showing the husband and wife
> smiling with President Trump, who apparently stopped by to greet
> the couple and shake hands with guests.
>
> Trump has become such a fixture at nuptials at his resorts, the
> Bedminster club once advertised a Trump appearance as a
> potential feature of booking a wedding there, according to a now-
> discontinued brochure obtained by the *New York Times*:
>
>> If [Trump] is on-site for your big day, he
>> will likely stop in & congratulate the happy
>> couple.  He may take some photos with you
>> but we ask you and your guests to be
>> respectful of his time & privacy.
>
> This was Trump's 24th visit to a golf course since he was elected.
> In addition to making an appearance, it looks like Trump also took
> the time to sign autographs for fans.  One photo showed Trump
> with a Sharpie, waving a Make America Great Again hat.

*See* <u>Exhibit B</u>.

10.    The Article is accompanied by three images, including the image that I understand to be at issue in this action (the "Snapshot").  Each image is accompanied by an attribution line crediting the image to the Instagram account of Laura Piatkowski (@lauramp11) that reads "Instagram/@lauramp11."  *See* <u>Exhibit B</u>.

11.    Based on this attribution line, Hearst's customs and practice, and information about the Article displayed in Hearst's CMS that I have reviewed, I understand that Mr. Wade obtained each of the three images referenced in Paragraph 10 from the Instagram account of Laura Piatkowski.

12.    The three images referenced in Paragraph 10 substantiate the Article's reporting and commentary about the fact that "[p]hotos surfaced on Instagram" showing the President at the wedding.  In particular, the Snapshot is important to the Article's commentary about the

President's willingness to be photographed at weddings because it depicts the President and a

bride surrounded by multiple cameras.

13.    By the time this litigation was filed on June 21, 2017, Peter Wade was no longer a

Hearst employee, for reasons that are unrelated to his performance.

14.    I was not aware of Plaintiff's claim of ownership in the Snapshot prior to Hearst's

receipt of the complaint in the litigation.  To the best of my knowledge, no one else at Hearst was

aware of Plaintiff's claim of ownership in the Snapshot prior to Hearst's receipt of the complaint

either.

15.    Hearst removed the Snapshot from Esquire.com promptly after receiving

Plaintiff's complaint.

***Hearst's CMS***

16.    Hearst's CMS stores certain information about published and unpublished content

from many of Hearst's websites, including Esquire.com.

17.    Attached hereto as <u>Exhibit C</u> is a true and correct set of screenshots from Hearst's

CMS that display information about the Article stored in Hearst's CMS.  Hearst editors can edit

some, but not all, of the pieces of information about the Article that are visible in <u>Exhibit C</u>.

With respect to certain of the information in <u>Exhibit C</u> that can be edited—for example, the

information in the "Content Type" section—Hearst editors are only able to select from a limited,

prepopulated list of entries.

18.    Attached hereto as <u>Exhibit D</u> is a true and correct set of screenshots from Hearst's

CMS that display information about the Snapshot stored in Hearst's CMS.  As with the

information about the Article, Hearst editors can edit some, but not all, of the pieces of

information about the Snapshot that are visible in <u>Exhibit D</u>.  And with respect to some of the

information in Exhibit D that can be edited—for example, the information in the "Copyright"

section—Hearst editors are only able to select from a limited, prepopulated list of entries.

19.     The "Copyright" and "Photographer Name" sections in Exhibit D, which both

appear under the heading "Attribution," are used by the CMS to generate a photograph

attribution line on Hearst's public-facing websites, including Esquire.com.  In order for any

photograph to be published on Hearst's public-facing website, either the "Copyright" section or

the "Photographer Name" section must be completed.  Because these fields are used to generate

an attribution line, the information entered into these fields does not always refer to a

photograph's *actual* copyright owner or photographer, depending on the circumstances.

20.     The "Copyright" section visible in Exhibit D contains a prepopulated list of

common sources for photographs used on Hearst's websites, such as Getty Images and the AP.

If a photograph does not come from one of the sources in the prepopulated list, the "Copyright"

field must be left blank.  Editors *cannot* manually type a new entry into the "Copyright" field.

21.     If the source of a photograph to be published on one of Hearst's websites is not

included in the prepopulated list available in the "Copyright" field, a Hearst editor must

manually type an attribution line into the "Photographer Name" field visible in Exhibit D before

an image can appear on Hearst's public-facing sites.  Generally, in typing an attribution line into

this field, Hearst editors will reference their source or licensor for the particular photograph

being added—which may or may not be the actual photographer's name, depending on the

circumstances of the sourcing and permission for the image.

22.     The only inferences that can be drawn with respect to the information about the

Snapshot populated in the "Copyright" and "Photographer Name" fields in Exhibit D are that (1)

the Snapshot was obtained from—and was to be attributed to—Laura Piatkowski's Instagram

account, and (2) the Snapshot did *not* come from one of Hearst's common sources, such as Getty Images or AP.

23.     The "Limited Rights," "Syndication Rights," and "Image Rights" sections visible in Exhibit D are used by the CMS to tag an image for possible re-use in a variety of contexts. The "Image Rights' field specifically refers to whether the image can be re-used in a new article. The "No Rights" selection within this field, which is visible in Exhibit D, indicates that the Snapshot was not to be re-used in another Hearst article.

***Programmatic Advertisements on Esquire.com***

24.     Hearst does not charge for access to Esquire.com, and did not charge for access to the Article.  However, as with most of the pages on Esquire.com, programmatic advertisements ran alongside the Article.  These ads are served to Hearst's websites through a series of online ad exchanges which conduct split-second auctions for the ad space.  Hearst receives only a tiny fraction of a cent per page view from the display of each programmatic ad on Esquire.com, and it receives the lowest rate for content that is categorized as "News and Politics."

25.     Because the Article was not part of a sponsorship program, to the best of my knowledge, the only revenue Hearst received from its publication of the Article would have come from the programmatic ads that ran with the Article.

26.     A very conservative estimate of the total revenue Hearst received from the programmatic ads that ran alongside the Article (during the limited time the Article was online) is $148.99, based on the page views of the Article and Esquire.com's average *total* revenue (not just programmatic ad revenue) per page view during the time the Article was online.  The actual amount is likely quite lower, because the revenue associated with the Article would have come

from programmatic ads, and because the Article was placed in the "News & Politics" ad category, which, again, pays the lowest rate per page view.

*Hearst's Use of Images on Esquire.com*

27.    Nearly all articles on Esquire.com are accompanied by a visual element.  When Hearst publishes digital news articles on Esquire.com without any photographs, those articles are nearly always accompanied by a video or other visual element.

28.    Hearst sometimes pays to license photographs for use in connection with articles on Esquire.com.  It typically pays between $20 and $100 to license images of public figures, such as celebrities or politicians, for use on Esquire.com.

*Other Relevant Facts*

29.    I understand that the plaintiff in this case has submitted as Exhibit G to his declaration a copy of the Article at issue that was produced by Hearst in this action.  That copy of the Article does not contain the full text of the Article, because one paragraph of the Article is obstructed by a gray block that reads [ADVERTISEMENT-CONTINUE READING BELOW]. This obstruction sometimes occurs when Hearst's websites are printed, due to the way the programmatic ad elements are pulled into the publicly visible website.  The full text of the Article is set forth in Exhibit A to this declaration, and the paragraph that is missing from Plaintiff's Exhibit G is also visible in Exhibit C's screenshots from Hearst's CMS.


Executed this 26th day of March, 2018, in New York, New York


_____
Michael Sebastian

8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above document filed through the ECF

system will be sent electronically to the registered participants as identified on the Notice of

Electronic Filing on March 26, 2018.

/s/ Jennifer D. Bishop
Jennifer D. Bishop