# Exhibit C

1

2          IN THE UNITED STATES DISTRICT COURT

3            SOUTHERN DISTRICT OF NEW YORK

4              Case No. 1:17-cv-04712-GHW

5    ----------------------------------------------x

6    JONATHAN OTTO,

7                        Plaintiff,

8        v.

9    HEARST COMMUNICATIONS, INC.,

10                       Defendant.

11   ----------------------------------------------x

12

13       VIDEOTAPED DEPOSITION OF JONATHAN OTTO

14          New York, New York

15          Monday, December 11, 2017

16

17

18

19   Reported by:

     Amy A. Rivera, CSR, RPR, CLR

20

21

22

23   JOB NO. 134834

24

25

JONATHAN OTTO

A.   It's seems to imply that it was from
Instagram from Laura MP 11, but I don't know.
There's a Pinterest in the bottom right-hand
corner, but I'm not sure if that's advertising
or --
Q.   Do you know who owns the Instagram
account, Laura MP 11?
A.   I do not.
Q.   Do you know how Laura MP 11 might have
obtained a copy of the photograph?
A.   I do not.
Q.   When did you discover the photograph
on esquire.com?
A.   Somewhere the day after the wedding.
Q.   How did you come across it?
A.   I just started looking -- I primarily
ran a Google image search to back search if it
found my image in other locations.
Q.   What prompted you to run a Google
image search?
A.   Because my wife had received a text
message asking her if some of the media stories
were the wedding we attended to -- attended.  And
my wife had noticed, I guess -- my wife sent it to

JONATHAN OTTO

me, I believe, and I noticed right away it was my
photo.
Q.   And why did that prompt you to look
for other instances of your photo being used?
A.   Because none of them had permission to
use my photo.
Q.   But why did you expect other media
outlets had used your photograph?
A.   At the point I looked at the one
article, I saw at least probably a dozen other
articles.
Q.   And what did you expect would happen
after you identified unauthorized uses of your
photograph?
A.   I wasn't sure.  I had known it was an
issue.  I had other outlets use my photos without
permission in the past.  They were generally
one-offs.  But I inquired with, you know, some
attorneys and friends, you know, what I could do
about it.
Q.   You said you had other photos used
without permission by media outlets in the past,
what were those photos?
A.   I don't know all of them.  The biggest

JONATHAN OTTO

one, I took a photo from Hurricane Sandy of
flooded taxicabs in Hoboken.  That's probably the
biggest one.
Q.   Did you post that to your social
media?
A.   I believe so, yes.
Q.   Is that how the media outlets obtained
your photograph?
A.   I'm not sure.
Q.   Did you ever file a lawsuit?
A.   I don't think so.
Q.   Did you, with respect to that
Hurricane Sandy photograph, did you ever complain
to the media outlets that used it without your
authorization?
A.   Yes.
Q.   Did you ever receive a payment from
the media outlets for the use of that photograph?
A.   No.
Q.   Did you ever ask that they pay you for
the use of that photograph?
A.   Possibly in communication with them.
Q.   So you said a minute ago that after
the day after the wedding, when you discovered at

JONATHAN OTTO

least one use of your photograph in the media,
you -- you spoke with friends and attorneys.  Who
were the friends and attorneys you spoke with?
A.   Oh, I -- I couldn't name them all.  I
mean, I know I had reached out to Liebowitz,
Richard Liebowitz, the day after.  I'm not sure of
the other attorneys that I reached out to by name.
There were probably half a dozen.
Q.   What about the friends you reached out
to?
A.   Probably just friends I was with that
day.  I think we were having a few friends over
that afternoon.
Q.   And what did you speak with your
friends about, with respect to the photograph?
A.   Just confirming that it was indeed my
photo that was being used in the media and --
yeah.
Q.   Did you know Mr. Liebowitz prior to
reaching out to him about this photograph?
A.   I believe I had contacted him for
probably my Hurricane Sandy photo.  I believe that
was what it was.  It could have been a
different -- for a different photo thing.

Page 38

JONATHAN OTTO

1
2    Q.  About when did the issue with your
3    Hurricane Sandy photo arise?
4    A.  Oh, it's been ongoing, since Hurricane
5    Sandy 'til today.
6    Q.  So it's still being used without your
7    authorization?
8    A.  Yes.  I think there was something
9    recently with the five-year anniversary, but I'm
10   not sure.
11   Q.  And you said you might have contacted
12   Mr. Liebowitz about other photos, but you don't
13   recall what those photos are?
14   A.  There's a lot.  There's a lot of
15   photos and videos of mine that have been
16   published.  Most recently -- most recently, I took
17   the video of a man being saved from drowning in
18   the Hudson River.  That made news outlets and
19   staff started publishing.
20   Q.  And how -- do you know how those news
21   outlets published that photograph?
22   A.  I'm assuming from my Twitter, but they
23   downloaded it and didn't repost it.
24       MS. BISHOP:  I'd like to take a little
25   break.  I don't know if now is a good time,

Page 39

JONATHAN OTTO

1
2    but it is for me.
3        So if we can go off record.
4        VIDEOGRAPHER:  The time is 11:07 a.m.
5    We're off the record.
6        (Recess.)
7        VIDEOGRAPHER:  The time is 11:12 a.m.
8    We're on the record.
9    BY MS. BISHOP:
10   Q.  Mr. Otto, I asked you a few minutes
11   ago who the friends were at your apartment the day
12   that you were discussing the media's uses of your
13   photograph.  Can you just, please, provide their
14   names for me?
15   A.  I'm not sure who it was.  It was
16   months back now.  I'm not sure.  In the
17   summertime, we tend to have a lot of people over
18   on the weekends.
19   Q.  You don't remember even one person?
20   A.  No, not definitively.
21   Q.  When did you retain Richard Liebowitz
22   as your lawyer for any matter?
23   A.  Actually retain him?  In this case?
24   Q.  In any case?
25   A.  I'm not sure I retained him.  It might

Page 40

JONATHAN OTTO

1
2    have been just, you know, information gathering
3    previous instances when I spoke with him.  But in
4    this case, I believe it was maybe two, three days
5    after the wedding.
6    Q.  Do you recall at all when you spoke to
7    him about other instances that are not this
8    photograph?
9    A.  I do not.
10   Q.  Was it in the last year?
11   A.  I'm not sure.
12   Q.  Was it more than three years ago?
13   A.  I'm not sure.
14   Q.  Have you ever licensed the photograph
15   at issue in this case to anyone?
16   A.  Currently, yes.
17   Q.  What do you mean by "currently"?
18   A.  We've -- we've licensed the photos,
19   yes.
20   Q.  Who have you licensed it to?
21   A.  TMZ.
22   Q.  Is that it?
23   A.  To my knowledge as of today, yes.
24       (Exhibit 7, a license, was marked for
25   identification at this time.)

Page 41

JONATHAN OTTO

1
2    Q.  Mr. Otto, do you recognize Exhibit 7?
3    A.  Yes.
4    Q.  Is this your license with TMZ?
5    A.  Yeah, with Warner Brothers
6    Entertainment.
7    Q.  Do you know why it's marked
8    "confidential" at the top?
9    A.  I'm not sure.  There were a bunch of
10   confidentiality agreements that I signed with
11   them.
12   Q.  With TMZ and Warner Brothers?
13   A.  Yes.
14   Q.  So I want to direct your attention to
15   the second "whereas" paragraph in recitals on the
16   first page of the license.
17   A.  Sorry.  Which?
18   Q.  The second whereas paragraph, so
19   there's a heading that says "recitals," there's
20   two?
21   A.  Okay.
22   Q.  Does this license -- does this
23   paragraph indicate that this license authorizes
24   TMZ's use of the photograph at a specific URL?
25   A.  Correct.

Page 42

JONATHAN OTTO

1
2     Q.    Does the license authorize that use
3  beginning on a specific date?
4     A.    I'm not sure.
5     Q.    Do you know when TMZ published the
6  photo?
7     A.    To the best of my knowledge, it was
8  the day after the wedding.
9     Q.    Does this license cover TMZ's use of
10  the photo going back to the day after the wedding?
11     A.    I'm honestly not sure.
12     Q.    Do you know whether you could sue them
13  for their use in between the day of the wedding
14  and the day this license agreement was signed?
15     A.    I'm not sure.
16     Q.    Did TMZ approach you to negotiate a
17  license?
18     A.    I believe so.
19     Q.    They approached you?
20     A.    I believe so.
21     Q.    Under what circumstances?
22     A.    I believe due to the lawsuit.
23     Q.    What lawsuit?
24     A.    Regarding their use of the photograph
25  we had filed a lawsuit against them.

Page 43

JONATHAN OTTO

1
2     Q.    What's the status of that lawsuit?
3     A.    I believe that one's settled or a
4  settlement, I think, as well.
5     Q.    Was this license agreement part of the
6  settlement of that lawsuit?
7     A.    No, they're separate.
8     Q.    How are they separate?
9     A.    We had a settlement with them after
10  the license agreement.
11     Q.    Is there a separate written settlement
12  agreement?
13     A.    Yes.
14     Q.    Was there an additional payment
15  besides this license fee in consideration for the
16  settlement agreement?
17     A.    I can't talk about it.
18     Q.    Why can't you talk about it?
19     A.    I'm not sure what the confidentiality.
20     Q.    We have a confidentiality order in
21  this case, and you can mark this part of the
22  deposition as "confidential" and he can answer the
23  question.
24         MR. FREEMAN:  He can't answer any
25     questions about a settlement agreement.

Page 44

JONATHAN OTTO

1
2  That's confidential, even though we had a
3  confidential protective order, the terms of
4  that agreement bind him to not answer these
5  questions.  So we can't lead him into breach
6  of contract with Warner Brothers by virtue
7  of him answering your question.
8         MS. BISHIOP:  Can we go off the record
9     for a second?
10         VIDEOGRAPHER:  The time is 11:18 a.m.
11     We're off the record.
12         (Recess.)
13         VIDEOGRAPHER:  The time is 11:20 a.m.
14     We're on the record.
15  BY MS. BISHIOP:
16     Q.    Were there any other confidential
17  settlement agreements that you've signed with
18  third parties regarding the use of the photograph?
19     A.    Yes.
20     Q.    Approximately how many?
21     A.    I think one.
22     Q.    Who was the third party with whom you
23  signed that settlement agreement?
24     A.    I'm not sure I can -- like I said, all
25  of them have a bunch of confidentiality documents

Page 45

JONATHAN OTTO

1
2  that I signed along with it.
3     Q.    You just said there was only one more,
4  and now you're referring to all of them.  I just
5  want to be clear as to how many there are.  Are
6  there two or three or five?
7     A.    There's two settlements and one
8  license.
9     Q.    And one of the settlements is also
10  with TMZ and Warner Brothers?
11     A.    Correct.
12         MS. BISHOP:  And I just want to put on
13     the record as we discussed off line, we're
14     going to request that this deposition remain
15     open so that we can go to the Court and
16     request the settlement -- request a court
17     order ordering production of the settlement
18     agreements and we reserve our rights to come
19     back and reopen the deposition and question
20     you regarding the settlement agreements.
21         (Exhibit 8, a text message, was marked
22     for identification at this time.)
23     Q.    Mr. Otto, what is Exhibit 8?
24     A.    I believe it was a text message
25  exchange with Sean Burke the day after the