**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN OTTO, <br><br>                 Plaintiff, <br><br>    - against – <br><br><br> HEARST COMMUNICATIONS, INC. <br><br><br>                Defendants. | 1:17-cv-04712 (GHW-JLC) <br><br><br> ECF Case |


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON**
**LIABILITY AGAINST DEFENDANT FOR COPYRIGHT INFRINGEMENT**
**AND IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**


Richard Liebowitz
James H. Freeman
LIEBOWITZ LAW FIRM, PLLC
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
rl@liebowitzlawfirm.com
jf@liebowitzlawfirm.com

*Counsel for Plaintiff Jonathan Otto*

## TABLE OF CONTENTS[1]

TABLE OF AUTHORITIES ........................................................................ v

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT ............................................................................................ 2

POINT I:   THE TWO ELEMENTS OF PLAINTIFF'S INFRINGEMENT CLAIM
HAVE BEEN ESTABLISHED AND STAND UNREBUTTED BY ANY
CONTRARY EVIDENCE ............................................................ 2

A. THE 309 REGISTRATION MEETS ALL STATUTORY REQUIREMENTS AND IS
THEREFORE VALID WITH RESPECT TO OTTO'S PHOTOGRAPH ................................ 3

B. PLAINTIFF PRESENTS TESTIMONY FROM THREE WITNESSES, INCLUDING LEAD
COUNSEL OF RECORD, WHO SWEAR THAT OTTO'S PHOTOGRAPH IS ON DEPOSIT
WITH THE 309 REGISTRATION .................................................................. 5

C. THE EVIDENTIARY BURDEN RESTS ON HEARST – NOT OTTO – TO PRESENT DEPOSIT
COPIES FROM THE COPYRIGHT OFFICE TO REBUT VALIDITY ................................. 7

D. DEFENDANT HAS FAILED TO PROFFER ANY EVIDENCE THAT OTTO DEFRAUDED
THE COPYRIGHT OFFICE .......................................................................... 10

POINT II:   THE COURT SHOULD DISMISS THE FAIR USE DEFENSE OR, IN
THE ALTERNATIVE, LET THE JURY DECIDE .................................... 11

A. HEARST DOES NOT ENJOY A FIRST AMENDMENT RIGHT TO INFRINGE PLAINTIFF'S
WORK AND MUST BEAR THE BURDEN OF PROVING FAIR USE .............................. 12

B. REJECTION OF THE FAIR USE DEFENSE WILL PROMOTE THE PURPOSE OF THE
COPYRIGHT ACT.. ................................................................................. 13

C.  WITH RESPECT TO THE FIRST FACTOR, HEARST HAS FAILED TO DEMONSTRATE
THAT ITS FOR-PROFIT USE OF OTTO'S PHOTOGRAPH WAS TRANSFORMATIVE ..... 15

1. Defendant's Argument that News Reporting Constitutes *Per Se* Fair Use Has
Been Consistently Rejected .................................................................. 15

---

[1] Plaintiff's Statement of Uncontroverted Facts and Standard of Law, as set forth in
Plaintiff's principal brief, are incorporated by reference herein. [Dkt. #37, pp. 9-12 of 32]

2. The Court Should Adopt the Bright-Line Distinction Between Editorial Commentary About a Controversial Image (i.e., Transformative) vs. Descriptive Statements About the Content of an Image (i.e., Infringing)............................. 16

3. The Text of Hearst's Article Does Nothing More Than Describe the Contents of Two Other Photographs; There is No Editorial Commentary Whatsoever .......... 18

4. Defendant Hasn't Altered the Purpose of Otto's Photograph Simply Because Hearst is in the Commercial Business of Exploiting Copyrights ......................... 21

5.   Hearst's Commercial Use Was NOT Justified and Carried Out in Bad Faith ... 23

D. WITH RESPECT TO THE SECOND FACTOR, HEARST HAS FAILED TO DEMONSTRATE THAT OTTO'S PHOTOGRAPH WAS "NOT CREATIVE"............................................... 25

E. WITH RESPECT TO THE THIRD FACTOR, HEARST HAS FAILED TO DEMONSTRATE THAT ITS USE OF OTTO'S PHOTOGRAPH WAS NECESSARY .................................... 27

F. WITH RESPECT TO THE FOURTH FACTOR, MARKET HARM SHOULD BE PRESUMED IN LIGHT OF HEARST'S WHOLESALE COPYING AND, IN ANY EVENT, THE WIDESPREAD MARKET DEMAND FOR OTTO'S WORK IS UNDENIABLE ......................................... 28

1. *Sony's* Presumption of Market Remains Good Law and Has Been Recently Applied to a News Organization's Wholesale Copying of An Amateur Photographer's Work .............................................................................................. 28

2. The Fact That Otto Did Not Originally Intend to Exploit the Photograph is Immaterial to Whether a Potential Market Exists .................................................. 29

POINT III:   DEFENDANT HAS FAILED TO PRESENT ANY EVIDENCE TO SUPPORT THE DEFENSES OF WAIVER AND CONSENT WHICH, IN ANY EVENT, ARE NOT LEGALLY COGNIZABLE............................ 31

POINT IV:   A REASONABLE JURY COULD FIND DEFENDANT'S INFRINGEMENT WAS WILLFUL ......................................... 32

A. THE FACT THAT HEARST IS IN THE PUBLISHING BUSINESS AND IS PRESUMED TO BE SOPHISTICATED ABOUT COPYRIGHT LAW AND LICENSING PROCEDURES IS EVIDENCE OF WILLFULNESS.................................................................................... 32

B. THE FACT THAT HEARST HAS BEEN SUED FOR COPYRIGHT INFRINGEMENT OVER 10 TIMES IN THE PAST TWO YEARS IS EVIDENCE OF WILLFULNESS.................... 33

C. THE SUPERVISING EDITOR OF THE ARTICLE FAILED TO REVIEW OTTO'S PHOTOGRAPH PRIOR TO PUBLICATION, FAILED TO CONSULT COUNSEL, AND FAILED

TO INQUIRE AS TO THE IDENTITY OF THE COPYRIGHT HOLDER, ALL OF WHICH CREATE A STRONG INFERENCE OF "WILLFUL BLINDNESS".................................. 34

CONCLUSION................................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*Arias-Zeballos v. Tan*,
  No. 06CIV1268GEL, 2008 WL 833225, at *6 (S.D.N.Y. Mar. 28, 2008) .................. 10

*Associated Press v. Meltwater U.S. Holdings, Inc.*
  931 F.Supp.2d 537, 561 (S.D.N.Y. 2013) ................................... 13

*Authors Guild v. Google, Inc.*,
  804 F.3d 202, 214–15 (2d Cir. 2015) ........................................ 24

*Balsley v. LFP, Inc.*,
  691 F.3d 747, 754 (6th Cir. 2012) ...................................... passim

*Baraban v. Time Warner*,
  No. 99-cv-1569 (JSM), 2000 WL 358375 at *4 (S.D.N.Y. April 6, 2000) ................. 20

*Barcroft Media, Ltd. v. Coed Media Group, LLC*,
  No. 16-cv-7634 (JMF), 2017 WL 5032993 (S.D.N.Y. 2017) ............................. passim

*Bollea v. Gawker Media, LLC*,
  913 F. Supp. 2d 1325, 1327 (M.D. Fla. 2012) ............................... 29

*Brewer v. Hustler Magazine, Inc.*,
  749 F.2d 527, 529 (9th Cir. 1984) ............................... 27

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F.Supp.3d 395, 407 (S.D.N.Y. 2016) ........................................ passim

*Campbell v. Acuff–Rose Music, Inc.*,
  510 U.S. 569, 590 (1994) ...................................................... passim

*Cariou v. Prince*,
  714 F.3d 694, 706 (2d Cir. 2013) ................................................ 18

*Castle Rock Entertainment v. Carol Pub. Group, Inc.*,
  955 F.Supp. 260, 267 (S.D.N.Y.1997) ........................................ 33

*Dhillon v. Does 1-10*,
  No. C 13-01465 SI, 2014 WL 722592, at *5 (N.D.Cal. Feb. 25, 2014) ...................... 20

*Eldred v. Ashcroft*,
  537 U.S. 186, 190 (2003) ................................................ 12

**CASES (continued….)**

*EMI Entertainment World, Inc. v. Karen Records, Inc.*,
    806 F.Supp.2d 697, 703 (S.D.N.Y. 2011) *vacated on grounds of standing,* 2013 WL
    2480212 (S.D.N.Y. June 10, 2013).......................................................................... 33, 34

*Fallaci v. New Gazette Literary Corp.*,
    568 F. Supp. 1172 (2d Cir. 1983) ............................................................... 33

*Fameflynet, Inc. v. Shoshanna Collection, LLC*,
    No. 16-cv-7645, 2017 WL 4402568 at *3 (S.D.N.Y. Oct. 2, 2017)............................. 8

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340, 361 (1991).................................................................................... 2

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517, 524 (1994) .................................................................................. 14

*Fonar Corp. v. Domenick*,
    105 F.3d 99, 104 (2d Cir.), *cert. denied*, 522 U.S. 908 (1997)...................................... 7

*Friedman v. Live Nation*,
    833 F.3d 1180, 1189 (9th Cir. 2016) ..................................................... 32, 34

*Goodman v. Universal Beauty*,
    17-cv-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. March 9, 2018)............. passim

*Graham Archives, LLC v. Dorling Kindersley Ltd.*,
    386 F. Supp. 2d 324, 328-29 (S.D.N.Y. 2005) ........................................... 16

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539, 561 (1985)................................................................................ passim

*Harris v. Emus Records Corp.*,
    734 F.2d 1329, 1333 (9th Cir. 1984) .................................................................. 31

*In re Literary Works in Elec. Databases Copyright Litig.*,
    509 F.3d 116, 131 (2d Cir. 2007), *rev'd and remanded sub nom. Reed Elsevier, Inc. v.*
    *Muchnick*, 559 U.S. 154 (2010) ..................................................................... 3, 4

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
    413 F.3d 257 (2d Cir. 2005)................................................................................ passim

*Katz v. Google, Inc.*,
    802 F.3d 1178, 1182-83 (11th Cir. 2015) .................................................. 20

**CASES (continued….)**

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811, 820 (9th Cir. 2003) ................................................................ 27

*Konangataa v. Am. Broadcasting Companies, Inc.*,
  No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)..... passim

*Latimer v. Roaring Toyz, Inc.*,
  601 F.3d 1224, 1239 (11th Cir. 2010) ........................................................ 12

*Leibovitz v. Paramount Pictures Corp.*,
  948 F. Supp. 1214, 1217 (S.D.N.Y. 1996), *aff'd,* 137 F.3d 109 (2d Cir. 1998) .......... 11

*Louise Paris, Ltd. v. Standard Fabrics, Int'l, Inc.*,
  No. 15-cv-3250 (PKC), 2016 WL 4203548, at *2 (S.D.N.Y. Aug. 8, 2016) ............ 8, 9

*Manes Fabrics Co. v. Miss Celebrity, Inc.*,
  246 F. Supp. 975, 977 (S.D.N.Y. 1965) ...................................................... 4

*Mantel v. Microsoft Corp.*,
  No. 16-CV-5277 (AJN), 2018 WL 1602863, at *1 (S.D.N.Y. Mar. 29, 2018) ............. 9

*Mathieson v. Associated Press*,
  1992 WL 164447 (S.D.N.Y. June 25, 1992) ............................................... 17

*Mavrix Photographs LLC v. Sandra Rose LLC*,
  2016 WL 6246408 *2 (C.D. Cal. April 6, 2016) ........................................... 18

*Miller v. Glenn Miller Productions, Inc.*,
  454 F.3d 975, 988 (9th Cir. 2006) ............................................................. 31

*Monge v. Maya Magazines*,
  688 F.3d 1164,1173 (9th Cir. 2012). .......................................................... 16

*Murphy v. Millennium Radio Grp. LLC*,
  650 F.3d 295, 307 (3d Cir. 2011)............................................................... 15

*New Era Publications Intern., ApS v. Henry Holt and Co., Inc.*,
  873 F.2d 576, 584 (2d Cir. 1989).............................................................. 13

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
  558 F.2d 1090, 1092 n. 1 (2d Cir.1977)....................................................... 3

**CASES (continued….)**

*Nunez v.Caribbean Int'l News Corp.*,
    235 F.3d 18, 25 (1st Cir. 2000) ............................................................. 17

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471, 478 (2d Cir. 2004) .......................................................... 16

*Pearson Educ., Inc. v. Liu*,
    656 F. Supp. 2d 407, 409 (S.D.N.Y. 2009) ............................................. 23

*Philpot v. Media Research Center Inc.*,
    279 F. Supp. 3d 708, 715-18 (E.D. Va. 2018) ....................................... 21

*Psihoyos v. National Examiner*,
    No. 97-cv-7624 (JSM), 1998 WL 336655, *3 (S.D.N.Y. June 22, 1998) ............. 16, 17

*Rogers v. Koons*,
    960 F.2d 301, 307 (2d Cir.), *cert. denied,* 506 U.S. 934 (1992) ............................ 11, 14

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein, Black Inc., A. G. v. Columbia
    Broad. Sys., Inc.*, 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980), *aff'd sub nom. Roy Exp.
    Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.*, Inc., 672 F.2d
    1095 (2d Cir. 1982) ................................................................................ 13

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
    489 F.3d 474, 481 (2d Cir.2007) ............................................................. 12

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417, 450 (1984) ........................................................................ 28

*Strauss v. Hearst Corp.*,
    No. 85 CIV 10017 (CSH), 1988 WL 18932, at *10 (S.D.N.Y. Feb. 19, 1988) ........... 23

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
    756 F.3d 73, 85 (2d Cir. 2014) .......................................................... 15, 21

*The Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.*,
    04 Civ. 5002, 2005 WL 2063819, at *3 (S.D.N.Y. Aug. 24, 2005) .................... 34

*Twin Peaks Prods., Inc. v. Publications Int'l*,
    778 F. Supp. 1247, 1250 (S.D.N.Y. 1991), *aff'd in part and vacated in part sub
    nom. Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993)
    ................................................................................................................ 23

**CASES (continued….)**

*United Feature Syndicate, Inc. v. Koons,*
   817 F.Supp. 370 (S.D.N.Y.1993) ................................................................. 11

*Urbont v. Sony Music Entm't,*
   831 F.3d 80, 92 (2d Cir. 2016) .................................................................. 10

*Van Der Zee v. Greenridge,*
   2006 WL 44020, *2 (S.D.N.Y. Jan. 6, 2006) ................................................ 33

*Viacom, Int'l Inc. v. Fanzine Int'l, Inc.,*
   98 Civ. 7448, 2001 WL 930248, at *4 (S.D.N.Y. Aug. 16, 2001) ............................. 33

*Walt Disney Co. v. Best*, 1
   990 WL 144209, *2 (S.D.N.Y. Sept. 26, 1990) ............................................. 34

*Whimsicality, Inc. v. Rubie's Costume Co. Inc.*,
   891 F.2d 452, 455 (2d Cir. 1989) .................................................................. 7

*Yurman Design, Inc. v. PAJ, Inc.,*
   262 F.3d 101, 112 (2d Cir.2001) ................................................................ 32

**STATUTES**

17 U.S.C. § 107 ..................................................................................... passim

17 U.S.C. § 401(c) ..................................................................................... 32

17 U.S.C. § 504(c)(2) ................................................................................. 32

**REGULATIONS**

U.S. Copyright Office, Group Registration of Published Photographs,
   FL-124 (2012) ........................................................................................... 8

## PRELIMINARY STATEMENT

Defendant Hearst Communications, Inc. ("Hearst" or "Defendant"), a billion-dollar media conglomerate, claims a First Amendment right to shoplift whatever photographs it wants from social media. After contributing to the decimation of a proper licensing market for content created by amateur photographers, Hearst then claims that no market ever existed, therefore giving it a monopoly right to exploit the creative work of anyone possessed of a smartphone. The Court should put a stop to this brazen corporate thievery and recognize that private citizens with iPhones, whose work happens to resonate with the masses, are accorded as much protection under the Copyright Act as the pros with their $2500 Nikons.

Hearst would have this Court believe that all uses of photographs in the context of commercial news reporting are fair. While President Trump's pattern of wedding crashing may be newsworthy; it doesn't give Hearst the right to just take, take and take. Hearst could have made its point without using Otto's Photograph. After all, Hearst used two other images of Donald Trump to convey its message about the President, so there was no reason to infringe Otto's copyright other than to optically enhance its Article.

Moreover, because the Article makes no effort whatsoever to comment on or even describe the Photograph that is the subject of this litigation, Defendant has failed to show any transformative effect. Hearst's editors just expropriated Otto's image in less than an hour, with no questions asked, and exploited it at the height of its market demand. When Hearst got caught, it promptly removed the Photograph – knowing full well that Otto's copyright had been violated – and then called upon its in-house counsel to clean up the mess. That's not an exercise of a First Amendment right, it's willful infringement.

## ARGUMENT

**POINT I:**    **THE TWO ELEMENTS OF PLAINTIFF'S INFRINGEMENT CLAIM HAVE BEEN ESTABLISHED AND STAND UNREBUTTED BY ANY CONTRARY EVIDENCE**

To establish a claim of copyright infringement, plaintiff must show two elements: (1) ownership of a valid copyright; and (2) unauthorized copying of the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).

In opposition to Plaintiff's motion for partial summary judgment, Hearst does not dispute the second element of Plaintiff's copyright infringement claim, namely that Hearst actually copied Otto's work without his authorization.  [D's 56.1, ¶¶ 54-55 (actual copying); ¶¶ 60-62 (without authorization)].  Accordingly, there is no material issue of fact concerning the second element of Otto's infringement claim.

Hearst does, however, challenge the first element of Otto's infringement claim, arguing that "there is a material question as to whether Plaintiff has a valid copyright registration [for Otto's Photograph]" [D's Memo, Dkt. # 52, p. 46 of 52].  Hearst makes two arguments in support of this challenge.

First, Hearst claims that the title of the 309 Registration - "Donald Trump crashes wedding at Trump Nationsl [sic] Golf Club, Bedminster, NJ" - is insufficient to prove that Otto's Photograph is on deposit with the 309 Registration and that Plaintiff therefore must provide further evidence beyond the certificate itself.

Second, Hearst argues that the declaration of Ms. Donna Halperin, an employee of Liebowitz Law Firm who personally registered Otto's Photograph, should be stricken from the record and, in any event, raises question of credibility.

As demonstrated below, both arguments fail because Defendant has not presented any "hard evidence" to rebut the validity of the 309 registration, nor shown that the Photograph is not on deposit with the 309 Registration.  Further, in addition to the certificate itself, Plaintiff has presented <u>three</u> witnesses, including lead counsel of record Richard Liebowitz, who swear that Otto's Photograph is on deposit with the 309 Registration.

The evidentiary and financial burden rests on Hearst – not Otto – to retrieve certified copies from the Copyright Office if it seeks to challenge validity of the copyright at issue.  Hearst failed to do so and thus summary judgment should be granted on the second element of Otto's infringement claim.  *See Goodman v. Universal Beauty*, 17-cv-1716 (KBF), 2018 WL 1274855, at *5 (S.D.N.Y. March 9, 2018) ("A full period of discovery has occurred in this case; defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration . . .").

A.    THE 309 REGISTRATION MEETS ALL STATUTORY REQUIREMENTS AND IS THEREFORE VALID WITH RESPECT TO OTTO'S PHOTOGRAPH

"The Copyright Office certificate of registration is prima facie evidence of the facts stated therein. This has generally been held to mean prima facie proof of ownership and validity." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 131 (2d Cir. 2007), *rev'd and remanded sub nom. Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) (citing *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n. 1 (2d Cir.1977) (citation omitted)); see *also Manes Fabrics Co. v. Miss Celebrity,*

*Inc.*, 246 F. Supp. 975, 977 (S.D.N.Y. 1965) ("plaintiffs have satisfied all the statutory requirements for copyright registration and consequently their copyright has prima facie validity."); H.R.Rep. No. 94–1476, at 156–67, 1976 U.S.C.C.A.N. at 5772–83 ("Under section 410(c), a certificate is to 'constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.' The principle that a certificate represents prima facie evidence of copyright validity has been established in a long line of court decisions, and it is a sound one.").

Here, the 309 Registration satisfies all of the statutory and regulatory requirements given that the Copyright Office has assigned an effective date of registration [Liebowitz Declr. ¶ 7, Ex. C][2]. Therefore, the certificate standing alone "constitutes prima facie proof of ownership and validity." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d at 131.

Hearst argues that additional evidence is required beyond the certificate because the "certificate does not clearly identify the work at issue." [D's Memo, Dkt. #52, p. 46 of 52] However, neither the statute nor the Copyright Office's regulations require that the title of the certificate match the content of the work. In any event, the title of the 309 Registration, "Donald Trump crashes wedding at Trump Nationsl [sic] Golf Club, Bedminster, NJ, does, in fact, match the content of Otto's Photograph, which depicts Donald Trump crashing a wedding at Trump National Golf Club in Bedminster, New Jersey. [Liebowitz Declr. ¶ 7, Ex. C]

---

[2] The Copyright office publishes Circular No. 40 which clearly sets forth the requirements to register a photograph. "When the Copyright Office issues a registration certificate, it assigns as the effective date of registration the date it received all required elements—an application, a nonrefundable filing fee, and a nonreturnable deposit—in acceptable form, regardless of how long it took to process the application and mail the certificate." *Id.* COPYRIGHT REGISTRATION FOR PICTORAL, GRAPHIC AND SCULPTURAL WORKS, Circular 40. *See* https://www.copyright.gov/circs/circ40.pdf.

**B.    PLAINTIFF PRESENTS TESTIMONY FROM <u>THREE</u> WITNESSES, INCLUDING LEAD COUNSEL OF RECORD, WHO SWEAR THAT OTTO'S PHOTOGRAPH IS ON DEPOSIT WITH THE 309 REGISTRATION**

In further support of Plaintiff's motion for summary judgment, and in opposition to Defendant's motion for summary judgment, Richard Liebowitz, Plaintiff's lead counsel, proffers a declaration swearing that it is his law firm's "routine practice to register photographs with the U.S. Copyright Office (the "USCO") on behalf of the Firm's clients."  [Liebowitz Declr., ¶ 2]; that his firm "employs several individuals whose job function is to register clients' photographs with the USCO and that he "directly supervise[s] the registration process, particularly with respect the to the Firm's new clients [*Id*., ¶ 3]; and that his employee, Donna Halperin, registered Otto's Photograph with the Copyright Office [*Id*. ¶ 4, Ex. A] under his "direct supervision" [*Id*., ¶ 5] "while [he] was in the office" [*Id*., ¶ 6]  The USCO eventually approved the Application and mailed the Firm the 309 Registration. [*Id*., ¶ 7]  "The Firm's registration of the Photograph on behalf of Mr. Otto was carried out in accordance with the Firm's routine practice of registering clients' photographs with the USCO." [*Id*., ¶ 8]; *accord* FRE 406 (evidence showing "an organization's routine practice may be admitted to prove that on a particular occasion the ... organization acted in accordance with the ... routine practice.").

Hearst has challenged the admissibility of Donna Halperin's declaration [Dkt. # 55], even though Hearst's counsel knew during discovery that the Liebowitz Law Firm handled the registration process [Otto Tr. 53-56:5] and that Richard Liebowitz's name is listed on both the face of the 309 Registration certificate and the application [Liebowitz Declr. ¶¶ 6-7, Exs. B and C]

Notwithstanding the admissibility of Ms. Halperin's testimony, Mr. Liebowitz's declaration, standing alone, is sufficient to establish that Otto's Photograph was deposited in conjunction with the 309 Registration. *See Goodman,* 2018 WL 1274855, at *5 (decided after plaintiff filed his principal motion for partial summary judgment in this case). In *Goodman*, Judge Forrest rejected the defendant's challenges to validity of the registration, holding that legal argumentation (rather than actual evidence) is insufficient to show invalidity.

> "defendants have made two arguments in support of their position that the registration is deficient. However, they have failed to proffer any evidence in support of such arguments; <u>unsupported arguments alone do not raise a triable issue that defeats summary judgment</u>…
>
> A full period of discovery has occurred in this case; defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. <u>Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration</u> . . **.**
>
> As such, defendants have failed to raise a genuine dispute of fact as to copyright ownership.
>
> *Goodman*, 2018 WL 1274855, at *5 (underline added).

Here, not unlike the defendant in *Goodman*, Defendant has made legal arguments to contest the validity of the 309 Registration [D' Memo, Dkt. # 52, p. 46 of 52]; but Hearst hasn't produced any actual evidence to support these arguments. In fact, Defendant abjectly failed to produce *any* information from the Copyright Office during the course of discovery, despite ample opportunity to do so. [P's 56.1, ¶¶ 99-101][3]

---

[3] Further, Hearst cannot complain that it didn't know during the course of discovery that Mr. Liebowitz supervised the registration process. Mr. Otto repeatedly testified at his deposition that Mr. Liebowitz was directly involved in the process.

> **Q:** Did you review the application?
> **A:** Yes.
> **Q:** Prior to it being submitted? Do you know how it was submitted?

**C.    THE EVIDENTIARY BURDEN RESTS ON HEARST – <u>NOT</u> OTTO – TO PRESENT DEPOSIT COPIES FROM THE COPYRIGHT OFFICE TO REBUT VALIDITY**

"Possession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable." *Whimsicality, Inc. v. Rubie's Costume Co. Inc.*, 891 F.2d 452, 455 (2d Cir. 1989). A party's "proffer of its certificate of copyright registration thus shifts to [the opposing party] the burden of proving the invalidity of the copyright." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir.), *cert. denied*, 522 U.S. 908 (1997); see also *Goodman*, 2018 WL 1274855, at \*2 (*citing Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) ("The party challenging the validity of the copyright registration bears the burden of rebutting the presumption.") To be timely, a certificate of registration must be obtained "before or within five years after first publication" of a work. *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005).

Here, Defendant <u>admits</u> that Otto is in possession of the 309 Registration certificate [Dkt. #53, Def. 56.1, ¶ 90]; and that the 309 Registration was obtained "before or within five years after first publication" of the Subject Photograph. [*Id.*, ¶ 91]

---

**A:** I believe Richard [Liebowitz]'s office submitted it . . .
[Otto Tr. 53:2-15]
**Q:** Were you in Mr. Liebowitz's office when he submitted this?
**A:** No.
**Q:** How did you review it before it was submitted?
**A:** We had discussed it, went back and forth on the phone…"
[Otto Tr. 54:17-23]
**Q:** So do you know this beginning on OTTO 005 is the exact document that Mr. Liebowitz submitted to the Copyright Office?
**A:** I believe so. I have a copy in my e-mail . . .
[Otto Tr., 55:4-8]
**Q:** But do you know whether they were submitted at all?
**A:** Yeah, I have a confirmation." [Otto Tr. 55:23-25]
**Q:** That copies of the photographs were submitted?
**A:** Again, I was on the phone with Richard when it was being filed.
[Otto Tr. 56:2-5]

Accordingly, Defendant concedes that a rebuttable presumption exists that Otto's Photograph is copyrightable in terms of both validity and originality. *Whimsicality*, 891 F.2d at 455. Defendant has also therefore conceded that the evidentiary burden rests on Defendant to present hard evidence to rebut the validity of Plaintiff's copyright registration. *Fonar*, 105 F.3d at 104.[4]

Defendant cites the case *Louise Paris, Ltd. v. Standard Fabrics, Int'l, Inc.*, No. 15-cv-3250 (PKC), 2016 WL 4203548, at *2 (S.D.N.Y. Aug. 8, 2016) for the proposition that Plaintiff must produce deposit copies obtained from the Copyright Office where the face of a registration certificate for a collective work does not identify the titles of each photograph registered as part of a group. However, Defendant's reliance on *Louis Paris* is unavailing.

First, *Louis Paris* is distinguishable because the certificate at issue there involved fabric designs as part of a Collective work registration, rather than a single photograph registration. However, collective work registrations are governed by separate rules and regulations, *see, e.g.,* Group Registration of Published Photographs, FL-124 (2012) that do not apply to the single work registration at issue here.

Second, the court in *Louis Paris* found that the deposition testimony and declarations attached to the summary judgment motion concerning the issue of the

---

[4] Notwithstanding, Hearst argues that Plaintiff "did not produce an official deposit copy of [Otto's Photograph] from the Copyright Office." [D's Memo, Dkt. #52, p. 47 of 52]. However, this argument presupposes that Otto shoulders the burden of proving that his Photograph is on deposit with the 309 Registration. But as noted, no such statutory or regulatory requirement exists. Moreover, Second Circuit law does not require Otto to proffer deposit copies from the Copyright Office to establish validity, it only requires him to proffer the certificate itself (which he has done). It is therefore the Defendant's "heavy burden" alone to prove invalidity of the 309 Registration. *Fameflynet*, 2017 WL 4402568 at *3; *Fonar*, 105 F.3d 99 at 104; accord *Goodman*, 2018 WL 1274855, at *5 ("defendants had the opportunity to request a certified deposit copy from the U.S. Copyright Office and submit it with their opposition to plaintiff's motion for summary judgment. Their failure to submit any evidence, however, prevents them from raising a triable issue on the validity of the registration . . .").

copyright deposit were <u>not</u> based on personal knowledge.  *Louis Paris*, 2016 WL 4203548, at *3-4 ("Mr. Zakaria's deposition testimony demonstrates that he did not have personal knowledge that Design #7851 was part of the registered Collection. Instead, his testimony on the point was premised upon supposition and surmise . . . . It does not appear that Mr. Zakaria reviewed SFI's purported records himself. Thus, his statement that Design #7851 is part of the registered Collection is again not based on personal knowledge.").  Here, in contrast, the three witnesses who submitted sworn declarations concerning the 309 Registration did, in fact, have personal knowledge of the certificate and its contents.  [Liebowitz Declr. ¶¶ 5-7; Otto Declr. ¶¶ 23-26, Otto Tr. 53-56; Halperin Declr. ¶¶ 7-9]

    <u>Third</u>, while the court in *Louis Paris* noted that communications or correspondence with the Copyright Office could have bolstered the claim to validity, *Louis Paris*, 2016 WL 4203548, at *4, it never actually held (as Defendant suggests) that a party seeking to prove validity must produce copyright deposit information during discovery.  The court merely stated that such information would have been helpful given that there was no other credible evidence submitted that the design was registered as part of a collective work. *Louis Paris*, 2016 WL 4203548, at *4.  Thus, the court found material issues of fact that could not be resolved on summary judgment.

    Finally, in its forthcoming reply brief, Hearst may also invoke the recent decision of *Mantel v. Microsoft Corp.,* No. 16-CV-5277 (AJN), 2018 WL 1602863, at *1 (S.D.N.Y. Mar. 29, 2018) where Judge Nathan dismissed plaintiff's case on summary judgment by precluding ALL evidence proffered in support of summary judgment, including plaintiff's sworn testimony and documents. *Id.* at *4 ("the Court concludes that

Mantel's affidavit and copyright registration application will not be allowed to supplement the discovery record").

However, *Mantel* is clearly distinguishable because: (1) neither Mr. Liebowitz (nor his staff) submitted a declaration in support of Mantel's testimony that the photograph was on deposit, whereas here such declarations are on the record; (2) Mantel did not produce hard copies of his application or certificate during discovery on grounds that they were a matter of public record and equally accessible to defendant, whereas here Otto did produce such documents during discovery; and (3) Mantel's certificate was for a group registration which did not list any individual titles of photographs, whereas here a single work certificate is involved that does list the title of the photograph on the face of the certificate.[5]

### D.    DEFENDANT HAS FAILED TO PROFFER ANY EVIDENCE THAT OTTO DEFRAUDED THE COPYRIGHT OFFICE

"The validity of a registration may be rebutted by proof of a certificate holder's fraud on the Copyright Office, though the party seeking to establish such fraud bears a 'heavy burden.'" *BWP Media*, 196 F.Supp.3d at 401 (*citation omitted); see also Fonar Corp.*, 105 F.3d at 105 (*"the presumption [of validity] may be overcome only by 'proof of deliberate misrepresentation.'"*).

In *Fameflynet, Inc. v The Shoshanna Collection, LLC*, 16 Civ. 7645 (RWS), 2017 WL 4402568 at *2 (S.D.N.Y. October 2, 2017), Judge Sweet granted summary judgment

---

[5] In any event, Judge Nathan's decision is currently being challenged on a motion for reconsideration given that it was clearly erroneous to preclude Mantel's testimony.  As a matter of law, a non-movant's testimony must be credited on summary judgment. *Urbont v. Sony Music Entm't*, 831 F.3d 80, 92 (2d Cir. 2016); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010); *Arias-Zeballos v. Tan*, No. 06CIV1268GEL, 2008 WL 833225, at *6 (S.D.N.Y. Mar. 28, 2008) ("on summary judgment it is not the Court's function to evaluate the credibility of the parties. Rather, the Court must credit the testimony of the non-moving party, and draw all reasonable inferences in favor of that party.").  The same rule applies to the Liebowitz Declr.

in plaintiff's favor on the issue of liability for copyright infringement.  After noting that

Defendants bear a "heavy burden" of demonstrating the invalidity of copyright, 2017 WL

4402568 at *3, the Court stated as follows:

> where Defendants have not alleged that plaintiff has either defrauded or made any
> deliberate misrepresentation to the Copyright Office, "the presumption of the
> Registration's validity stands, and the Plaintiff's Registration establishes its
> ownership of the . . . Photos."

2017 WL 4402568 at *3 (underline added).

Defendant has failed to sustain its burden of showing that the 309 Registration

was obtained by fraud. There is no evidence on the record showing that the 309

Registration was procured by "willful and deliberate" misrepresentation to the Copyright

Office.  *BWP Media*, 196 F.Supp.3d at 401.  In fact, Defendant abjectly failed to produce

*any* information from the Copyright Office during the course of discovery, despite ample

opportunity to do so.  [P's 56.1, ¶¶ 99-101]  As such, summary judgment should be

granted in Plaintiff's favor on the elements of Plaintiff's copyright infringement claim.


**POINT II:     THE COURT SHOULD DISMISS THE FAIR USE DEFENSE OR,
                IN THE ALTERNATIVE, LET THE JURY DECIDE**

"[A] rejection of the fair use defense and a subsequent finding in favor of a

copyright plaintiff . . . may be appropriate at summary judgment." *Leibovitz v.*

*Paramount Pictures Corp.,* 948 F. Supp. 1214, 1217 (S.D.N.Y. 1996), *aff'd,* 137 F.3d 109

(2d Cir. 1998).[6]

---

[6] See also *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.), *cert. denied,* 506 U.S. 934 (1992) (holding that
summary judgment in favor of plaintiff on the fair use issue was proper when the direct evidence is
undisputed, or when the evidence was such that no reasonable jury could differ); *United Feature Syndicate,
Inc. v. Koons,* 817 F.Supp. 370 (S.D.N.Y.1993) (granting summary judgment in favor of plaintiff after
rejecting fair use defense).

**A.        HEARST DOES NOT ENJOY A FIRST AMENDMENT RIGHT TO INFRINGE PLAINTIFF'S WORK AND MUST BEAR THE BURDEN OF PROVING FAIR USE**

Hearst begins its rambling analysis of the fair use defense with two patently frivolous arguments, namely that: (1) "Plaintiff should bear the burden of disproving fair use"; and (2) Defendant has a First Amendment right to exploit protected works without the copyright owner's authorization.  [D's Memo of Law, Dkt. #52, pp. 17- of 52]. Both arguments are absurd and demonstrate a fundamental misapprehension of copyright law.

First, the Supreme Court has twice held, based on legislative history*, that* Defendant must bear the burden of proving fair use.  *See, e.g.*, *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590 (1994) ("fair use is an affirmative defense"); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985) ("The drafters resisted pressures from special interest groups to create presumptive categories of fair use, but structured the provision as an affirmative defense requiring a case-by-case analysis.") (*citing* H.R.Rep. No. 83, 90th Cong., 1st Sess., 37 (1967)); *see also Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1239 (11th Cir. 2010) ("binding Supreme Court authority requires us to treat fair use as an affirmative defense.")

Second, "the First Amendment does not provide news entities an exemption from compliance with intellectual property laws, . . ." *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 481 (2d Cir.2007).  In order to prove that Hearst has exercised a right under the First Amendment – as opposed to trespassing on plaintiff's intellectual property – Defendant must prove that the four factors prescribed by 17 U.S.C. § 107, in their totality, weigh in Defendant's favor.  *See, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 190 (2003) (holding that the codified fair use doctrine under section 107 "contains built in First Amendment accommodations."); *New Era Publications Intern., ApS v. Henry Holt*

*and Co., Inc.*, 873 F.2d 576, 584 (2d Cir. 1989) ("Our observation that the fair use doctrine encompasses all claims of first amendment in the copyright field never has been repudiated.") (internal citation omitted); *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1099 (2d Cir.), *cert. denied*, 459 U.S. 826, (1982) ("[n]o Circuit that has considered the question . . . has ever held that the First Amendment provides a privilege in the copyright field distinct from the accommodation embodied in the 'fair use' doctrine.")

## B.    REJECTION OF THE FAIR USE DEFENSE WILL PROMOTE THE PURPOSE OF THE COPYRIGHT ACT

"[T]he copyright law bestows a monopoly right on the copyright owner to encourage artistic creativity." *Roy Exp. Co. Establishment of Vaduz, Liechtenstein, Black Inc., A. G. v. Columbia Broad. Sys., Inc.*, 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980), *aff'd sub nom. Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys.*, Inc., 672 F.2d 1095 (2d Cir. 1982).  "The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Bill Graham Archives*, 448 F.3d at 608 (citation omitted).  Accordingly, "the rejection of the fair use defense here will further the ultimate aim of the Copyright Act, which is to stimulate the creation of useful works for the public good." *Associated Press v. Meltwater U.S. Holdings,* 931 F.Supp.2d 537, 561 (S.D.N.Y. 2013) (*citing Harper & Row*, 471 U.S. at 562).

The Court's dismissal of the fair use doctrine in this case will further the purpose of the Copyright Act on several grounds.

First, it will deter largescale news publishers from freely expropriating photographic content from social media accounts.  This widespread practice has persisted

13

unabated for years as ordinary citizens have stood by powerless to act.  But so-called amateur photographers with iPhones have rights too, and the Court should not permit media conglomerates like Hearst, who is armed with ample resources, to free-ride off the content generated by others.  Indeed, no reasonable juror, each of whom owns a smartphone camera, is going to find that Hearst's use was fair.  *Rogers,* 960 F.2d at 307 (holding that summary judgment in favor of plaintiff on the fair use issue was proper when the evidence was such that no reasonable jury could differ).  Each one of the jurors will identify with Otto's story and will resent Hearst's position that it can just take whatever photos it wants from social media without obtaining a license or giving credit where credit's due.

Second, the Court's rejection of fair use will cause publishers to independently create their own news content, thereby maximizing the quality and quantity of expressive works available to the public.  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994) ("The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public.").  Hearst argues that by publishing Otto's work, it gave the public greater access to more artistic works.  But this argument overlooks that Hearst failed to create its own work by retaining it own photographers to cover the President.  If the Court allows Hearst to just shoplift images from social media at will, it will have no incentive to create its own artistic works, thereby frustrating the purpose of the Act.

Third, a finding against fair use will encourage news publishers to license photographic content from copyright holders whose images are displayed on social media.  It is far more *fair* to maintain a fully functioning licensing market for

14

photographs posted to social media than it is to allow largescale publishers to poach whatever content they want and obtain 100% profit margin from the creative works of others. Moreover, Hearst's position on the fourth fair use factor, i.e. that no *economic* market existed for Otto's Photograph (despite the market demand for the work) is terribly ironic. If no economic market existed, that's only because the largescale news organizations have developed an illegal practice of infringing photographic content found on social media rather than licensing it. So Hearst and its competitors decimate the economic market by stealing the content and then, when sued, claim there is no market. That's not fair.

C.    **WITH RESPECT TO THE FIRST FACTOR, HEARST HAS FAILED TO DEMONSTRATE THAT ITS FOR-PROFIT USE OF OTTO'S PHOTOGRAPH WAS TRANSFORMATIVE**

1.    **Defendant's Argument that News Reporting Constitutes *Per Se* Fair Use Has Been Consistently Rejected**

One again ignoring Supreme Court authority, Defendant avers that its function as a news reporter gives it blanket immunity from infringement suits. [D's Memo, Dkt. #52, p. 21 of 52 ("This alone [news reporting] is sufficient for the Court to find that the first statutory factor favors fair use")]. But federal courts consistently hold otherwise. *See, e.g.*, *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 557 (1985) ("[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the [work]."); *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 85 (2d Cir. 2014) ("A news organization thus may not freely copy creative expression solely because the expression itself is newsworthy."); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 307 (3d Cir. 2011) ("[N]ews reporting does not enjoy a blanket exemption from copyright. News

organizations are not free to use any and all copyrighted works without the permission of the creator simply because they wish to report on the same events a work depicts."); *Psihoyos v. National Examiner*, No. 97-cv-7624 (JSM), 1998 WL 336655, *3 (S.D.N.Y. June 22, 1998) ("The mere fact the photo depicts a newsworthy item does not justify commercial exploitation of it.").  In short, "[a]lthough news reporting is an example of fair use, it is not sufficient itself to sustain a *per se* finding of fair use." *Monge v. Maya Magazines*, 688 F.3d 1164,1173 (9th Cir. 2012).

Hearst attempts to sidestep these authorities by inviting this Court to reject legal standards that squarely address news organizations' use of photographs, *see, e.g.*, *Barcroft Media, Ltd. v. Coed Media Group, LLC*, No. 16-cv-7634 (JMF), 2017 WL 5032993 (S.D.N.Y. 2017) and *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,196 F.Supp.3d 395, 407 (S.D.N.Y. 2016), by relying on general guidelines set forth by *Campbell v. Acuff-Rose*, 510 U.S. 569 (1994), a music parody case; *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004), a case about executive seminar training manuals for paid subscribers; and *Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F. Supp. 2d 324, 328-29 (S.D.N.Y. 2005), a case about a coffee table book that uses thumbnail images of historical concert posters. [D'S memo, Dkt. #52, pp. 20-21 of 52]  While *Campbell*, *NXIVM* and *Bill Graham Archives* are helpful for defining broader fair use principles, they provide limited guidance for distinguishing between news reports that are fair versus news reports that are infringing.

2.    **The Court Should Adopt the Bright-Line Distinction Between Editorial Commentary About a Controversial Image (i.e., Transformative) vs. Descriptive Statements About the Content of an Image (i.e., Infringing)**

Rather than relying on generic principles set forth in non-news reporting cases,

16

the Court should adopt the bright-line distinction drawn by Judge Furman in *Barcroft Media*, Judge Faila in *BWP Media* and Judge Miller in *Psihoyos*, which all distinguish between editorial commentary directed at a controversial photograph, on the one hand, and descriptive reporting about the content of the photograph on the other.

When a news report offers an editorial stance or <u>opinion</u> about the controversy surrounding an image, such commentary is likely transformative. *See, e,.g.*, *Nunez v.Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000) (fair use found where salacious photograph of Miss Puerto Rico Universe was published by newspaper to comment on the controversy surrounding her qualifications to retain the crown); *Konangataa v. Am. Broadcasting Companies, Inc.*, No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017) (offering social commentary about the phenomenon of someone publicly live-streaming the birth of a child); *Mathieson v. Associated Press*, 1992 WL 164447 (S.D.N.Y. June 25, 1992) (newspaper's use was transformative where it published the cover of a company's marketing pamphlet featuring a photo of Oliver North to offer an opinion about North's involvement with the company).

In contrast, where a news report does nothing more than offer descriptive statements about the content depicted in an image, there can be no transformative effect. *See, e.g.*, *Barcroft Media*, 2017 WL 5032993, at *6 (no transformation where images used as illustrative aids to depict the subjects described in its articles); *BWP Media*, 196 F.Supp. at 404-405 (no transformation where use of images are general illustrations rather than the target of editorial commentary); *Psihoyos*, 1998 WL 336655, *3 (where image of an art car republished in a news article to show what an art car looks like, defendant's "use is not transformative, because its piece uses the photo to show what it

depicts."); *Mavrix Photographs LLC v. Sandra Rose LLC*, 2016 WL 6246408 *2 (C.D. Cal. April 6, 2016) (finding that even though defendant's inclusion of celebrity photos on its website qualified as "news reporting," there was no evidence that defendant had transformed the celebrity photographs).

As set forth below, Defendant's Article is infringing because it falls into the latter category of news reports which merely offer descriptive statements about the content depicted in an image; rather than editorial commentary directed at the image itself.[7]

3.    **The Text of Hearst's Article Does Nothing More Than Describe the Contents of Two Other Photographs; There is No Editorial Commentary Whatsoever**

Hearst argues that its use of Otto's Photograph was transformative because the Article provided so-called "commentary about the President's proclivity for crashing weddings and appearing in guest photos" [D's Memo, Dkt. #52, p. 20 of 52]  But the statements offered in the Article are mere recitations of factual events depicted in Otto's Photograph; they do not amount to editorial commentary or criticism.

Citing its Article, Hearst identifies the following text as "commentary" about photographs displayed in the Article:

> *"Photos surfaced on Instagram showing the happy husband and wife smiling with President Trump, who apparently stopped by to greet the couple and shake hands with guests . . . He may take some photos with you [the happy couple] . . . One photo showed Trump with a Sharpie, waving a Make America Great Again hat."*

As a preliminary matter, the Article's text which discusses photos of the President does <u>not</u> even bother to describe Otto's Photograph at all.  Rather the text of the Article describes the two other photographs displayed in the Article which are not the subject of

---

[7] Relying on the Second Circuit case of *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013), Hearst argues that commentary or criticism directed at the original work is not required.  [D's Memo, p. 26 of 52] However, *Cariou* is clearly distinguishable because it is an <u>art appropriation</u> case, not a news reporting case. In the context of news reporting, the secondary use must offer some opinion about a controversial image. Otherwise, there would be no protection for *any* photograph included in a news report.

this litigation.

| Image Posted in Esquire.com Article | Textual Description of Photos in Article |
|---|---|
| **NOT** OTTO'S IMAGE  | ***"Photos surfaced on Instagram** showing the happy husband and wife smiling with President Trump . . ."*<br><br>***He may take some photos with you [the happy couple] . . ."*<br><br>[Description, but no opinion] |
| **NOT** OTTO''S IMAGE  | ***"One photo showed Trump with a Sharpie, waving a Make America Great Again hat."***<br><br>[Description, but no opinion] |
| OTTO'S PHOTOGRAPH  | ***NONE***<br><br>[Neither description Nor opinion] |

As illustrated above, the text of the Article does not offer any editorial

commentary or criticism directed at *any* of the photographs.  For example, the author

does not opine that President Trump's proclivity for crashing weddings is detrimental to the public interest because the President needs to spend more time in the Oval Office running the country rather than crashing weddings.  Nor does the author opine that President Trump's proclivity for appearing in guest photos is good for the public interest because it shows how President Trump is the "people's president" who makes himself accessible to voters.  Simply put, the Article doesn't take any stance at all with respect to the President's reported conduct.[8]

But an editorial stance is what's needed to transform the image for purposes of fair use news reporting.  *See, e.g.*, *Nunez*, 235 F.3d at 22-23 (offering editorial commentary as to whether Miss Puerto was qualified to retain her crown after appearing in salacious photos); *Konangataa,* 2017 WL 2684067, at *1 (criticizing a father's lack of discretion for live-streaming graphic images of his child's birth); *Galvin v. Ill. Republican Party*, 130 F. Supp. 3d 1187, 1192-93 (N.D. Ill. 2015) (use of photograph to lambast a politician was transformative); *Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592, at *5 (N.D.Cal. Feb. 25, 2014) (use of politician's headshot was fair to criticize the subject's political views); *Baraban v. Time Warner*, No. 99-cv-1569 (JSM), 2000 WL 358375 at *4 (S.D.N.Y. April 6, 2000) (finding "the photograph is itself a work of political commentary" which allowed defendants "to quote or reproduce a reasonable portion of that commentary in order to respond to it"); *Katz v. Google, Inc.*, 802 F.3d 1178, 1182-83 (11th Cir. 2015) (fairly using image of businessman to criticize his

---

[8] Similarly, Hearst's attempt to offer its own self-serving interpretation of the text to imply that the Article is about a "broader trend in the President's behavior" [D's Memo, p. 20 of 52] or that it "makes an implicit point about the President's desire for public adoration and publicity" [D's Memo, p. 13 of 52] doesn't change the analysis.  <u>First</u>, stating the obvious about President Trump serves no societal benefit because it is common knowledge that politicians in general, and President Trump in particular, seek publicity.  That's what makes them politicians.  <u>Second</u>, and more importantly, Defendant has failed to offer any opinion or editorial commentary as to President Trump's tendency to seek publicity at weddings.  Is it good or bad for the country? Hearst takes no position. So the Article is merely descriptive and therefore infringing.

predatory business practices); *Philpot v. Media Research Center Inc.*, 279 F. Supp. 3d 708, 715-18 (E.D. Va. 2018) (using images of rock stars to provide editorial commentary about their conservative political views); see also *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*, 756 F.3d 73, 84 (2d. Cir. 2014) (explaining that the altered purpose or context of the work must be "evidenced by surrounding commentary or criticism").

### 4. Defendant Hasn't Altered the Purpose of Otto's Photograph Simply Because Hearst is in the Commercial Business of Exploiting Copyrights

The crux of Hearst's argument in support of fair use (for purposes of both the first and fourth factor) is that largescale news organizations can rip off photographs from private citizens with iPhones who are not themselves in the commercial business of reporting news. This is another way of saying that news organizations only need to obtain licenses from professional photojournalists, but can freely expropriate the millions of other photographs posted to social media. [D'S Memo, p. 27 of 32 (citing Nimmer for the proposition that "the news media may have a lesser claim to fair use when appropriating the product of journalists")]. This is really what this litigation is all about.

For the policy reasons stated in Point II.B, *supra*, the Court should reject Hearst's broad interpretation of the Fair Use doctrine which allows news organizations to shoplift whatever photographs it wants from social media without obtaining a license and providing attribution. The Copyright Act is not intended to only protect the work of professional photojournalists, who occupy a very small segment of content generators in the photographic field, particularly given the recent invention of smartphones.

Indeed, the parties have both "scorched the earth" by citing fair use case-after-case. But there's only <u>one case</u> cited by both parties where a federal court has actually addressed what happens when a professional news organization publishes an amateur's

photograph which was originally intended for personal use (as oppose to news reporting), and which the copyright holder had no interest in disseminating. And that case <u>rejected</u> the news organization's claim to fair use in view of a jury verdict.

In *Balsley v. LFP, Inc.*, 691 F.3d 747, 754 (6th Cir. 2012), plaintiff was a female news anchor who, while on vacation in Florida, entered a "wet t-shirt" contest at a bar and ultimately danced nude. An amateur photographer named Gontran Durocher was in attendance and took pictures of Balsley in various states of undress, without Balsley's knowledge. Durocher then published the photograph to the internet and Balsley lost her job as a result. Balsley sought ownership of the photographs so that she would have a legal means to suppress the photograph's dissemination. Durocher sold and transferred the copyright to Plaintiff (and her husband). The defendant, Hustler magazine, later published the nude photograph as part of its "Hot New Babes" contest. Plaintiff sued.

The Sixth Circuit rejected Hustler's argument that the photograph was transformative because it was being used to offer social commentary in the context of news reporting:

> Defendant's use of the photograph was the same as Durocher's original use—to shock, arouse, and amuse. Defendant argues that its use was transformative because the original work was published on lenshead.com to depict the fact that Balsley participated in the wet t-shirt contest, whereas Defendant used the picture to "illustrate its entertainment news story." We disagree with this tenuous assertion. "In light of the context of the publication, the jury could have reasonably concluded that the photograph was used . . . to enhance readership, rather than as a social commentary.
>
> *Balsley*, 691 F.3d at 759.

The facts here are analogous. Like Durocher, Otto is an amateur photographer who just happened to be present when an interesting event transpired that warranted creation of a photo. And like Balsley, the eventual copyright owner, Otto expressed no

interest in disseminating the photograph. Although Durocher published the photo on-line, neither Durocher nor Balsley sought to exploit the photograph for the commercial purpose of news reporting. The defendant Hustler, not unlike Hearst, is in the publishing business and reports news content for profit. Yet, the Sixth Circuit still determined that a jury could find there was no transformative purpose given that the commercial publisher used the photograph as gratuitous eye candy rather than for editorial commentary.

Contrary to Defendant's position here, *Balsley* stands for the proposition that the copyright owner need not be a professional photojournalist who directly competes with a defendant-news organization in order to avail himself of the Copyright law's protections. Nor does the copyright owner need to harbor the intent of disseminating the work. Commercial publishers are required to seek a license from *amateur* photographers as well because one of the key benefits of copyright ownership is the right to control how the work is disseminated.[9]

*Balsley* is also significant in terms of Otto's opposition because it precludes the granting of summary judgment in Defendant's favor. A reasonable jury could certainly find that a commercial publisher's unauthorized use of an amateur's photograph, even if not intended for broad dissemination, does not constitute fair use.

## 5.  Hearst's Commercial Use Was NOT Justified and Carried Out in Bad Faith

---

[9] *See, e.g., Twin Peaks Prods., Inc. v. Publications Int'l*, 778 F. Supp. 1247, 1250 (S.D.N.Y. 1991), *aff'd in part and vacated in part sub nom.*, 996 F.2d 1366 (2d Cir. 1993) ("Section 106(1) of the Copyright Act provides the owner of a copyright with the exclusive right to 'reproduce the copyrighted work in copies'); *Pearson Educ., Inc. v. Liu*, 656 F. Supp. 2d 407, 409 (S.D.N.Y. 2009) ("the distribution right is a right to control *use* . . . . It primarily protects a copyright owner's ability to control the terms on which her work enters the market by providing a remedy against persons who distribute copies of her work without permission."); *Strauss v. Hearst Corp.*, No. 85 CIV 10017 (CSH), 1988 WL 18932, at *10 (S.D.N.Y. Feb. 19, 1988) (recognizing that "'unjust enrichment' is the injury that all copyright holders suffer in the event that their exclusive rights to control the reproduction and display of their works are transgressed").

Hearst argues that its status as a for-profit publisher is "irrelevant" and that the advertising revenue generated by exploitation of Otto's Photograph was "indirect" or "attenuated." [D's Memo, p. 29 of 52]. Defendant's strained legal arguments aside, it has already admitted that "Hearst earned revenue from ads that were visible at the same URL on www.esquire.com as the Article." [D's 56.1 Statement, ¶ 57, SF ¶ 32]. Accordingly, the Court should hold Hearst to its factual admission. Further, a reasonable jury could find that Hearst's exploitation of Otto's Photograph was for commercial purposes. *See Balsley*, 691 F.3d at 759 (*Hustler* editors admitted that the "Hot News Babes" section of the magazine was added to generate interest, sales, and profits. And common sense informs any reasonable jury that the contest would, in fact, be in place for commercial purposes, . . .").

Hearst also argues that "even a clear finding of bad faith does not bar a holding that the first factor favors a defendant" [D'S memo, p. 30 of 52]. Otto never argued that bad faith is dispositive of the issue. But bad faith, or lack of justification for expropriating a protected work, remains an element to be considered in the Court's analysis under the first statutory factor. *NXIVM*, 364 F.3d at 478-79; *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214–15 (2d Cir. 2015) ("the would-be fair user of another's work must have justification for the taking").

In addition to the arguments set forth in Otto's principal brief [P's Memo, Dkt. # 37, p. 23 of 32], the record shows that Hearst's editors acted recklessly and with "willful blindness" in expropriating Otto's Photograph without giving any thought to whether such use was legal or fair. *See* Point IV.C, *infra.*

24

**D.    WITH RESPECT TO THE SECOND FACTOR, HEARST HAS FAILED TO DEMONSTRATE THAT OTTO'S PHOTOGRAPH WAS "NOT CREATIVE"**

In his principal brief, Otto was forthcoming with the Court and averred that the second statutory factor was likely neutral, because his Photograph possessed a mixed nature of fact and creativity.  [P's Memo, p. 25 of 32 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1658 (2016) ("The mere fact that the original is a factual work . . . should not imply that others may freely copy it," as "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression.")].

In *Balsley*, the only fair use case cited by either party which involves an amateur photographer taking spontaneous shots at a public event, the Court of Appeals concluded that the second factor either slightly favored plaintiff or was neutral.  *Balsley v. LFP, Inc.*, 691 F.3d at 760 ("The parties' arguments persuade us that the Balsley photograph possesses a mixed nature of fact and creativity. Consequently, the jury could reasonably find that this factor weighed in slight favor of Plaintiffs or, at the very least, its impact was neutral").

Predictably, Hearst argues that Otto's Photograph is purely factual in nature and involved no creativity whatsoever.  [D's Memo, 34 of 52]  Indeed, Hearst attempts to diminish the creativity imbued in Otto's Photograph by labeling it a "Snapshot."  But Hearst's denigration of the work is belied by the fact that out of the dozens of images available on Instagram, Hearst (and many if its largescale competitors such as Washington Post, CNN, GQ, TMZ and Daily Mail) sought to commercially exploit Otto's work for its qualitative assets.  [D's 56.1, ¶¶ 78-82]  The widespread market

demand for Otto's Photograph shows that it has been valued for its creativity, regardless of its depiction of a factual event.

Consistent with its self-entitled argument that commercial publishers can shoplift whatever photographs they want from social media with absolute impunity, Hearst states that "[a]ll of these people walking around with cameras in their pockets" generate content that "involves essentially zero creativity or effort." [D's Memo, p. 36 of 52]. Hearst concludes that such people (who, incidentally, will also be occupying seats on the jury) do not deserve protection under U.S. Copyright law. Hearst further admits that "[p]hotographs licensed by Hearst generally are taken by professional photographers with professional camera equipment." [D's 56.1, ¶ 63]

Clearly, Hearst envisions a future market where it never has to license ANY photographs; where all of its news content is generated for free by unsuspecting citizens "walking around with cameras in their pocket." What an absurd position. It's a like a restaurant owner arguing that it should be entitled to walk into Costco and take all of the food it wants for free because it's in the public's benefit to eat. Hearst should not be entitled to a such massive windfall of creative content simply because technology has empowered ordinary citizens with the ability to take spontaneous photographs. After all, the art of photography has everything to do with timing,[10] and an amateur photographer

---

[10]  *See, e.g., Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998) (protectable elements include photographer's "positioning and timing"); *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 453 (S.D.N.Y. 2005) (finding that a photograph's originality is based, in part, on timing because "a person may create a worthwhile photograph by being at the right place at the right time.").

whose work generates mass appeal is entitled to as much copyright protection as the pros with their $2500 Nikons.

**E.    WITH RESPECT TO THE THIRD FACTOR, HEARST HAS FAILED TO DEMONSTRATE THAT ITS USE OF OTTO'S PHOTOGRAPH WAS NECESSARY**

The third factor inspects "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" to help us determine whether the use was fair. 17 U.S.C. § 107(3).  Hearst argues that the third factor is neutral because Hearst performed some minor cropping of the image and because Otto's Photograph was "reasonably necessary" in light of its "news reporting purpose" alleged in the first factor. [D's Memo, p. 37 of 52]

First, Hearst's minor cropping of the image does not diminish Otto's argument that Hearst engaged in wholesale copying by publishing the entirety of the work.  *See, e.g., Barcroft Media*, 2017 WL 5032993, at *7 (third factor favors plaintiff where defendant "used all or most of each original Image in its website displays" and where despite some cropping of the background, "nonetheless focused on the portion of the Image most likely to grab viewers' attention").[11]

Second, as visibly demonstrated in Otto's analysis of the first factor, Hearst's use of Otto's Photograph was *entirely unnecessary* to the Article.  The text of the Article only describes the content of two photographs that are not even the subject of this litigation. The Article could have made all the same points alleged by Hearst in the absence of Otto's Photograph, which was merely utilized as "eye candy," an optical enhancement to

---

[11] See also *Balsley*, 691 F.3d at 760 (third factor favors plaintiff where defendant "published the entire photograph at issue less minor cropping of the background."); *Brewer v. Hustler Magazine, Inc.,* 749 F.2d 527, 529 (9th Cir. 1984) ("only a small portion of the photograph was cropped off. This fact favors the jury's verdict [against fair use]"); see also *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("copying an entire work militates against a finding of fair use.").

make the Article look more appealing to viewers.  On the face of the Article, there is no textual description of the content of the Photograph; nor is there any editorial commentary which would require use of Otto's Photograph to serve Hearst's alleged reporting purpose.  Because Otto's Photograph was not used in a transformative fashion, "the 'purported justification[ ]' for the use was not reasonable, and thus the qualitative and quantitative amounts used were inherently unreasonable as well." *HathiTrust*, 755 F.3d at 96." *Barcroft Media*, 2017 WL 5032993, at *7 .

F.    **WITH RESPECT TO THE FOURTH FACTOR, MARKET HARM SHOULD BE PRESUMED IN LIGHT OF HEARST'S WHOLESALE COPYING AND, IN ANY EVENT, THE WIDESPREAD MARKET DEMAND FOR OTTO'S WORK IS UNDENIABLE**

The final factor, "the effect of the use upon the potential market for or value of the copyrighted work," looks "to not only the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613; *see also Harper & Row*, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." (internal quotation marks omitted)).

1.    ***Sony's* Presumption of Market Remains Good Law and Has Been Recently Applied to a News Organization's Wholesale Copying of An Amateur Photographer's Work**

As a threshold matter, Otto is entitled to the presumption of market harm based on Hearst's commercial wholesale copying of his work.  *See, e.g.*, *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) (holding that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"). "A presumption of market harm

"makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591.

Here, Hearst admits that it engaged in wholesale copying of Otto's Photograph [D's 56.1, ¶¶ 48-50, 54]; and admits that such copying was done by a for-profit entity [D's 56.1, ¶ 11] in the business of publishing news [*Id.*, at ¶ 12]. Defendant further admits that Hearst generated advertising revenue as a result of such exploitation [D's 56.1, ¶¶ 56-57]. Nevertheless, Hearst argues that *Sony's* presumption of market harm is inapplicable to this case because it involves news reporting. [D's Memo, p. 40 of 52]

Contrary to Defendant's unsupported assertion, *Sony's* presumption of market remains good law and has been recently applied to a news organization's wholesale copying of an amateur photographer's work. *See Balsley*, 691 F.3d at 760–61 ("Defendant's publication of the photograph was commercial; thus, the presumption of unfair exploitation applies."). Defendant's reliance on *Bollea v. Gawker Media, LLC*, 913 F. Supp. 2d 1325, 1327 (M.D. Fla. 2012) and *Swatch Grp.,* 756 F.3d at 90-92 to refute *Sony's* presumption are entirely misplaced, as neither case even addresses the argument.

## 2. The Fact That Otto Did Not Originally Intend to Exploit the Photograph is Immaterial to Whether a Potential Market Exists

To rebut the presumption of market harm, Hearst argues that Otto had no original intent of exploiting the Photograph and therefore no market exists. [D's Memo, pp. 41-44 of 52]

Once again, the Sixth Circuit's decision in *Balsley*, 691 F.3d at 760–61 remains the ONLY case cited by both parties in this action where a news organization exploited an amateur photograph whose copyright owner had no intention to commercially exploit

the work.  In affirming a jury's finding that there was no fair use, *Balsley* determined that

the copyright owner's intent was immaterial to the analysis of the fourth statutory factor:

> Defendant's publication of the photograph was commercial; thus, the presumption of unfair exploitation applies. Defendant attempts to rebut the presumption by arguing not that its publication had no effect on the market, but rather that Plaintiffs have no present intention of exploiting the market for the Balsley photograph, so Plaintiffs have not and will not suffer harm. Of course, a copyright owner is not required to show that actual harm has come to her, *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. 774, but must show merely a "potential" effect on the market for the copyrighted work. *Harper & Row,* 471 U.S. at 568–69, 105 S.Ct. 2218. **We agree with Plaintiffs that their current desire or ability to avail themselves of the market for the Balsley photograph is immaterial to the issue outlined by the statute, namely, whether there is potential for an adverse effect on the market for the photograph should the challenged use become widespread**. *Id.* at 568, 105 S.Ct. 2218. Plaintiffs presented ample evidence of the vast market for the Balsley photograph, and they persuasively argued that Defendant's publication and sale of the picture "directly competed for a share of the market for" the Balsley photograph. *Id.* The jury would not be unreasonable in finding that this factor weighed in favor of Plaintiffs because Defendant failed to rebut the presumption that its publication of the Balsley photograph affected the market.

*Balsley*, 691 F.3d at 760–61 (boldface added).

Here, the facts are analogous.  There is no dispute that Otto had no intent of

commercially exploiting the Photograph at the time Hearst published it as part of its

Article.  He did, of course, move swiftly to protect his work once he discovered that

media organizations began to exploit it without his authorization.  In any event, if the

Court is going to credit Hearst's argument and measure Otto's intent at the time of the

creation of the Photograph on June 10, 2017, then his intent is immaterial according to

*Balsley*. But if the Court measures Otto's intent at the time this litigation was filed, then

clearly, Otto did (and does) have the intent to commercially exploit the Photograph,

which renders Defendant's argument entirely moot.

Regardless of when Otto's intent is measured, he has presented evidence to the

Court of widespread market demand for his work.  Hearst does not and cannot deny that

his Photograph was in high demand by major media outlets, including Washington Post,

CNN, GQ, TMZ and Daily Mail. [D's 56.1, ¶¶ 78-82]  Further, there is no dispute that

Hearst and its media competitors expropriated Otto's Photograph at the height of its

market demand without procuring a license.  [D's Memo, p. 42 of 52] This had the

obvious effect of decimating any potential market for licensing.  It's not unlike a

widespread riot of a department store where products are being looted off the shelves.

Under those circumstances, there's not going to be anyone purchasing items at the cash

register.  Hearst cannot on one hand claim that no economic market exists while it steals

the content with the other hand behind its back.

Accordingly, as Hearst has failed to rebut the presumption of market harm, and

because there is obvious potential for an adverse effect on the market should Hearst's

practice of freely expropriating photographs from social media allow to persist, the fourth

factor heavily weighs in Otto's favor.

**POINT III:    DEFENDANT HAS FAILED TO PRESENT ANY EVIDENCE TO
SUPPORT THE DEFENSES OF WAIVER AND CONSENT
WHICH, IN ANY EVENT, ARE NOT LEGALLY COGNIZABLE**

Hearst argues that its defenses of consent and waiver present questions of material

fact.  However, there is no record evidence that Otto ever communicated with Hearst

prior to publication [D's 56.1 Statement, ¶¶ 64-65].  Otto never manifested his consent to

anyone, but even if he did, Hearst cannot step into the shoes of others to avoid liability.

*See, e.g., Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) ("It

is well established in patent and copyright law that a patent or copyright licensee may not

sub-license his licensed intellectual property rights without express permission from the

licensor."); *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) ("a non-

exclusive licensee has 'no right to re-sell or sublicense the rights acquired unless he has

been expressly authorized to do so.'"").  In short, the law presumes that a registered copyright holder will seek to control publication of his works and thus will <u>not</u> grant the right to sub-license unless he knows of the identity of the sub-licensee.

**POINT IV:    A REASONABLE JURY COULD FIND DEFENDANT'S INFRINGEMENT WAS WILLFUL**

In a "Hail Mary" attempt to mitigate damages, Hearst argues that Plaintiff cannot establish willful infringement. [D's Memo, p. 49 of 52]  However, the record is replete with evidence upon which a jury could find willfulness so as to qualify Otto for enhanced damages under 17 U.S.C. § 504(c)(2).

To prove "willfulness" under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights. *Island Software & Computer Serv.*, 413 F.3d at 263 (citations omitted); *see also Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 112 (2d Cir.2001) ("Willfulness in this context means that the defendant recklessly disregarded the possibility that its conduct represented infringement.")

**A.    THE FACT THAT HEARST IS IN THE PUBLISHING BUSINESS AND IS PRESUMED TO BE SOPHISTICATED ABOUT COPYRIGHT LAW AND LICENSING PROCEDURES IS EVIDENCE OF WILLFULNESS.**

Hearst admits that it is in the publishing industry [D's 56.1, ¶¶ 12-13]; that it licenses photographers for use in its publications [*Id.* at ¶ 14]; that it employs lawyers in-house who are knowledgeable about copyright law and licensing practices [*Id.* at ¶ 15-18]; and maintains written standard or practices concerning licensing procedures [*Id.* at ¶ 19-20].

32

These admissions are evidence that Hearst recklessly disregarded Otto's rights.

*See, e.g.*, *Fallaci v. New Gazette Literary Corp.*, 568 F. Supp. 1172 (2d Cir.

1983) (finding that a newspaper publisher willfully infringed because, as a publisher of a

copyrighted newspaper, defendant should have known that its unauthorized reproduction

of plaintiff's copyrighted article constituted copyright infringement); *Castle Rock*

*Entertainment v. Carol Pub. Group, Inc.,* 955 F.Supp. 260, 267 (S.D.N.Y.1997) (where

publisher "testified that his company has had experience with the copyright laws, and that

he is familiar with the requirements of those laws, the court found publisher acted in

reckless disregard because it was sophisticated with respect to the publishing industry and

copyright laws).[12]

## B.     THE FACT THAT HEARST HAS BEEN SUED FOR COPYRIGHT INFRINGEMENT OVER 10 TIMES IN THE PAST TWO YEARS IS EVIDENCE OF WILLFULNESS

Hearst admits that it has been sued for copyright infringement in this District at

least 10 times in the past two years.  [D's 56.1 Statement, ¶ 26]  This is evidence of

willfulness because repeated litigation shows that Hearst should have known that it

needed to obtain a license to publish Otto's Photograph.  *See, e.g.*, *Walt Disney Co. v.*

---

[12] See also *Viacom, Int'l Inc. v. Fanzine Int'l, Inc.,* 98 Civ. 7448, 2001 WL 930248, at *4 (S.D.N.Y. Aug. 16, 2001) (finding willful infringement where defendant was "a multi-national publishing company that publishes over 200 magazine releases a year" and "[a]s such ... is or should be familiar with copyright law and particularly with the general practices of securing permission before reproducing copyrighted works"); *EMI Entertainment World, Inc. v. Karen Records, Inc.*, 806 F.Supp.2d 697, 703 (S.D.N.Y. 2011) *vacated on grounds of standing,* 2013 WL 2480212 (S.D.N.Y. June 10, 2013) (noting that "other courts in this district have inferred willful infringement from a defendant's ownership of copyrights and experience in an industry heavily regulated by copyright law."); *Van Der Zee v. Greenridge,* 2006 WL 44020, *2 (S.D.N.Y. Jan. 6, 2006) ("Defendants' work in the book publishing industry should have provided sufficient knowledge that copyright protection is available for photographs."); *Fitzgerald Publishing Co.,* 807 F.2d at 1115 (defendant's position as an experienced publisher gave it constructive knowledge of its infringement);

*Best*, 1990 WL 144209, *2 (S.D.N.Y. Sept. 26, 1990) ("Defendant's past infringement is a strong indication that it was familiar with the law and willfully violated it.").[13]

**C.    THE SUPERVISING EDITOR OF THE ARTICLE FAILED TO REVIEW OTTO'S PHOTOGRAPH PRIOR TO PUBLICATION, FAILED TO CONSULT COUNSEL, AND FAILED TO INQUIRE AS TO THE IDENTITY OF THE COPYRIGHT HOLDER, ALL OF WHICH CREATE A STRONG INFERENCE OF "WILLFUL BLINDNESS"**

Hearst argues that Otto has failed to develop a record of Hearst's state of mind. [D's Memo, p. 49 of 52]  But a reasonable jury could infer willfulness based on the existing record.  Of course, "whenever state of mind is at issue, direct proof of one's specific wrongful intent is rarely available and so recourse to circumstantial evidence is most often necessary."  *Friedman v. Live Nation*, 833 F.3d 1180, 1189 (9th Cir. 2016).

Here, Mr. Sebastien, who in his capacity as Digital Director of Esquire.com, "often oversee[s] the development of and edit articles for publication on the site" [Sebastien Declr. ¶ 2] testified that he never even saw Otto's Photograph until it was published on Hearst's website, a fact which the documents bear out.[14]

---

[13] See also *EMI Entertainment World, Inc. v. Karen Records, Inc.*, 806 F.Supp.2d 697, 704 (S.D.N.Y. 2011), *vacated on grounds of standing*, 2013 WL 2480212 (S.D.N.Y. June 10, 2013) ("Other courts in this district have found that a defendant whose practices have given rise to other copyright suits acts in reckless disregard of copyrights holders' rights when he continues them and merely instructs employees not to violate copyright law."); *The Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.*, 04 Civ. 5002, 2005 WL 2063819, at *3 (S.D.N.Y. Aug. 24, 2005) (noting that plaintiff's prior "lawsuit put [defendant] on clear notice of the risk of infringement involved in his company's practices"); *Viacom, Int'l Inc.*, 2001 WL 930248, at *4 (finding willful infringement where the defendant "has been sued at least two other times for copyright infringement within a span of one year").

[14] Otto took his Photograph at approximately 9:32 p.m. on Saturday, June 10, 2017.  [Otto's Declr., ¶ 6]. The next morning, on Sunday, June 11, 2017 at 9:56 a.m., Mr. Wade (the Article's author) contacted Mr. Sebastien (Hearst's editor) [Dkt. # 38-11, Otto Decl., Ex. K, p. 2 of 4; Dkt. #54, Sebastien Decl. ¶ 3 ]  At 10:00 a.m., Mr. Wade posted a photograph of President Trump that is not subject to this litigation. [*Id.* at p. 3; Sebastien Decl. ¶ 3]  At 10:06 a.m., Mr. Sebastien approved Mr. Wade's idea for an article about Presdient Trump crashing weddings.  [*Id.;* Sebastien Decl. ¶ 3]  Then, by no later than 10:41 a.m., Mr. Wade had published Otto's Photograph to Hearst's website as part of the Article.  [*Id.;* Sebastien Decl. ¶ 3] Based on the record evidence and testimony, Mr. Sebastien never saw nor even approved Defendant's use of the Otto's Photograph before it was subjected to commercial exploitation by Hearst.

Indeed, Mr. Sebastien testifies that after Mr. Wade sent Mr. Sebastien a photograph that is not subject to this litigation, "Mr. Wade did not provide me with any further information about how he looked for sources of material for inclusion in an Esquire.com article about President Trump's appearance at the wedding." [Sebastien Declr. ¶ 7]  But Mr. Sebastien was supposed to be supervising Hearst's publication of copyrighted materials on-line.  [Sebastien Declr. ¶ 2] Accordingly, Mr. Sebastien knew or should have known that licenses and proper attribution are required to post copyrighted material on a commercial website.[15]

Mr. Sebastien's gross failure to review the Article before it was hastily posted, inquire as to the status of the copyright holder, consult with Hearst's in-house counsel concerning fair use, or approve Hearst's use of Otto's Photograph in particular all create a strong inference that he (and therefore Hearst) acted with willful blindness in permitting Otto's Photograph to be re-published for Defendant's commercial purpose.  A reasonable jury could certainly find as such.  Accordingly, there is enough evidence on the record for the question to be decided by a fact-finder.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Jonathan Otto's motion for partial summary judgment on liability against Defendant for infringement [Count I] should be GRANTED and Defendant's Cross-Motion Should Be DENIED.

Respectfully Submitted,

LIEBOWITZ LAW FIRM PLLC

by: **/jameshfreeman/___**

---

[15] There is also evidence on the record that Mr. Wade left the "Copyright" field in the CMS blank and misattributed the photographer's name, indicating Hearst's abject failure to inquire as to the identity of the copyright owner.  [Otto Declr., ¶ 20]