UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
JONATHAN OTTO,                                          :
                                                        :
                                    Plaintiff,          :       **OPINION AND ORDER**
                                                        :
                  -v-                                   :       17-CV-4712 (GHW) (JLC)
                                                        :
HEARST COMMUNICATIONS, INC.,                            :
                                                        :
                                    Defendant.          :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Settlement conferences are the lifeblood of a magistrate judge's work. Over time, we handle hundreds and eventually thousands of them. As a result, it is an all-too-familiar experience for a magistrate judge—or anyone engaged as a mediator—to observe the posturing and puffery that lawyers engage in during settlement negotiations. But must all material representations made during a settlement conference be truthful? And can a party rely on a purported misrepresentation at an off-the-record settlement conference as a basis for seeking sanctions? These questions lie at the heart of the pending cross-motions before the Court in this copyright infringement action.

Defendant Hearst Communications, Inc. has moved for sanctions against plaintiff Jonathan Otto and his counsel at Liebowitz Law Firm, PLLC. Hearst alleges that Otto and his counsel made material misrepresentations during a settlement conference with the Court, and engaged in related bad-faith conduct during the course of discovery. Hearst seeks an award of $72,612.50 ($50,000 in

1

fines and $22,612.50 in attorneys' fees) as well as an admonishment of both Otto and his counsel. Otto and his counsel oppose the motion and have cross-moved for a judgment of civil contempt and sanctions against Hearst and its counsel, alleging violations of the Court's Standing Settlement Order. Otto seeks an award of $10,087.50 in attorneys' fees and a court order directing Hearst's counsel to complete ethics training. Hearst in turn opposes Otto's cross-motion, arguing that it is retaliatory and should be rejected because Hearst acted in good faith with respect to the confidentiality of the settlement conference. For the following reasons, the Court declines to impose sanctions on either party or their counsel, or to hold Hearst and its counsel in contempt.

## I.     BACKGROUND

### A.     Procedural History

The series of events that led to the present action began when Otto captured a photograph of President Trump (the "Photograph") with his camera phone while attending a friend's wedding in June 2017 at a Trump-owned golf club in New Jersey. Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment of Civil Contempt and for Sanctions; and in Opposition to Defendant's Motion for Sanctions ("Otto Mem.") dated Apr. 17, 2018, Dkt. No. 67, at 2; Memorandum of Law in Support of Defendant's Motion for Sanctions ("Hearst Mem.") dated Mar. 27, 2018, Dkt. No. 60, at 1. Hearst subsequently obtained the Photograph from a third party's social media account and published it in an online article entitled "President

Trump is the Ultimate Wedding Crasher" on one of its websites. Otto Mem. at 2;
Hearst Mem. at 1–2.

Otto brought this lawsuit alleging that Hearst infringed his copyright in the
Photograph by reproducing and publicly displaying it on its website without a
license. Complaint dated June 21, 2017, Dkt. No. 1. After Hearst answered Otto's
complaint, the Honorable Gregory H. Woods referred this case to me for settlement
in September 2017. Order of Reference dated Sept. 13, 2017, Dkt. No. 14. The
parties thereafter appeared before me for a settlement conference on October 23,
2017, but did not reach a resolution of Otto's claims.

After the close of discovery and during a status conference with Judge Woods
on February 5, 2018 to discuss possible summary judgment motions, Hearst
reported that it had "learned of some misconduct by [Otto] and counsel that began
during the initial October settlement conference . . . and continued throughout the
discovery period." Transcript of February 5, 2018 Conference ("Tr.") at 27:19–22,
Dkt. No. 46. Otto's counsel responded that the issue dealt with damages,
specifically "with an interpretation of a settlement agreement and how it relates to
a licensing agreement." *Id.* at 29:10–12. Given that the issue involved conduct
during the settlement conference, Judge Woods referred the dispute to me. Dkt. No.
32.

By letter dated February 27, 2018, Hearst requested a pre-motion conference
to discuss its anticipated motion for sanctions for "misconduct by [Otto] and his
counsel concerning [Otto's] purported evidence of license fees . . . ." Dkt. No. 43, at

2. Hearst indicated that it was "not providing further detail regarding [Otto]'s and his counsel's misconduct in [its] publicly-filed letter due to the confidential nature of the [s]ettlement [c]onference and the relevant documents." *Id.* Otto's counsel submitted a letter in opposition on the same day, arguing that Hearst's intent to use statements made during the course of a confidential settlement conference violated the Federal Rules of Evidence and the Court's Standing Order for All Cases Referred for Settlement ("Standing Order"). Dkt. No. 44, at 1. In his submission, he indicated that he would seek contempt for such violations. *Id.* at 2.

On March 6, 2018, I held a telephone conference to set a briefing schedule for the parties' motion papers. On March 30, 2018, Hearst filed its motion for sanctions, along with its memorandum of law, declarations from counsel Jennifer D. Bishop, Esq., and Ravi V. Sitwala, Esq., and accompanying exhibits. *See* Notice of Defendant's Motion for Sanctions dated Mar. 27, 2018, Dkt. No. 59; Hearst Mem.; Declaration of Jennifer D. Bishop ("Bishop Decl.") dated Mar. 27, 2018, Dkt. No. 61; Declaration of Ravi V. Sitwala ("Sitwala Decl.") dated Mar. 27, 2018, Dkt. No. 62.[1]

On April 17, 2018, Otto cross-moved for a judgment of civil contempt and sanctions against Hearst and its counsel and submitted his memorandum of law, declarations from counsel Richard Liebowitz, Esq., and James H. Freeman, Esq., and accompanying exhibits. *See* Notice of Motion of Plaintiff's Motion for Judgment

---

[1] Pursuant to the Court's March 6, 2018 Order (Dkt. No. 50), Hearst first served its unredacted motion papers, along with a version with its proposed redactions, on Otto and the Court by email on March 27, 2018. Given that Otto did not object to Hearst's proposed redactions and the fact that Hearst incorporated Otto's additional request for redactions, Hearst properly filed a redacted version of its sanctions motion on ECF by the Court's March 30, 2018 deadline.

of Civil Contempt Pursuant to L.R. 83.6 and Sanctions filed Apr. 17, 2018, Dkt. No.

66; Otto Mem.; Declaration of Richard Liebowitz ("Liebowitz Decl.") dated Apr. 17,

2018, Dkt. No. 68; Declaration of James H. Freeman ("Freeman Decl.") dated Apr.

17, 2018, Dkt. No. 69.

On April 27, 2018, Hearst submitted its reply memorandum of law in further

support of its motion and its opposition to Otto's cross-motion, along with a reply

declaration from Bishop. *See* Memorandum of Law in Further Support of

Defendants' Motion for Sanctions and in Opposition to Plaintiff's Motion for

Contempt and Sanctions ("Hearst Reply Mem.") dated Apr. 27, 2018, Dkt. No. 73;

Reply Declaration of Jennifer D. Bishop in Further Support of Defendant's Motion

for Sanctions ("Bishop Reply Decl.") dated Apr. 27, 2018, Dkt. 74.

On December 10, 2018, Judge Woods granted Otto's motion for summary

judgment on Hearst's liability for copyright infringement and denied Hearst's cross-

motion on its fair use defense. *Otto v. Hearst Communications, Inc.*, 345 F. Supp.

3d 412, 437 (S.D.N.Y 2018). A trial on damages is scheduled to begin on July 15,

2019. Dkt. No. 91.

**B.    Facts**

Otto and Liebowitz attended the settlement conference on October 23, 2017.

Bishop and Sitwala, along with Michael Sebastian, a digital director at

Esquire.com, a Hearst publication, attended on behalf of Hearst. Liebowitz ¶ 9;

Bishop Decl. ¶ 8; Sitwala Decl. ¶ 2. Hearst alleges that "near the outset of the

[c]onference, [ ] Liebowitz represented to [its] counsel and the Court that [Otto] was

on the verge of executing a license for the [Photograph] for a sum of $9,500 (the "Purported License")." Hearst Mem. at 3; Bishop Decl. ¶ 9; Sitwala Decl. ¶ 3.[2] It further alleges that Liebowitz "allowed Hearst's counsel to examine[ ] an unsigned document that he represented was that Purported License," "suggest[ing] that a reasonable estimate of damages in this case would be three to five times the license fee of $9,500." Hearst Mem. at 3; Bishop Decl. ¶¶ 9–10; Sitwala Decl. ¶¶ 3–4. Hearst contends that "after being presented with the claimed draft license, [its] counsel repeatedly asked [ ] Liebowitz and the Court whether the Purported License was in settlement of [Otto's] claims against another media entity," to which it alleges "[ ] Liebowitz stated that it was not." Hearst Mem. at 3; Bishop Decl. ¶ 10; Sitwala Decl. ¶ 4.

Liebowitz responds that there is no record of the statements made at the settlement conference and that in light of the amount of time that has elapsed and the numerous conferences that he has attended since the settlement conference, he "will not venture a guess as to what communications were made, or weren't made." Otto Mem. at 4; Liebowitz Decl. ¶ 11. While Liebowitz neither confirms nor denies Hearst's allegations, he argues that hypothetically if Hearst's counsel had asked him at the conference whether Otto had settled his claims with another media company, specifically Warner Brothers Entertainment Inc. ("Warner Bros."), or

---

[2] Prior to the October settlement conference, Otto had responded to Hearst's interrogatories, stating: "Plaintiff [ ] calculates the loss of [a] licensing fee in the range of $5,000 based on the market rate of photographs of similar style, quality and content." Bishop Decl. ¶ 7, Exhibit A: Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories dated October 18, 2017 at 3, Dkt. No. 61-1.

whether his licensing agreement was part of a settlement agreement, then the correct hypothetical answer would have been "no" based on the timing of the question—Otto's settlement agreement with Warner Bros. was not executed until October 27, 2017, four days after the settlement conference. Otto Mem. at 4–5; Liebowitz Decl. ¶¶ 11–13; Bishop Decl., Ex. E: First Stipulation of Facts ("Stipulation") dated Dec. 20, 2017 ¶ 1, Dkt. No. 61-5.

Indeed, on October 27, 2017, a settlement agreement in *Otto v. Warner Bros.*, No. 17-CV-4763 (LTS) (SN)—a similar copyright infringement action involving the Photograph—was executed. Bishop Decl., Ex. E: Stipulation ¶ 1. A licensing agreement between Otto and Warner Bros. was attached as an exhibit to this settlement agreement, and Otto explains that this was done with the specific intent of having the licensing agreement exist as a separately enforceable agreement. Otto Mem. at 5; Liebowitz Decl. ¶ 22. A stipulation of dismissal in *Otto v. Warner Bros.* was filed on October 30, 2017. Freeman Decl. ¶ 10, Ex. F: Stipulation of Dismissal with Prejudice at 8, Dkt. No. 69-6.

During discovery, on December 7, 2017, Otto produced a copy of the licensing agreement from *Otto v. Warner Bros.* to Hearst. Bishop Decl., Ex. B: Production Email, at OTTO_0067–69, Dkt. No. 61-2. Hearst alleges that the licensing agreement "appears to be an executed copy of the license shown to Hearst at the [s]ettlement [c]onference (the "Purported License")," and that the December 7 production—titled "Photography License"—"was not accompanied by any redacted

pages nor any other indication that it was not a complete document." Hearst Mem. at 4; Bishop Decl. ¶ 15.

During his deposition on December 11, 2017, Otto was questioned about the relationship between the licensing agreement and the Warner Bros. lawsuit:

> Q.   Have you ever licensed the photograph at issue in this case to anyone?
> A.   Currently, yes.
> Q.   What do you mean by "currently"?
> A.   We've—we've licensed the photos [sic], yes.
> Q.   Who have you licensed it to?
> A.   TMZ
> Q.   Is that it?
> A.   To my knowledge as of today, yes. . . .
>
> *                    *                    *
>
> Q.   What's the status of [your lawsuit against Warner Brothers]?
> A.   I believe that one's settled or a settlement, I think, as well.
> Q.   Was this license agreement part of the settlement of that lawsuit?
> A.   No, they're separate.
> Q.   How are they separate?
> A.   We had a settlement with them after the license agreement.
> Q.   Is there a separate written settlement agreement?
> A.   Yes.

Bishop Decl. ¶ 17, Ex. C: Deposition Transcript of Jonathan Otto dated Dec. 11, 2017 at 40:14–23, 43:2–13, Dkt. No. 61-3; Hearst Mem. at 5.  In light of confidentiality concerns, Otto did not answer further questions about the settlement with Warner Bros. during his deposition.  Otto Deposition Tr. at 43:14–44:7.

Following his deposition, Hearst informed Otto that it would move to compel the production of all settlement agreements relating to the Photograph.  Hearst Mem. at 5; Bishop Decl. ¶ 17.  Otto agreed to produce a copy of his Settlement and Release Agreement with Warner Bros. and made his production on December 15,

2017. Freeman Decl. ¶¶ 16–17. On December 20, 2017, he stipulated that the licensing agreement, attached as Exhibit B to the settlement agreement and bate-stamped OTTO_0077–79, was identical to the licensing agreement produced on December 7 and bate-stamped OTTO_0067–69, and to the license agreement that Otto testified about at his deposition. Otto Mem. at 8; Freeman Decl. ¶¶ 16–17; Bishop Decl. ¶ 19, Ex. E: Stipulation ¶ 2.

Following the close of discovery and during a telephone call between Bishop, Sitwala, and Freeman on January 26, 2018, Freeman represented that it was the Liebowitz Law Firm's practice and "specific intent [to] draft[ ] licensing agreements as separate instruments that are severable from [ ] settlement agreements," and that "the issue of whether the [l]icensing agreement in this case was separately enforceable was a question of law." Freeman Decl. ¶¶ 38–40. Freeman reported that during this call Hearst's counsel "took issue with Liebowitz's representation of the [l]icensing [a]greement as a standalone document and accused him of failing to disclose the existence of an associated settlement agreement (even though there was no settlement as of October 23, 2017)." *Id.* ¶ 38. In the end, Freeman contends that "what [Hearst's] counsel described as a misrepresentation of fact was nothing more than their own disagreement with [Otto's] legal position." *Id.* ¶ 40.

## C.   Summary of the Parties' Arguments

Hearst argues that "[Otto] and his counsel repeatedly misrepresented the nature of the Purported License: at the [s]ettlement conference, through their document production, and at [Otto]'s deposition;" and that their misconduct

constitutes "fraud upon the court." Hearst Mem. at 9. It contends that their

"claims about the Purported License were so completely without merit that bad

faith can and should be inferred" because their conduct "permits no other conclusion

but that they intended to mislead both the Court and Hearst about the nature of the

Purported License to falsely inflate [Otto's] claim of damages." *Id.* at 10 (internal

quotation marks and citation omitted). Hearst argues that Otto and his counsel

"concocted a plan to inflate their damages claim through doctored evidence," by

"settl[ing] similar copyright claims against [Warner Bros. for the Photograph], and

draft[ing] a settlement agreement with the specific intent of representing to Hearst

and the Court that the settlement fee was in fact a *license* fee, and thus evidence of

damages in this case." *Id.* at 1.

Hearst alleges that Otto and Liebowitz "brought an altered version of [the

licensing] agreement to the Court during [the] settlement conference, calling it a

'license' and arguing that it should form the basis of damages calculations." *Id.* It

also alleges that Otto "produced a doctored, repaginated version of the Purported

License without redactions or indications that it was part of the Complete

[settlement] Agreement" (*id.* at 12); and that Otto "lied under oath, insisting that

the 'license' was separate from any settlement." *Id.* at 1. Hearst asserts that under

Otto's theory of damages, "the reasonable license fee that [he] may have lost

because of Hearst's use of the [Photograph] is critical to the damages calculation."

*Id.* at 2 (citations omitted). Hearst argues that Otto and his counsel's conduct

during both the settlement conference and the course of discovery crossed the line

between "zealous advocacy and deliberate misrepresentation of facts and evidence," and constitutes "fraud upon the court," "warrant[ing] the strongest sanctions available to deter similar abuses of the judicial process." *Id.* at 1; Hearst Reply Mem. at 1.

Otto counters that Hearst's motion should be denied because there is no reliable record of the communications from the confidential settlement conference; Otto's document production was proper; and Otto's deposition testimony was consistent with his understanding of his legal position. Otto Mem. at 4, 21, 23. Otto argues that Hearst "intentionally filed documents with the Court," including declarations which "reference communications that were allegedly made by [ ] Liebowitz . . . during the course of the settlement conference . . . ," in violation of the Court's Standing Order. Otto Mem. at 4, 13. He also argues that portions of the declarations are "cunningly paraphrased[,] [ ] drawn from biased selective memory, [and] disclose the purported amount of [the] settlement demand issued by [him]." Otto Mem. at 4; Liebowitz Decl. ¶ 9. Liebowitz asserts that "he will not . . . violat[e] a Standing Court Order and destroy[ ] the integrity of the settlement conference program by engaging in a debate as to what was actually said at the settlement conference." Otto Mem. at 4; Liebowitz Decl. ¶ 11.

Otto further contends that Hearst "willfully violat[ed] an Order which serves to protect the sanctity and integrity of 'off-the-record' settlement conferences," in order to "harass [him] during the briefing of summary judgment and pre-litigate the merits of his expert's theory of damages." Otto Mem. at 1. He argues that Hearst's

actions amount to civil contempt and that "in order to preserve the sanctity and integrity of the mediation program that is critical to the efficient functioning of the judicial system," sanctions are warranted. *Id.* at 17–18. Otto also contends that Hearst has failed to establish how his licensing agreement was "doctored," arguing that it was "specifically intended to exist as a <u>separately enforceable agreement</u> <u>subject to different terms and conditions</u> than [his] [s]ettlement [a]greement with Warner Bros.," and that whether the licensing agreement is severable from the settlement agreement is a question of law, open to Otto's interpretation and legal position on damages in this case. Otto Mem. at 5, 10, 21; Liebowitz Decl. ¶ 22; Freeman Decl. ¶ 40. Hearst responds that Otto's cross-motion for contempt and sanctions is retaliatory and should be rejected because Hearst "not only acted reasonably and in good faith, but approached this issue . . . with caution and respect for the confidentiality of the [s]ettlement [c]onference." Hearst Reply Mem. at 16.

## II.   DISCUSSION

### A.   Hearst's Motion for Sanctions

#### 1.   Applicable Standards

Hearst contends that the Court has three separate sources of authority by which to impose sanctions for misconduct during a settlement conference and the course of discovery—Rule 16(f) of the Federal Rules of Civil Procedure, its inherent power, and 28 U.S.C. § 1927. I will consider each in turn.

### a.    Sanctions Pursuant to Rule 16(f)

Under Rule 16(f), a court may issue sanctions "if a party or its attorney . . . does not participate in good faith . . . in [a pretrial] conference," including a settlement conference. Fed. R. Civ. P. 16(f)(1)(B). However, in the context of court-ordered settlement conferences, "courts have interpreted good faith narrowly to require compliance with orders to attend [a settlement conference], provide pre-[settlement] memoranda, and in some cases, produce organizational representatives with sufficient settlement authority." *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 381 (S.D.N.Y. 2011) (quoting John Lande, *Using Dispute System Design Methods to Promote Good-Faith Participation in Court-Connected Mediation Programs*, 50 UCLA L. Rev. 69, 84 (2002)).

### b.    Sanctions Pursuant to the Court's Inherent Powers

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). Courts may exercise these inherent powers to sanction a party or attorney who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). "[O]ne permissible sanction is an 'assessment of attorney's fees' . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1186

(quoting *Chambers*, 501 U.S. at 45). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 136 (2d Cir. 2017) (quoting *Chambers*, 501 U.S. at 44).

"While a court 'may impose sanctions for misconduct during discovery through [its] inherent power to manage its own affairs,' it 'should exercise this power with restraint and only upon the finding of bad faith'—i.e., motivated by harassment, delay, or other improper purposes." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 327 F. Supp. 3d 673, 688 (S.D.N.Y. 2018) (quoting *Interscope Records v. Barbosa*, No. 05-CV-5864 (DGT) (RML), 2007 WL 14332, at *3 (E.D.N.Y. Jan. 3, 2007)). "Bad faith requires clear evidence that the challenged conduct is entirely without color and taken for improper purposes." *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688 (citation and quotation marks omitted). "[B]ad faith may be inferred 'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose . . . .'" *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (citing *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)).

In addition, "a court has the inherent power to sanction a party for perpetrating a fraud on the court." *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688. In determining whether a party has perpetrated a fraud on the court, courts in the Second Circuit consider the following factors: "(1) whether the misconduct

14

was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *McMunn v. Memorial Sloan-Kettering Cancer Center*, 191 F. Supp. 2d 440, 446 (S.D.N.Y. 2002) (citation omitted); *accord Bravia Capital Partners, Inc. v. Fike*, No. 09-CV-6375 (JFK), 2015 WL 1332334, at *3 (S.D.N.Y. Mar. 25, 2015). However, "as a general matter, a court should not impose sanctions on a party or attorney pursuant to its inherent authority unless it finds, by clear and convincing evidence, that [a] party or attorney knowingly [made or] submitted [ ] materially false or misleading [statements and evidence], or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly." *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) (citations omitted).

### c.  Sanctions Pursuant to 28 U.S.C. § 1927

Section 1927 of Title 28 of the United States Code permits courts to sanction "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. The standard for sanctions pursuant to Section 1927 is identical to the standard under the court's inherent power. *See Succession Picasso v. Spedding*, No. 96-CV-4546 (SAS), 1997 WL 65911, at *3 (S.D.N.Y. Feb. 13, 1997). "[T]he only meaningful difference between an award made under [Section] 1927 and one made pursuant to the court's inherent power is . . . that

awards under [Section] 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Enmon*, 675 F.3d at 144 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)).

## 2.   Application

Although Hearst properly invokes Rule 16(f) and Section 1927 as sources of authority for the imposition of sanctions against Liebowitz, and there is considerable overlap among all the sources it cites, the Court will analyze Hearst's sanctions motion under its inherent powers, as doing so will best enable it to efficiently and comprehensively assess both the conduct of Otto and his counsel during both the settlement conference and the course of discovery.[3]

For the reasons to follow, the Court declines to impose sanctions against Otto and his counsel because Hearst has not established with "clear and convincing evidence" that their conduct at the October 23 settlement conference or during discovery was the product of "bad faith," or amounted to a "fraud upon the court." *Kortright Capital Partners LP*, 327 F. Supp.3d at 688; *Almeciga*, 185 F. Supp. 3d at 427; *McMunn*, 191 F. Supp. 2d at 446. Moreover, while the record establishes that it diligently searched for the facts about Otto's licensing and settlement agreement with Warner Bros., Hearst itself acknowledges that "it has suffered relatively little

---

[3] "Even if the Federal Rules or a statute provides an adequate basis for imposing sanctions, a court still may resort to its inherent power as the source of the sanctions . . . ." *Estate of Shaw v. Marcus*, No. 14-CV-3849, 14-CV-5653 (NSR) (JCM), 2017 WL 825317, at *5 (S.D.N.Y. Mar. 1, 2017) (quoting *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 623 (S.D.N.Y. 2001)).

prejudice," Hearst Mem. at 15, especially given the fact that if what was proffered by Otto and his counsel at the conference was inaccurate, it still did not induce a settlement. It also admits that the alleged misrepresentations made during the course of discovery were "corrected," *id.* at 13, such that the record at trial will not be tainted by any ongoing misrepresentations.

### a.    Settlement Conference

There is a "long-standing tension between [a] lawyer's duty of zealous advocacy to [his] client and the duties of candor and fair dealing with others," Dana A. Remus, *Out of Practice: The Twenty-First Century Legal Profession*, 63 Duke L.J. 1243, 1284, n.163 (March 2014) (citing Barry R. Temkin, *Misrepresentation by Omission in Settlement Negotiations: Should There Be a Silent Safe Harbor?*, 18 Geo. J. Legal Ethics 179, 181 (2004)), and determining whether a lawyer's advocacy tips the scale to a finding of sanctionable behavior is a fact-specific determination. While the Court is troubled by the allegations surrounding Liebowitz's purported misuse of the Warner Bros. license for purposes of attempting to set a damages figure at the settlement conference, it is not persuaded that sanctions are warranted under the particular circumstances of this case.

First, Liebowitz's alleged misrepresentations were made during the course of a confidential settlement conference—those representations were not memorialized or recorded. There is thus no record for the Court to find "by clear and convincing evidence, that [Liebowitz] knowingly [made or] submitted [ ] materially false or misleading [statements and evidence]." *Almeciga*, 185 F. Supp. 3d at 427. Indeed,

the Court cannot verify what statements were actually made and what documents were presented during this conference. Hearst seeks to have the Court "evaluate the accuracy of [its] counsel's recollection for itself," Hearst Reply Mem. at 5, but the Court is simply not able to do so, both because there is no record of the proceedings and the Court's recollection of the conference is hazy at best.

Second, no settlement was reached based on Liebowitz's alleged misrepresentations. Hearst therefore did not suffer any prejudice in this respect. Third, even if Liebowitz had represented that Otto was on the verge of executing a license for the Photograph in exchange for a license fee, and denied that the license and fee were negotiated in a settlement of his claims, Hearst has not disproved these representations with evidence that existed at the time the representations were made. The record demonstrates that Otto's settlement with Warner Bros. was not executed until October 27, 2017. Bishop Decl., Ex. E: Stipulation ¶ 1. Thus, no license or settlement existed as of the date of the October 23 settlement conference.

Although the Court can understand Hearst's frustration with Liebowitz's negotiation tactics and the facts that were ultimately uncovered in discovery, "[b]ad faith requires clear evidence that the challenged conduct is entirely without color and taken for improper purposes," *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688, and can be inferred "only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose . . . ." *Schlaifer Nance & Co., Inc.*, 194 F.3d at 336 (internal quotation marks and citation omitted). To the extent Liebowitz was attempting to use the

18

potential Warner Bros. license as leverage to support a higher settlement demand in this case, and he thought that the license could be considered separately from the settlement agreement (or at least wanted to argue that it could) he was posturing about the value of Otto's case at the conference, as lawyers often do. However, on the present record, the Court cannot conclude that the challenged conduct, as alleged, rose to the level of bad faith. While Hearst contends that Liebowitz's representations about the purported license "ultimately derailed" the settlement conference, Hearst Mem. at 9, that is a self-serving and ultimately unproveable characterization.

Moreover, Hearst has not provided the Court with sufficient authority for sanctions that could be applied here by analogy—its legal support either does not address misrepresentations that were made in the context of a settlement conference, or the facts in the cases it cites are distinguishable. *Cf. Chen v. Marvel Food Services, LLC*, No. 15-CV-6206 (JMA) (AYS), 2016 WL 6872626, at *4 (E.D.N.Y. Nov. 21, 2016) (sanctions imposed for doubling demand minutes before settlement conference);[4] *Xu v. UMI Sushi, Inc.*, No. 15-CV-4710 (RJS), 2016 WL 3523736, at *4–5 (S.D.N.Y. June 21, 2016) (lawyers sanctioned for false statements to the court as to their representation of clients and involvement in the case); *Fisher*

---

[4] It is true, as Hearst points out, that Otto's settlement position at the conference was apparently inconsistent with the interrogatory response he had provided calculating the loss of his licensing fee in the range of $5,000, and Otto provides no meaningful response on this point. But settlement conferences are often fluid proceedings, and it cannot be said with any certainty that Otto doubled his demand minutes before the conference. Since the case did not settle, it is impossible to know what Otto might ultimately have agreed to at the conference.

*v. SmithKline Beecham Corp.*, No. 07-CV-347A(F), 2008 WL 4501860, at *6

(W.D.N.Y. Sept. 29, 2008) (sanctions imposed against defendants for surprising

plaintiff with summary judgment motion on eve of mediation); *Skywark v.*

*Issaacson*, No. 96-CV-2815 (JFK) (NRB), 1999 WL 1489038, at *15 (S.D.N.Y. Oct.

14, 1999) (report and recommendation) (sanctions imposed against party for pattern

of lying under oath, delays, withholding documents, and cover-up attempts).

A Maryland case not cited by the parties (understandably so as it is not from

this Circuit), *Ausherman v. Bank of America Corp.,* includes an extended discussion

of the requirements for truthfulness in negotiations and what constitutes a

misrepresentation, and thus provides useful guidance here. 212 F. Supp. 2d 435 (D.

Md. 2002). In *Ausherman*, a lawyer was referred for discipline for making false

statements in the course of proposing settlement terms. *Id.* at 437. The lawyer

promised in a letter, in exchange for a payment, to disclose the identity of an

informant who had leaked confidential information, but later admitted that he had

fabricated the existence of the informant. *Id.* at 437–40. Although the *Ausherman*

court also imposed monetary sanctions against the lawyer, it did so on the

independent basis of discovery abuses, which were unrelated to his

misrepresentations. *Id.* at 442.

While the *Ausherman* court notably declined to impose monetary sanctions

for the lawyer's misrepresentation, its opinion on this topic is instructive: "[i]t does

not require a rule of professional responsibility for a lawyer to know that, during

the process of settlement negotiations, he or she may not lie to opposing counsel

about a fact that is material to the resolution of the case." *Id.* at 443–44.  It observed, however, that "recognizing just where the line is to be drawn between ethical and unethical behavior during the negotiation process can be difficult to discern.  Patently, certain aspects of the process unavoidably involve statements that are less than completely accurate, such as posturing or puffery, intentional vagueness regarding a negotiating party's 'bottom line,' estimates of price or value, and the party's ultimate intentions regarding what an acceptable settlement would be . . . ." *Id.* at 446 (citations omitted).

In any event, the facts present in *Ausherman*—a lawyer's admission of his lies and documentation of his misrepresentations—are absent here.  And even under those circumstances, the *Ausherman* court declined to impose monetary sanctions.  Here, we have no such admissions and there is no record of Liebowitz's alleged misrepresentations from the October settlement conference.  While it has made serious allegations about Liebowitz's conduct during the settlement conference, without a factual record or legal authority to support its position, Hearst has not met its burden.  Having reached that conclusion, the Court, however, does not in any way condone Liebowitz's alleged practice of attempting to use a so-called stand-alone license as a bargaining chip in other cases.  If the record is clear that a license was obtained as part of a settlement, and would not have otherwise been obtained but for the settlement, it is plainly misleading to suggest that the license has any significance independent of the settlement or that it should be used to form the basis of damages calculations.

### b.   Document Production

Hearst argues that "even if the Court were to allow [Otto] and his counsel to hide behind the Standing Order to excuse their misconduct, their continued misrepresentations after the [s]ettlement [c]onference independently call for sanctions," asserting that on December 7, Liebowitz "produced a doctored, repaginated version of the Purported License without redactions or indications that it was part of the Complete [settlement] Agreement." Hearst Mem. at 12.  Otto counters that his December 7 production of the licensing agreement was in direct response to Hearst's request to produce "the licensing agreement entered into with Warner Brothers," Otto Mem. at 24; Freeman Decl. ¶¶ 12–13, and was identical to the licensing agreement produced on December 15.  *See* Freeman Decl. ¶ 17. Further, he asserts that he had a "right to present the Licensing Agreement in its severable form because it was intended to be used as a separate document."  Otto Mem. at 24; Freeman Decl. ¶¶ 32–36.

While the Court declines to opine as to the merits of Otto's severability argument in this decision, it is, at a minimum, a colorable argument (and Hearst has not cited any authority to suggest otherwise).  *See Schlaifer Nance & Co., Inc.*, 194 F.3d at 337–38; *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688.  Even assuming arguendo that Otto's production of the *complete* settlement agreement with Warner Bros. on December 15—eight days after his production of *only* the licensing agreement on December 7—constitutes bad faith, "motivated by delay or other improper purposes," *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688,

22

the record demonstrates that any alleged misrepresentation was corrected, the delay in uncovering the facts about Otto's licensing and settlement agreement with Warner Bros. was minor, and Hearst did not suffer any significant prejudice.

For these reasons, Otto's document production does not warrant sanctions or amount to a "fraud upon the court." There is no evidence in the record of spoliation, concealment, or fabrication of evidence, nor were these documents presented to the Court for adjudication (hence there was literally nothing, fraud or otherwise, *on the court*). *Cf. McMunn*, 191 F. Supp. 2d at 461–62 (sanctions imposed and fraud found for spoliation and concealment of evidence); *Shangold v. Walt Disney Co.*, No. 03-CV-9522 (WHP), 2006 WL 71672, at *6 (S.D.N.Y. Jan. 12, 2006) (sanctions imposed because plaintiffs fabricated and tainted evidence and sought to conceal their conduct); *1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583–84 (S.D.N.Y. 1996) (sanctions imposed against plaintiff for pattern of falsehoods, fabrication of records, and attempts to conceal fabrication); *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444–45 (S.D.N.Y. 2002) (sanctions imposed against plaintiff who submitted seven pieces of falsified evidence).

### c.   Deposition Testimony

Hearst also seeks sanctions against Otto personally, asserting that he "perjured himself at his deposition, [when he] testif[ied] that '[w]e had a settlement with [Warner Brothers] *after* the license agreement' with 'a *separate* written settlement agreement,' and [gave] the impression that [he] received a second fee (separate from the $9,500 fee in the Purported License) for the settlement of his

case against Warner Brothers." Hearst Mem. at 13; Bishop Decl. ¶ 17, Ex. C: Otto

Deposition Tr. at 43:2–13. Otto counters that his "lay testimony was accurate and

consistent with his understanding and legal position on the merits" of this case.

Otto Mem. at 23.

Aside from any technical arguments that could be made on Otto's behalf

about the licensing agreement being *physically separate* from the settlement

agreement (as an exhibit on standalone pages), or about the settlement potentially

being satisfied *after* the creation of the Photography License, the Court declines to

impose sanctions against Otto personally, because Hearst has not demonstrated

that his deposition testimony rises to the level of sanctionable conduct.

Even if Hearst had established that Otto perjured himself, the Court would

not impose sanctions against him because "an isolated instance of perjury, standing

alone, will not constitute fraud upon the court." *Braun ex rel. Advanced Battery*

*Technologies, Inc. v. Zhiguo Fu*, No. 11-CV-4383 (CM) (DF), 2015 WL 4389893, at

\*17 (S.D.N.Y. July 10, 2015) (citing *McMunn*, 191 F. Supp. 2d at 445).[5] And even if

Hearst had established that Otto's conduct during his deposition was the "product

of intentional bad faith," it has not demonstrated that his conduct was part of a

"pattern of misbehavior" or that "further misconduct [by Otto himself] is likely to

---

[5] Indeed, "[u]ntruthful testimony by a witness, which has not been suborned by his
lawyer, does not, standing alone, constitute fraud upon the court.  This is
particularly true where, as here, the testimony is given during a pretrial deposition.
Until the deposition is placed in evidence, it does not become part of the case before
the Court." *In re Grievance Committee*, 847 F.2d 57, 64 (2d Cir. 1988) (Van
Graafeiland, J., concurring).

continue in the future." *McMunn*, 191 F. Supp. 2d at 446. Further, even if Hearst had demonstrated that Otto's deposition testimony amounted to a misrepresentation, it was corrected four days later, and Hearst acknowledges that it suffered relatively little prejudice. Hearst Mem. at 4–5, 13, 15. Hearst has simply not established that Otto's personal conduct was "part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly." *Almeciga*, 185 F. Supp. 3d at 427.

### 3. The Rules of Professional Conduct Do Not Provide a Separate Basis for Sanctions

Hearst also cites the New York State Rules of Professional Conduct in its motion papers, presumably as a separate basis for sanctions (though it does not explicitly say so), but its references are limited to three footnotes. *See* Hearst Mem. at 12, n.5; Hearst Reply Mem. at 1, n.2 and 13, n.11. It argues that "Mr. Liebowitz's misrepresentations during the [s]ettlement [c]onference appear to violate Rule 3.3 of the Rules of Professional Conduct . . . or Rule 4.1 . . . , or both." Hearst Mem. at 12, n.5. Rule 3.3 governs conduct before a tribunal and provides: "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal . . . ." *Id.* Rule 4.1 governs truthfulness in statements to others and provides: "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person." N.Y. Rules of Prof'l Conduct (McKinney).

Hearst also cites Rule 8.4, which governs misconduct and provides: "[a] lawyer or law firm shall not: engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," but it does not offer any arguments or authority to

substantiate a violation of this rule in this case.  Hearst Reply Mem. at 1; N.Y.
Rules of Prof'l Conduct (McKinney).  And it cites Rule 3.4, which governs fairness to
an opposing party and its counsel and provides: "[a] lawyer shall not: (a)(1) suppress
any evidence that the lawyer or the client has a legal obligation to reveal or produce
. . . (3) conceal or knowingly fail to disclose that which the lawyer is required by law
to reveal; (4) knowingly use perjured testimony or false evidence; (5) participate in
the creation or preservation of evidence when the lawyer knows or it is obvious that
the evidence is false . . . ," but it offers nothing in its submissions beyond a
recitation of the rule.  Hearst Reply Mem. at 1, n.2; N.Y. Rules of Prof'l Conduct
(McKinney).

　　The New York Rules of Professional Conduct "do not specifically address the
duty of truthfulness in the context of negotiations," and "[t]here is not a large body
of New York case law or ethics opinions on negotiations."  David Keyko, *Ethics and
Negotiating: Truth or Consequences?*  New York Law Journal (April 24, 2009), at 4.
However, "[i]t is not unusual in a negotiation for a party, directly or through
counsel, to make a statement in the course of communicating its position that is less
than entirely forthcoming."  ABA Comm. of Prof'l Ethics & Grievances, Formal Op.
06-439 (2006) (*Lawyer's Obligation of Truthfulness When Representing a Client in
Negotiation: Application to Caucused Mediation*).[6]  "A party in a negotiation also

---

[6]  The ABA Opinion concluded that "[u]nder Model Rule 4.1, in the context of a
negotiation, including a caucused mediation, a lawyer representing a client may not
make a false statement of material fact to a third person.  However, statements
regarding a party's negotiating goals or its willingness to compromise, as well as
statements that can fairly be characterized as negotiation 'puffing,' ordinarily are

might exaggerate or emphasize the strengths, and minimize or deemphasize the weaknesses, of its factual or legal position." *Id.* Indeed, one commentator has observed that "consensual deception is the essence of caucused mediation." John W. Cooley, *Defining the Ethical Limits of Acceptable Deception in Mediation*, 4 Pepp. Disp. Resol. L.J. 263, 264 (2004).[7] Even so, a lawyer may not knowingly make a

---

not considered 'false statements of material fact' within the meaning of the Model Rules."

[7] Cooley cites to an article, now 30 years old but still timely, that "poignantly illustrates the differences of opinion and confusion among the experts regarding truthfulness standards in negotiation. Using four hypothetical negotiation situations, the author conducted a survey of [15] participants, which included eight law professors who had written on ethics and negotiation, or both; five experienced litigators, a federal circuit court judge, and a [federal] [m]agistrate [judge]." 4 Pepp. Disp. Resol. L.J. at 269. The four situations and how the 15 experts answered the ethical question posed by each of the situations are as follows:

> Situation 1: Your clients, the defendants, have told you that you are authorized to pay $750,000 to settle the case. In settlement negotiations after your offer of $650,000, the plaintiffs' attorney asks, "Are you authorized to settle for $750,000?" Can you say, "No I'm not?" Yes: Seven; No: Six; Qualified: Two

> Situation 2: You represent a plaintiff who claims to have suffered a serious knee injury. In settlement negotiations, can you say your client is "disabled" when you know she is out skiing? Yes: One; No: Fourteen; Qualified: None

> Situation 3: You are trying to negotiate a settlement on behalf of a couple who charge that the bank pulled their loan, ruining their business. Your clients are quite up-beat and deny suffering particularly severe emotional distress. Can you tell your opponent, nonetheless, that they did? Yes: Five; No: Eight; Qualified: Two

> Situation 4: In settlement talks over the couple's lender liability case, your opponent's comments make it clear that he thinks plaintiffs have gone out of business, although you didn't say that. In fact, the business is continuing and several important contracts are in the offing. You are on the verge of settlement; can you go ahead and settle without

false statement of fact or law in a negotiation.  N.Y. Rules of Prof'l Conduct 4.1.  *See*
Karen Wells Roby, *Ethics in Settlement: The Effect of Material Misrepresentation*,
59-AUG. Fed. Law. 42 (Aug. 2012) ("Even though a lawyer is not required to
disclose weaknesses in his or her client's case, the lawyer is prohibited from
knowingly making a false statement of fact or law to a third party—including
opposing counsel, a witness, or a mediator.").

Hearst cites to *Slotkin v. Citizens Cas. Co. of N.Y.*, 614 F.2d 301 (2d Cir.
1979), and a related disciplinary action in *In re McGrath*, 96 A.D.2d 267 (1st Dep't
1983) in the same footnotes mentioned above.  Hearst Mem. at 12, n.5; Hearst Reply
Mem. at 1, n.2.  In *Slotkin*, a defense lawyer was found liable for fraud in a
settlement of a medical malpractice claim where the parties stipulated to a
$185,000 settlement and the lawyer stipulated and stated on the record, at a court-
held settlement conference, that "to the best of his knowledge" the total insurance
coverage was $200,000 and there was no excess insurance coverage, when his
client's files, which were in the law firm's possession, included letters from excess
carriers which demonstrated otherwise.  614 F.2d at 307–08, 314.  In *In re
McGrath*, the same lawyer from the *Slotkin* case was subsequently disciplined for
his misrepresentation of the amount of insurance coverage that he knew his client
had because the plaintiff, as a result of the misrepresentation, "settled the claim for

---

correcting your opponent's misimpression? Yes: Nine; No: Four;
Qualified: Two

4 Pepp. Disp. Resol. L.J. at 269 (citing Larry Lempert, *In Settlement Talks, Does
Telling the Truth Have Its Limits?* 2 Inside Litigation 1, 15–18 (1988)).

a sum far less than ordinarily he would have done," and "at the time [the lawyer] made the representation there was information in his file that contradicted the representation made by him." 96 A.D.2d at 268, 271.

*Slotkin* and *In re McGrath* are distinguishable from this case for several reasons. First, the parties in this matter did not settle their case as a result of a misrepresentation. Second, the communications during the October settlement conference were not memorialized or recorded. Third, Liebowitz's alleged misrepresentations were not stipulated to or read into any record. And finally, even if Liebowitz had represented that Otto was on the verge of executing a license for the Photograph in exchange for a license fee; and denied that the license and fee were negotiated in settlement of his claims against another media entity, these alleged representations have not been disproved by any evidence that existed at the time the representations were made.

While there is an insufficient basis for the Court to impose sanctions against Liebowitz for violations of the professional rules of conduct on the current record, this motion was a close call and the Court strongly cautions Liebowitz and his law firm to be mindful of overplaying their hands (or worse) during settlement negotiations. If a license has been obtained as part of a settlement in another case, then the firm should be transparent in that regard and not try, as leverage, to pawn a license off as something other than a settlement. Lawyers have one treasured possession above all else, and that is their reputation. If it is squandered and lawyers become known for being untrustworthy, both their clients and the Court

29

are ill-served.  This is hardly the first time that Liebowitz and his firm have had

their reputation called into question, and the Court can only hope it will be the

last.[8]

## B.   Otto's Cross-Motion for Contempt

### 1.   Applicable Standard

Courts have the inherent power to find a party or an attorney in contempt for

"bad faith conduct violating the court's orders."  *S. New England Tel. Co. v. Global*

*NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010); *see also Xiao Xing Ni v. Gonzales*, 494

F.3d 260 (2d Cir. 2007) (citing *Chambers*, 501 U.S. at 43–44).  "[A] contempt order is

. . . a 'potent weapon, to which courts should not resort where there is a fair ground

of doubt as to the wrongfulness of the defendant's conduct.' "  *S. New England Tel.*

*Co.*, 624 F.3d at 145 (citing *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.

1995)).  "To establish contempt for failure to obey a court order, the movant must

show that (1) the order the alleged contemnor failed to comply with is clear and

unambiguous, (2) the proof of noncompliance is clear and unambiguous, and (3) the

alleged contemnor has not diligently attempted to comply in a reasonable manner."

*Patsy's Italian Restaurant, Inc. v. Patsy's Inc.*, 676 F. App'x 24, 26 (2d Cir. 2017)

---

[8] *See, e.g., Al Pereira v. 3072541 Canada Inc., d/b/a as Kendall + Kylie*, No. 17-CV-6945 (RA), 2018 WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) (collecting cases); *Janik v. SMG Media, Inc.*, No. 16-CV-7308 (JGK) (AJP), 2018 WL 345111, at *16 (S.D.N.Y. Jan. 10, 2018) (discussing history of sanctions and admonishing that "the Liebowitz Law Firm needs to consider its reputation with the Court and, frankly, clean up its act.").

(citing *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 111 (2d Cir. 2015)) (alterations omitted).

### 2.    Application

Otto's cross-motion is without merit because Hearst and its counsel have not engaged in contemptible conduct.  Further, and applying the sanctions standard discussed above under its inherent powers, the Court declines to impose sanctions against Hearst or its counsel, because Otto has not established with "clear and convincing evidence" that Hearst's actions in bringing its sanctions motion was the product of "bad faith," or was motivated by "harassment, delay, or [some] other improper purpose[ ]." *Kortright Capital Partners LP*, 327 F. Supp. 3d at 688. Hearst acted reasonably in submitting its sanctions motion, and the Court disagrees with Otto's assertion that "[Hearst] made no diligent attempt whatsoever to comply with the Standing Court Order in a reasonable manner."  Otto Mem. at 13.  While it ultimately did not prevail, Hearst made its motion based on plausible claims and it was not "completely without merit."  *Enmon*, 675 F.3d at 143.

Hearst first raised its concerns with the conduct of Otto and his counsel at a status conference by generally stating that it "learned of some misconduct by [Otto] and counsel that began during the initial October settlement conference . . . and continued throughout the discovery period."  February 5, 2018 Conference Tr. at 27:19–22, Dkt. No. 46.  It did not reveal any confidential communications at that time.  In its subsequent request for a pre-motion conference, Hearst exercised care and did not provide "detail[s] regarding [Otto]'s and his counsel's misconduct in [its]

31

publicly-filed letter due to the confidential nature of the [s]ettlement [c]onference and the relevant documents." Dkt. No. 43, at 2. Otto noted his objections to Hearst's intent to use statements made during the settlement conference (*see* Dkt. No. 44, at 1), but the Court proceeded with a conference, at which it allowed Hearst to submit its motion, but directed it to "serve its unredacted motion papers on plaintiff and the Court [by email] . . . , along with a version with any proposed redactions." Dkt. No. 50, at 1. Otto was given an opportunity to propose additional redactions (which Hearst incorporated), before Hearst filed its redacted documents on ECF. *Id.* Thus, only the parties and the Court have had access to Hearst's unredacted papers.

"Although settlement negotiations are of course confidential for most purposes, their contents may be revealed insofar as necessary for the decision of an issue of alleged misconduct in them." *In re Young*, 253 F.3d 926, 927 (7th Cir. 2001) (citation omitted). The record establishes that Hearst disclosed minimal information about the settlement conference from the outset, and filed its motion only after receiving the Court's permission to do so, and in compliance with the Court's instructions about redactions. *See Fisher*, 2008 WL 4501860, at *5 (disclosure of "most minimal information necessary to establish that Defendant's conduct is sanctionable," did not violate ADR plan).

None of the cases Otto cites supports a finding of contempt or sanctions against Hearst. *Cf. Calka v. Kucker Kraus & Bruh*, 167 F.3d 144, 146 (2d Cir. 1999) (confidentiality rule of court settlement conference violated, but sanctions not

imposed under the totality of circumstances); *E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., Inc.*, No. 00-CV-8670 (LTS) (GWG), 2003 WL 22416174, at *2–3 (S.D.N.Y. Oct. 23, 2003) (party admonished for revealing adversary's actual settlement offer without advance notice to the court); *Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778, 783–84 (S.D.N.Y. 1995) (sanctions imposed against attorney for disclosing to court statements made in mediation program).

## III.   CONCLUSION

For the foregoing reasons, the Court denies both Hearst's motion for sanctions, and Otto's cross-motion for a judgment of civil contempt and sanctions. In addition, neither party is awarded attorneys' fees. Accordingly, the Clerk is respectfully directed to close Docket Nos. 59 and 66 and mark each of them as denied.

This Opinion and Order refers to information that has been redacted in Hearst's motion papers, and accordingly will be temporarily filed under seal (and provided to the parties in unredacted form by email). The Court directs the parties to send a joint letter to the Court by email to CottNYSDChambers@nysd.uscourts.gov within 5 business days of the date of this Opinion and Order with any proposed redactions for the Court's review. The parties should be mindful of the presumption of public access to judicial documents in proposing any redactions, as notwithstanding the issues related to the confidentiality of the settlement conference, the Court believes it is in the public interest to publish this opinion without any redactions unless the parties can justify

them. *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). The Court will then determine how this Opinion and Order may be filed on the public docket.

Until further order of the Court, the Clerk is respectfully directed to file this Opinion and Order under seal.

**SO ORDERED.**

Dated: February 21, 2019
New York, New York

JAMES L. COTT
United States Magistrate Judge