J7J9OTTD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JONATHAN OTTO,

                    Plaintiff,

          v.                              17 CV 4712 (GHW)

HEARST COMMUNICATIONS, INC.,

                    Defendant.
                                          Decision
------------------------------x
                                          New York, N.Y.
                                          July 19, 2019
                                          10:33 a.m.

Before:

                    HON. GREGORY H. WOODS,

                                          District Judge


                    APPEARANCES via Speakerphone

LIEBOWITZ LAW FIRM, PLLC
     Attorneys for Plaintiff
BY:  JAMES H. FREEMAN

NATHANIEL S. BOYER
RAVI V. SITWALA
     Attorneys for Defendant

J7J9OTTD

```
 1            (In chambers)
 2            THE COURT:  This is Judge Woods.  Do I have counsel
 3   for plaintiff on the line?
 4            MR. FREEMAN:  Yes, your Honor.
 5            THE COURT:  Good.  Thank you.  Can you please identify
 6   yourself for the record.
 7            MR. FREEMAN:  Yes.  Good morning, Judge.  James
 8   Freeman on behalf of plaintiff.
 9            THE COURT:  Good.  Thank you.  Do I have counsel for
10   defendant on the line?
11            MR. BOYER:  Yes, you do, your Honor.
12            THE COURT:  Good.
13            MR. BOYER:  This is Nathan Boyer of the Hearst
14   Corporation for defendant Hearst Communication, Inc., joined by
15   my colleague Ravi Sitwala, also of the Hearst Corporation.
16            THE COURT:  Good.  Thank you very much.
17            So, counsel, first let me thank you for joining this
18   conference.
19            I am going to be issuing my decision in this case
20   today.  I'm going to do so orally, as permitted by Rule 52.
21   I'm going to ask you to place your phones on mute and to
22   indulge me as I read through my decision here.  I'll let you
23   know when you should take your phones off of mute to the extent
24   it's not apparent to you.
25            So let's begin.
```

I.   OVERVIEW.

Plaintiff Jonathan Otto ("Plaintiff" or "Otto") filed this action against Defendant Hearst Communications Inc. ("Defendant" or "Hearst"), alleging that Hearst's use of a photograph taken by Otto in connection with a story which was published on Esquire.com infringed Otto's copyright in the photograph.  On December 10, 2018, I granted Otto's motion for summary judgment on the issues of Hearst's liability for copyright infringement and Hearst's affirmative defenses, including its fair use defense.  Dkt. No. 85.  On July 15, 2019, I held a bench trial on the issues of whether Defendant's infringement of Plaintiff's copyright was willful under 17 U.S.C § 504(c)(2) and the appropriate award of statutory damages for Defendant's infringement.  Based on the evidence and testimony presented at trial, I make the following findings of fact and conclusions of law.

II.   FINDINGS OF FACT

A.   Hearst's Use of Otto's Photograph

Plaintiff Jonathan Otto is a Vice President of Operations at Deutsche Bank.  Otto is not, and has never been, a professional photographer and has never been in the business of licensing photographs.  Hearst is a for-profit entity with a significant presence in the publishing business.  Hearst operates a diversified media business and employs more than 1,000 people.  Hearst Magazines Digital Media ("HMDM") is a

J7J9OTTD

branch of Hearst which is composed of 26 magazine websites,
including Esquire.com.

On June 10, 2017, Otto attended his friend's Kristen
Piatowski's wedding at the Trump National Golf Club in
Bedminster Township, New Jersey.  President Donald Trump made a
surprise appearance during the wedding reception.  When
President Trump entered the reception, Otto "just started
taking photos" with his iPhone.  Otto captured between
twenty-four and one hundred snapshots of President Trump at the
reception, some of which were created using the iPhone's
"burst" function.  One of the images that was part of an iPhone
"burst" was the photograph which is at issue in this
litigation, which depicts the President holding hands with the
bride.  The photograph was not staged.  A camera and two cell
phones are visible in the frame of the photograph.  One of the
cell phones features prominently in the lower right side of the
photograph, its screen capturing the image of the President and
the bride.  The parties stipulated that other people at the
wedding took photographs of the President.

After taking the photograph, Otto texted a copy of it
to another wedding guest named Sean Burke, who had asked Otto
to share the photograph with him.  Otto did not post the
photograph to social media and he did not provide the
photograph to any commercial news organizations at that time.
However, Laura Piatowski, a family member of the bride, posted

1    the photograph to her Instagram account, @lauramp11.

2          Michael Sebastian, the Digital Director of

3    Esquire.com, testified at trial.  The Court found his testimony

4    to be fully credible.  Mr. Sebastian joined Hearst in July 2015

5    and has served as Digital Director of Esquire.com since May

6    2017.  As part of his testimony, Mr. Sebastian provided a

7    summary of his experience working with Peter Wade, who held the

8    position of weekend editor of Esquire.com from February 2016 to

9    June 2017.  Mr. Wade left Esquire.com shortly after the events

10   at issue in this litigation, but his departure was planned

11   prior to June 11, 2017.  Mr. Sebastian testified that Mr. Wade

12   left the company on good terms.  Mr. Sebastian also testified

13   that Mr. Wade had substantial previous experience working as a

14   writer and editor with various news and commentary websites and

15   that he was not aware of any instance in which Mr. Wade had

16   been accused of copyright infringement.  At the time of the

17   events at issue in this case, Mr. Wade had been reporting to

18   Mr. Sebastian for approximately one month.  However, Mr.

19   Sebastian was acquainted with Mr. Wade prior to that period

20   through Mr. Sebastian's role as News Director.  As an aside,

21   counsel for Plaintiff emphasized during closing arguments the

22   limited amount of time for which Mr. Wade worked for Mr.

23   Sebastian.  However, I note that Mr. Wade had been in his role

24   as Weekend Editor for approximately 16 months prior to the

25   events underlying this action, and that there is no evidence of

1   any concerns regarding his compliance with the copyright laws

2   prior to the events at issue here.

3           On Sunday, June 11, 2017 at 10:00 a.m., Mr. Wade wrote

4   to Mr. Sebastian and pitched him a news story about President

5   Trump crashing weddings at his New Jersey golf course.  In his

6   message, Mr. Wade attached a photograph of President Trump from

7   the night of the wedding.  That image was not Otto's

8   photograph.  Instead, it was an image of the President posing

9   between the bride and groom.  At 10:01 a.m., Sebastian asked

10  Wade: "Is that a recent picture?"  At 10:02 a.m., Wade

11  responded: "yeah, it's from last night according to The Hill.

12  Trying to find original source.  Oh wow.  There are a bunch of

13  them," linking to Laura Piatowski's Instagram account.  At

14  10:06 a.m., Sebastian responded to Wade: "Let's start there."

15  Wade posted a "thumbs up" emoji in response.  These messages

16  were the only communications between Mr. Wade and Mr. Sebastian

17  on June 11, 2017 concerning the Trump wedding crashing article.

18  When Mr. Sebastian sent his "Let's start there" message, he did

19  so in part because he believed that the fact that photos of

20  President Trump crashing a wedding had surfaced on Instagram --

21  and that Trump clubs have advertised the President's

22  willingness to appear in such photos -- was notable.  Mr.

23  Sebastian believed that this article fit within the broader

24  commentary in the news media (including several prior articles

25  on Esquire.com) about the President's apparent desire for

1    public adoration and publicity.  The Court does not have a

2    basis to conclude that Mr. Sebastian told Mr. Wade to "start

3    there" because Mr. Sebastian believed that Mr. Wade should take

4    the images from the Instagram account without considering

5    whether a license for the images was necessary.

6         At 10:41 a.m., Mr. Wade posted the completed

7    Esquire.com article entitled "President Trump is the Ultimate

8    Wedding Crasher," which displayed Otto's photograph.  Forty-one

9    minutes passed between the time Mr. Wade pitched the story to

10   Mr. Sebastian and the time that Otto's photograph was published

11   to the Esquire.com website.  Otto's photograph was the second

12   of three images in the article.  The first photograph in the

13   article immediately following the headline was the staged

14   photograph of the President with the bride and groom that Mr.

15   Wade had sent to Mr. Sebastian.  Footers below all three

16   photographs attributed them to Laura Piatowski's Instagram

17   account.  The article did not credit Otto as the photographer

18   or otherwise attribute the photograph to Otto.

19        Hearst did not seek Otto's permission to publish the

20   photograph and Otto never directly granted Hearst authorization

21   to copy the photograph or distribute copies of the image to the

22   public.  In fact, Hearst was not aware of Otto's claim of

23   ownership in the photograph before receiving the complaint in

24   this action.  Mr. Sebastian testified that he never saw Otto's

25   photograph or the text of the article before they were

J7J9OTTD

     1    published, that he did not make any attempt to investigate the

     2    identity of the copyright owner of the photograph and that he

     3    did not conduct an analysis of whether inclusion of the

     4    photograph in the article would be fair use.  Instead, he left

     5    that determination in the hands of Mr. Wade.  Mr. Wade was not

     6    called as a witness at trial, nor was he deposed.  As a result,

     7    the Court is left with little evidence of Mr. Wade's mental

     8    process when he decided to use Otto's photograph to illustrate

     9    his article.  As I will describe in more detail later, without

    10    any clear evidence to shed light on Mr. Wade's state of mind,

    11    the Court does not conclude that Mr. Wade willfully infringed

    12    Otto's copyright.

    13            At the time of the publication of the article at issue

    14    in this case, Hearst used a content management system (or

    15    "CMS") to store information about published and unpublished

    16    content from many of Hearst's websites, including Esquire.com.

    17    Among the information collected by CMS is information about

    18    photographs used in articles.  Indeed, in order for a

    19    photograph to be published on one of Hearst's public-facing

    20    websites, certain CMS fields must be completed with respect to

    21    the image, specifically either the "Copyright" section or the

    22    "Photographer Name" section.  Those fields are used to generate

    23    an attribution line for the photograph.

    24            Hearst editors can edit some, but not all of the

    25    information about a photograph stored in CMS.  In the

1   "Copyright" field Hearst editors are only able to select from a

2   limited, pre-populated list of entries which represent common

3   sources for licensed photographs.  If the source of a

4   photograph is not included in the pre-populated list, the

5   editor must manually type an attribution line into the

6   "Photographer Name" field.  Mr. Sebastian testified that Hearst

7   editors will generally write the name of their source or

8   licensor in this field, even if that person is not the actual

9   photographer.  CMS also contains fields for "Limited Rights,"

10  "Syndication Rights" and "Image Rights."  Those fields are used

11  to tag images for possible re-use in a variety of contexts.

12  They must be populated using an established menu of options.

13  There is no option in CMS for an editor to select "Fair Use" as

14  the basis for a determination that a given image may properly

15  be published.

16       The Court was provided with exhibits showing

17  screenshots of CMS as it was completed with respect to Wade's

18  article.  They show that the "Copyright" field for Otto's

19  photograph was left blank and the "Photographer Name" field

20  lists "Instagram/@lauramp11."  A slide box has been toggled to

21  indicate "No" next to a query regarding "Limited Rights."  The

22  "Syndication Rights" field indicates "OK for syndication."  The

23  "Image Rights" field states "No Rights."  The "Image Rights"

24  field specifically refers to whether the image can be re-used

25  in a new article.  The "No Rights" selection within this field

in the CMS system with respect to Otto's photograph indicates
that the photograph was not to be re-used in another Hearst
article.  The Court infers from this entry that Mr. Wade made a
determination that his basis for using the image in connection
with the article would not necessarily permit its use in other
Hearst works.  This is consistent with a possible determination
by Mr. Wade that his publication of the photograph was fair
use.

          At the time Hearst published Otto's photograph, Hearst
had the ability to view or use other photographs of President
Trump's attendance at the wedding.  Several third-party news
outlets published the photograph after apparently obtaining it
from Instagram.  Many similar images of President Trump at the
wedding also circulated on the internet.  Several third-party
news organizations published Otto's photograph.  Other
photographs of the President's attendance at the wedding have
been published.  Numerous news websites ran articles about
President Trump's appearance at the wedding and included
photographs and video other than, or in addition to, Otto's
photograph.

          B.   Hearst's Copyright Training Program and Policies
and History of Copyright Litigation

          Brooke Siegel, the Vice President of HMDM (and Mr.
Sebastian's boss), testified at length regarding HMDM's
approach to the licensing and protection of third-party

J7J9OTTD

content.  She testified credibly that HMDM publishes a

substantial volume of content, and, particularly, that it

publishes a high volume of images.  In particular, the 26

U.S.-based websites that she oversees publish, on average,

8,859 unique pieces of content and use 79,893 images each

month.  Almost every article published by HMDM contains some

photographs, graphics, videos, or GIFs, averaging nine images

in each piece of HMDM content.  This is merely a fraction of

the aggregate volume of content published by Hearst across all

of its media platforms.  Through its various domestic and

international platforms, Hearst publishes an immense volume of

content that frequently includes images.

Ms. Siegel's unchallenged testimony, which the Court

accepts, described HMDM's respect for the intellectual property

rights of content creators.  She testified that, because it

respects intellectual property rights, Hearst pays a

substantial amount each year both for enterprise licenses with

Getty Images and the Associated Press for editorial use of

photographic content, and directly to photographers and content

creators to license content.  Her uncontested, and credited,

testimony, was that HMDM's practice is to only use content that

it believes it has the right to use because (i) it owns the

copyrights, or (ii) it has obtained a license or other

permission from the copyright owner or authorized licensing

agent, or (iii) the use would be a "fair use."  She testified

J7J9OTTD

1    that HMDM is generally conservative when it comes to "fair use"

2    decisions.  HMDM empowers its editorial teams to make fair use

3    decisions in appropriate circumstances consistent with the

4    training they receive.  Like Ms. Siegel, Mr. Sebastian

5    testified that editorial teams are empowered to make their own

6    decisions regarding the use of third-party content, including

7    making fair use decisions.  Mr. Sebastian testified that, in

8    situations in which his team would like to use media on

9    Esquire.com that is not available on Getty or the Associated

10   Press, they will investigate who owns the copyright for that

11   material and will then try to communicate with the copyright

12   owner to get permission to use the photograph.  Mr. Sebastian

13   also testified that his team is empowered to make

14   determinations regarding whether the use of a potentially

15   copyrighted work would be fair use.

16         In order to protect against the improper misuse of

17   others' copyrighted materials, HMDM does a number of things.

18   First, as Ms. Siegel testified, the company strives to hire and

19   promote employees and freelancers who are knowledgeable and

20   experienced with issues concerning rights clearance and

21   copyright law.  Second, to provide employees and freelancers

22   with information regarding copyright issues, Hearst conducts

23   in-house training programs, which I will describe in more

24   detail momentarily.

25         At the time of the publication of Wade's article, as

now, Hearst employed in-house lawyers in the Office of General

Counsel who are knowledgeable about U.S. copyright law and

about licensing practices in the publishing industry.  Lawyers

from Hearst's Office of General Counsel make themselves

available regularly to answer questions by Hearst employees

about copyright issues.  Ms. Saketkoo, an attorney in the

Hearst Corporation Office of General Counsel, testified that

the position of her office is that it does not instruct Hearst

personnel to take certain actions, but rather, serves as a

resource for consultation and provides editors and writers with

the tools to make their own decisions.

        HMDM engages Hearst's Office of General Counsel to

provide editors with copyright training sessions.  These

sessions are provided by Hearst lawyers to HMDM's editorial

teams.  During these sessions, the lawyers address subjects of

copyright authorship and ownership, the licensing of

copyrighted content, and fair use.  They also answer the

attendees' questions.  The training sessions last from 90

minutes to two hours.  Ms. Siegel testified that she found the

information provided in those sessions to be informative,

interesting, and useful for editors confronting such questions.

Attendees at the training sessions are instructed to contact

the legal department if they have questions.  Mr. Sebastian

testified that the presentation materials are emailed to

participants after the presentations are given.  However, Ms.

Saketkoo testified that training materials are not distributed
after presentations.  Given her experience in conducting the
copyright trainings, the Court credits Ms. Saketkoo's testimony
on this point.  None of the witnesses employed by Hearst were
aware of any written policies regarding fair use, other than
the slides used during the training seminars, which were not
presented to the Court.  However, as Ms. Saketkoo testified at
trial, the Office of General Counsel provides contact
information for lawyers in the office following the training
sessions.

     As a result of HMDM's hiring practices, legal
training, and the availability of expert lawyers and senior
editors for consultation, Ms. Siegel believed that the system
in place at HMDM was adequate to provide her teams with the
tools necessary to make good decisions regarding the use of
third-party content, which, I understand to mean she believed
it adequate to protect the legal rights of third-party content
providers.

     Hearst has been sued for copyright infringement in the
past.  Ms. Saketkoo was able to identify four cases filed in
this district between 2016 and 2017 that involved claims of
copyright infringement against Hearst.  Plaintiff introduced
Plaintiff's Exhibit 20, which is a docket sheet from this
district.  That exhibit shows nine cases which may involve
copyright infringement which were filed in this district

1   against Hearst between 2016 and November 9, 2017.  However, the

2   Court has no information regarding the nature of the specific

3   allegations in those cases or their merit.  With respect to

4   HMDM, other than this case, Ms. Siegel recalled only three

5   other instances of HMDM being sued for copyright infringement

6   since she joined the company in 2015.  She views that as a very

7   positive track record given that HMDM publishes approximately

8   80,000 images a month.

9              C.  The Reasonable License Fee for Otto's Photograph

10             The only revenue lost by Otto and the only expense

11  saved by Hearst as a result of Hearst's use of Otto's

12  photograph without a license is the amount of the reasonable

13  license fee that Hearst did not pay to Otto.  At trial, Hearst

14  offered the testimony of two expert witnesses who opined

15  regarding the amount of that reasonable license fee.  John G.

16  Plumpe is the managing director of Epsilon Economics and has

17  extensive experience in the valuation of intellectual property.

18  Eric Rachlis is a photography and licensing consultant who has

19  worked in the film and image licensing industry for almost 30

20  years.  I find that both experts were qualified to give

21  testimony regarding the value of a reasonable license fee for

22  Otto's photograph.

23             As a preliminary matter, there was some contradicting

24  testimony offered at trial regarding the terms "stock,"

25  "editorial," and "commissioned" photography.  Mr. Plumpe

J7J9OTTD

1   identified only two categories of photographs:  "commissioned"

2   photographs, which are custom shots for the purchaser at the

3   purchaser's request, and "stock" photographs, which includes

4   all ready-to-use photographs available to be licensed.  I

5   understand that Mr. Plumpe was using the definitions of those

6   terms as they were used in internal documents he received from

7   Hearst, which varied somewhat from the use of those terms in

8   the market, as described by Hearst's other expert, Mr. Rachlis.

9   Mr. Rachlis distinguished between "stock" photographs and

10  "editorial" photographs.  According to Mr. Rachlis, a stock

11  photograph is a "generic image . . . used as a graphic or to

12  illustrate a concept."  Mr. Rachlis testified that Otto's

13  picture was not a stock photograph under his definition and

14  that his estimate of a reasonable licensing fee for Otto's

15  photograph was based on editorial photos available for license

16  on Getty Images.  I credit Mr. Rachlis' testimony on both of

17  those points.  However, I also find that under the definition

18  of stock photograph provided by Mr. Plumpe, Otto's photograph

19  was a stock photograph because it was not commissioned.  Based

20  on this analysis, I reject Plaintiff's contention that neither

21  expert's report was reliable because both experts improperly

22  categorized Otto's photograph as a stock photograph.  It is

23  clear that, while Mr. Plumpe adopted Hearst's language in

24  describing Otto's photograph as a stock photograph, he knew

25  that the relevant comparators were "editorial" images.  This is

demonstrated by his selection of relevant images as comparators
to evaluate the appropriate license fee, as I will describe in
just a moment.

At trial, Mr. Plumpe testified regarding the licensing
fees that Hearst paid for the use of other single photographs
on Esquire.com from 2015 to 2017.  Mr. Plumpe reached his
conclusions after examining a spreadsheet maintained by Hearst
employees which tracked the images for which Hearst has paid an
individual fee to acquire the rights to use the photographs on
Esquire.com.  Mr. Plumpe identified a subset of thirteen
photographs licensed by Hearst from 2015 to 2017 that he
believed had elements in common with Otto's photograph,
specifically because they are non-staged images of President
Trump or other public figures, often among the general public.
Based on his evaluation of the license fees paid for those
photographs, Mr. Plumpe estimated that a reasonable license fee
for Otto's photograph would be $100.  Mr. Plumpe also testified
that based on his consideration of licenses available through
websites such as Getty Images, standard license fees for
photographs of Donald Trump, paparazzi photographs, and
celebrity sightings range from $175 to $575, depending on image
size.  However, Mr. Plumpe made clear that his $175 to $575
figure was based on his evaluation of licenses made available
for purchase by the general public, not the prices available to
major media companies like Hearst.

J7J9OTTD

1                 Mr. Rachlis also calculated a range of potential

2     reasonable license fees for Otto's photograph based on the

3     public-facing Getty Images website.  Mr. Rachlis analyzed

4     photographs of recent images of President Trump and recent

5     paparazzi-type images of celebrities that were available for

6     digital use in an editorial-style article on a corporate

7     website or blog in the arts or entertainment industry.  Mr.

8     Rachlis noted that the cost of these licenses ranged from $108

9     to $126 for a three-month license and $162 to $178 for a

10    three-year license with up to five years of archival rights.

11    Mr. Rachlis also stated that certain factors affect the value

12    of a license, specifically:  (1) whether the use of the

13    photograph is commercial or editorial in nature (with

14    commercial uses garnering higher license fees); (2) whether the

15    license to use the photograph is exclusive or non-exclusive

16    (with exclusive licenses garnering higher fees); (3) the

17    uniqueness and quality of the photograph (with unique or high

18    quality photographs garnering higher license fees); (4) the

19    medium of the use, including whether it is in print or online

20    (with print uses garnering higher license fees); and (5) the

21    duration of the use (with longer durations garnering higher

22    license fees).  Based on the range of license fees he observed

23    on the Getty website and his evaluation of these five factors,

24    Mr. Rachlis concluded that a reasonable license fee for Otto's

25    photograph would be $125, assuming that Hearst did not use its

J7J9OTTD

bargaining power as a large media company to negotiate a lower

rate.  However, Mr. Rachlis testified that large media

companies like Hearst are typically able to negotiate rates

that are significantly lower than those charged to the general

public, and if Hearst had used its substantial bargaining power

in the license negotiations, he would expect it to have

negotiated a license fee for Otto's photograph in the range of

$25 to $50.

I credit Mr. Rachlis' testimony that large media

companies are generally able to negotiate lower license fees

than those paid by the public.  I also credit his testimony

that the factors he articulated affect the value of a

reasonable license fee for any particular photograph.  Based on

my analysis of those factors, as well as my finding regarding

Hearst's significant bargaining power, I conclude that the

reasonable license fee for Otto's photo would be at the lower

end of the ranges articulated by Defendant's experts.  Otto's

photograph was used to illustrate a news story, and therefore

would have been licensed for an editorial use.  Because Otto's

photograph was used by other news outlets, any license

negotiated with Hearst would not have been exclusive.  Otto's

photograph is not unique -- indeed, other photographs of the

same event were displayed in the Esquire.com story -- nor is it

high quality.  It was not taken with professional camera

equipment and shows other cameras and phones in the foreground.

J7J9OTTD

1    I do not make any specific findings with respect to the

2    duration of time for which Hearst would have wanted to license

3    Otto's photo, other than to note that I expect that the

4    duration of the license would have been similar to the duration

5    of the licenses that Hearst negotiated for the thirteen

6    photographs identified by Mr. Plumpe, given the similarity of

7    those photographs to Otto's photograph and the purposes for

8    which they were used on the Esquire.com website.  I therefore

9    conclude that the most appropriate measure of a reasonable

10   license fee in this case is the amount actually paid for the

11   use of individual photographs similar to Otto's photograph.

12   This was the mechanism employed by Mr. Plumpe, which resulted

13   in his assessment that a reasonable license fee for Otto's

14   photograph was $100.

15         I note that Mr. Sebastian testified that licenses

16   acquired by Hearst for images used on Esquire.com typically

17   cost between $20 to $100 for an image of a public figure, such

18   as a celebrity or politician.  As a result, the $100 license

19   fee is at the high end of the spectrum of fees usually paid by

20   Hearst to license images of a public figure.  $100 is

21   substantially greater than the average of $43 and median of $35

22   paid by Hearst for licenses of stock photographs, as calculated

23   by Mr. Plumpe.  This average and median, however, may be

24   affected by the fact that Hearst categorized both "stock" and

25   "editorial" photographs as "stock" photographs.  This potential

issue with this analysis is resolved by Mr. Plumpe's decision

to benchmark the license fee against a subset of equivalent

editorial images.  I believe that Mr. Plumpe's conclusion is

reasonable.  It is consistent with the direct evidence.  Based

on my assessment of the photograph under the analytical

framework provided by Mr. Rachlis, I conclude that a higher fee

is not warranted.  Consequently, I find that a reasonable

license fee for the photograph at issue in this case is $100.

            I should comment briefly on Plaintiff's argument that

I should value this image at $4,000 because there was evidence

that Hearst was willing to pay $4,000 for a particular

commissioned image.  I view that argument to be wholly

implausible.  First, this was not a commissioned photograph.

Second, it is not reasonable to ask me to value this image at

the value of what it would have cost had it been a commissioned

photograph.  There is no basis for me to speculate that Hearst

would have commissioned this photograph, much less that it

would have paid the highest possible amount for such a

photograph.  The argument that I should use $4,000 as a

benchmark is particularly frail when one considers this

photograph in the context of the factors described by Mr.

Rachlis -- this is not a professional photograph, it is not

high quality, it is not well-composed, it is not unique, and it

was not used exclusively by Hearst.  Quite simply not all

photographs are worth the same amount -- The Dutchess of Sussex

J7J9OTTD

1    can expect to be paid more for a staged photograph of her child

2    than another new parent can expect for an iPhone photograph of

3    theirs.  The logic behind Plaintiff's argument -- that the

4    highest amount a person will pay for a given photograph is what

5    they should be expected to pay for any photograph -- is in my

6    view quite flawed.  In any event, I find that Plaintiff's

7    position regarding the valuation of the license is not

8    supported on this record.

9            I must also address the revenue received by Hearst as

10   a result of its use of Otto's photograph.  Hearst does not

11   charge for access to Esquire.com and did not charge for access

12   to the article alongside which Otto's photograph was displayed.

13   However, commercial advertisements were visible on the same

14   webpage where Otto's photograph was displayed.  Because the

15   article was not part of a sponsorship program, the only revenue

16   Hearst received from its publication of the article would have

17   derived from those programmatic ads.  These ads are served to

18   Hearst's websites through a series of online ad exchanges which

19   conduct split-second auctions for the ad space.  Hearst

20   receives only a fraction of a cent per page view from the

21   display of each programmatic ad on Esquire.com.  The most

22   revenue Hearst might have realized from the programmatic ads

23   that ran alongside the article is $148.99.

24           III.  LEGAL CONCLUSIONS

25           A.  Willfulness

J7J9OTTD

1       After establishing liability for copyright

2   infringement, a copyright owner may elect to recover either

3   statutory damages or actual damages and profits.  17 U.S.C. §

4   504(c)(1).  Here, Otto has elected to recover statutory

5   damages.  Joint Pre-Trial Order, Dkt. No. 102, at 18-21.  With

6   respect to any one infringing work, the Court may award

7   statutory damages between $750 and $30,000.  17 U.S.C. §

8   504(c)(1).  However, if the Court determines that the

9   infringement was willful, it may, in its discretion, enhance

10  the statutory damages award up to $150,000 per infringed work.

11  § 504(c)(2).  The burden falls on the copyright owner to prove

12  that the infringement is willful.  Id.

13      A copyright infringement is "willful" within the

14  meaning of § 504(c)(2) if the copyright owner shows "(1) that

15  the defendant was actually aware of the infringing activity, or

16  (2) that the defendant's actions were the result of 'reckless

17  disregard' for, or 'willful blindness' to, the copyright

18  holder's rights."  Island Software & Computer Serv., Inc. v.

19  Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005).  "[A]

20  willfully blind defendant is one who takes deliberate actions

21  to avoid confirming a high probability of wrongdoing and who

22  can almost be said to have actually known the critical facts.

23  [A] reckless defendant is one who . . . knows of a substantial

24  and unjustified risk of such wrongdoing."  Global-Tech

25  Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769-70 (2011).  "To

J7J9OTTD

1   show willfulness, [a copyright owner is] not required to prove

2   [defendant's] actual knowledge that it was infringing.

3   Knowledge of infringement may be constructive rather than

4   actual."  Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d

5   996, 1010 (2d Cir. 1995).  As a preliminary matter, Hearst

6   argues that this standard is incorrect because proof of

7   "constructive knowledge" is akin to a finding of negligence, a

8   mens rea lower than willfulness.  See Erickson Prods., Inc. v.

9   Kast, 921 F.3d 822, 834 (9th Cir. 2019).  However, the Second

10  Circuit in Knitwaves made clear that its reference to

11  constructive knowledge meant only that willfulness "need not be

12  proven directly but may be inferred from the defendant's

13  conduct."  Knitwaves, 71 F.3d at 1010.  The Second Circuit has

14  more recently confirmed that understanding.  Island Software,

15  413 F.3d at 264 ("[A] plaintiff can still prove willfulness by

16  proffering circumstantial evidence that gives rise to an

17  inference of willful conduct.") (citing Knitwaves, 71 F.3d at

18  1010).  In other words, a defendant's knowledge may be inferred

19  from his or her conduct.  N.A.S. Import. Corp. v. Chenson

20  Enterprises, Inc., 968 F.2d 250, 252 (2d Cir. 1992).

21          The Court concludes that Hearst's infringement in this

22  case was not willful.  The evidence in the record establishes

23  that no person at Hearst had actual knowledge that posting the

24  photograph on Esquire.com would infringe Otto's copyright.

25  Therefore, Otto was required to prove that Hearst acted with

J7J9OTTD

1   willful blindness or reckless disregard.

2           My conclusion rests very heavily on the burden of

3   proof.  Plaintiff asks me to infer that, based on the limited

4   time period between his pitch of the story to Mr. Sebastian and

5   the story's posting on Esquire.com, Mr. Wade did not make any

6   significant effort to investigate or contact the owner of the

7   photograph, and that he must not have made a good faith

8   determination that the use of the image constituted fair use.

9   But it is at least equally possible for me to draw the

10  inference that before posting Otto's photograph on the

11  Esquire.com website, Mr. Wade did make a good faith

12  determination that use of the photograph in the article would

13  be fair use.  Supporting that inference is Mr. Sebastian's

14  testimony regarding Mr. Wade's experience as an editor, and Mr.

15  Sebastian's lack of knowledge of any concerns regarding Mr.

16  Wade's compliance with copyright law in the past, together with

17  the testimony of Ms. Siegel regarding the hiring practices of

18  HMDM generally, and her testimony regarding the effectiveness

19  of HMDM's training programs.  In addition, as noted above, on

20  the CMS system, the "No Rights" box was checked for "Image

21  Rights," supporting the conclusion that Mr. Wade made a

22  determination that the image could be used in the context of

23  his article, but no other.  That determination is consistent

24  with a determination of fair use.

25           As counsel has argued, fair use determinations are

1    fact specific.  I concluded at summary judgment that no

2    reasonable jury could conclude that Hearst's publication of

3    Otto's photograph was fair use.  But Mr. Wade was not a jury

4    making his determination with the benefit of precise legal

5    instructions and I think on these facts, he could reasonably

6    have believed in good faith that the use of the image was fair

7    use.  Because I find that it is just as likely that Mr. Wade

8    determined in good faith, based on his training, that no

9    license was necessary for the photograph as it is that Mr. Wade

10   recklessly disregarded or was willfully blind to Plaintiff's

11   ownership rights in the photograph, Plaintiff has not met his

12   burden of demonstrating that Mr. Wade's infringement was

13   willful.  See Agence France Presse v. Morel, 934 F. Supp. 2d

14   547, 570, reconsidered in part on other grounds, 934 F. Supp.

15   2d 584 (S.D.N.Y. 2013) ("Infringement is generally not willful

16   if a party reasonably and in good faith believes that its

17   conduct is innocent.").  I note that this conclusion is largely

18   a consequence of Plaintiff's decision not to depose Mr. Wade or

19   to put forth evidence at trial which would shed light on Mr.

20   Wade's mental state concerning the use of Plaintiff's

21   photograph.

22          I also find that Mr. Sebastian's decision to delegate

23   determinations regarding fair use and the potential need for a

24   license to Mr. Wade was not willfully blind or reckless.  The

25   evidence at trial did not demonstrate that Mr. Sebastian was

1    subjectively aware of a risk that Mr. Wade would infringe

2    Plaintiff's copyright.  To the contrary, Mr. Sebastian

3    testified that Mr. Wade had worked at Hearst for a substantial

4    period of time and that he was not aware of any instance in

5    which Mr. Wade had been accused of copyright infringement.  Mr.

6    Sebastian believed Mr. Wade had substantial experience in the

7    publishing industry.  Considering those facts in light of

8    Hearst's general practices regarding the hiring and training of

9    its employees and freelancers, together with the other facts

10   presented at trial, the Court does not infer that Mr. Sebastian

11   acted willfully.

12          In his closing argument, Plaintiff's counsel also

13   argued that Hearst has a general policy of willful blindness

14   towards copyright infringement with regard to photographs taken

15   from social media.  However, the evidence in the record does

16   not support this conclusion.  I have to decide the issues

17   presented here based on the evidence put forth at trial.  The

18   unrefuted testimony of Ms. Siegel, which I detailed previously,

19   describes Hearst as a company that is committed to the

20   protection of third-party content creators.  The evidence

21   presented here is that HMDM hires skilled people and provides

22   them with the tools that HMDM believes are necessary for them

23   to properly comply with the copyright law.  The company

24   provides regular training to employees and contractors.

25   Hearst's senior management -- as represented by the testimony

J7J9OTTD

of Ms. Siegel -- believes that Hearst's training and hiring
practices are effective protections against copyright
infringement.  Rather than establishing that Hearst has no
regard for copyrights, the evidence presented at trial was that
Hearst uses a huge volume of images regularly, and is subject
to copyright litigation with respect to only a small fraction
of the images that it uses.  I have to decide this case based
on the evidence presented, and there is a substantial volume of
essentially unrefuted evidence before the Court that Hearst and
HMDM have put in place a system that they reasonably believe
provides effective protection to copyright holders.

        Lacking other evidence of willfulness, Plaintiff
points me to a number of facts about Hearst's practices and
argues that these facts provide a basis for me to draw an
inference of willfulness.  I do not believe those facts to be
sufficient to draw that conclusion.  For example, the fact that
Hearst lacks written policies containing its lawyers' advice on
fair use does not necessarily lead to the conclusion that
Hearst is unconcerned with the rights of copyright holders.
Instead, that fact can just as easily be explained by the
possibility that Hearst does not want to risk a potential
waiver of the attorney-client privilege by memorializing its
lawyers' advice in writing and disseminating that writing
widely.  And, again, the evidence presented is that the senior
management of Hearst believes that its practices are

1    effective -- and they have presented data to illustrate the

2    reasonableness of their position.  The evidence presented at

3    trial shows, again, that only a small fraction of the images

4    used by Hearst and HMDM are the subject of copyright

5    litigation.  This does not support the conclusion that Hearst

6    is consciously avoiding compliance with copyright law

7            I understand that Plaintiff contends that the absence

8    of a tracking system for fair use determinations should drive

9    the Court to draw the inference that Hearst acted willfully.

10   However, I do not believe that to be the case.  Hearst's

11   decision not to include a field in CMS that would allow users

12   to track whether they made a fair use determination reveals

13   little about Hearst's mindset, at least in the absence of

14   evidence that Hearst considered and rejected such a system or

15   that tracking fair use determinations is a standard industry

16   practice.  Unlike counsel for Hearst, I can see how such a

17   check box might be helpful to support a defense of fair use in

18   the future, or to ensure that a conscious decision was made

19   regarding fair use.  But, even if Hearst's recordkeeping system

20   could be structured in an arguably better way, that does not

21   establish that they willfully infringed Plaintiff's copyright

22   in this case.  That position seeks to hold Hearst liable for

23   conduct that is far closer to negligence than to willfulness.

24           Nor does the Court conclude, having read Mr. Wade's

25   and Mr. Sebastian's communications surrounding the publication

of the Trump wedding crashing article, that Mr. Sebastian
greenlighted Mr. Wade's use of Otto's photograph as soon as he
found out that the photograph was from Instagram.  The Court
interprets Mr. Sebastian's comment to mean what it says:
"Let's start there," not "That is all we need to know."

          As an overarching comment, as I have already said, I
have to decide this case based on the evidence presented at
trial.  Arguments by counsel are helpful to direct me to the
proper inferences to draw from the evidence, but they are not
evidence.  The evidence admitted at trial is the evidence, and
inferences and arguments are ultimately bounded by it.  The
litigation position of Hearst with respect to fair use is not
evidence in the record at trial which I can use to evaluate
Hearst's state of mind.  I have specifically considered the
inferences that Plaintiff has asked me to draw from the
evidence, and I find that the evidence in the record does not
support the conclusion that Defendant was willfully blind or
otherwise willful based on my assessment of the record as a
whole.

          However, I would like to pause momentarily to offer
some thoughts on the validity of Plaintiff's "corporate willful
blindness" theory as a whole.  Defendant has taken the position
throughout this litigation that "the willfulness inquiry stops
at a consideration of the act of infringement at issue and the
state of the mind of the person that took those actions."

1   Trial Transcript at 155:18-20.  Plaintiff has argued that

2   general evidence about Hearst's practices and policies is

3   relevant to the willfulness inquiry because it speaks to a

4   broad corporate mens rea of willful blindness.  There is no

5   question that the reference to willfulness in 17 U.S.C §

6   504(c)(2) is willfulness as to a specific act of infringement.

7   Similarly, it is clear that a corporation can be willfully

8   blind or reckless regarding the possibility of infringement.

9   See Global-Tech, 563 U.S. at 768.  However, as noted above,

10  willful blindness and recklessness require, respectively,

11  knowledge of a "high probability of" or a "substantial and

12  unjustified risk" of wrongdoing.  What is not clear is the

13  level of generality at which that risk should be defined, or --

14  put differently -- whether a corporation can be willfully blind

15  regarding a specific act of infringement if individuals within

16  the company consciously disregard a high probability that their

17  policies will lead to infringement generally.  I am not aware

18  of any cases in this Circuit addressing that issue and, in

19  light of the fact that it was not briefed by the parties and is

20  not necessary to my decision, I decline to address it now.  I

21  note, as well, that counsel for Plaintiff conceded during

22  closing argument that to prove willfulness, he needed to prove

23  it as to Mr. Wade or Mr. Sebastian.  Nevertheless, I have

24  addressed a broader theory of corporate willfulness, and

25  concluded that there is an insufficient basis to find

1    willfulness at any level of the corporate defendant on this

2    record.

3

4              IV.  STATUTORY DAMAGES

5              "When determining the amount of statutory damages to

6    award for copyright infringement, courts consider: (1) the

7    infringer's state of mind; (2) the expenses saved, and profits

8    earned, by the infringer; (3) the revenue lost by the copyright

9    holder; (4) the deterrent effect on the infringer and third

10   parties; (5) the infringer's cooperation in providing evidence

11   concerning the value of the infringing material; and (6) the

12   conduct and attitude of the parties." Bryant v. Media Right

13   Prods., Inc., 603 F.3d 135, 144 (2d Cir. 2010); see also

14   Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 127 (2d Cir.

15   2014).  However, under Second Circuit law, a plaintiff seeking

16   statutory damages has no obligation to show actual damages or

17   losses.  See Psihoyos v. John Wiley & Sons, Inc., No. 11 CIV.

18   1416 JPO, 2012 WL 5506121, at *4 (S.D.N.Y. November 7, 2012),

19   affirmed, 748 F.3d 120, 127 (2d Cir. 2014).  I make the

20   following conclusions of law with respect to the factors

21   articulated in Bryant.

22             As previously discussed, I have determined that

23   Hearst's infringement was not willful.  I have also found that

24   the expenses saved by Hearst and the revenue lost by Otto as a

25   result of the infringement were the reasonable license fee of

J7J9OTTD

$100.  I have also determined that the maximum profits earned

by Hearst as a result of its use of Otto's photograph is

advertising revenue in the amount of $148.99.

As part of my analysis of statutory damages, I must

also consider the deterrent effect of the award on Hearst and

third parties.  "[S]tatutory damages are not meant to be merely

compensatory or restitutionary."  Yurman Design, Inc. v. PAJ,

Inc., 262 F.3d 101, 113-14 (2d Cir. 2001).  Instead, "[t]he

statutory award is also meant to discourage wrongful conduct."

Id. (quoting N.A.S. Import, 968 F.2d at 252).  Hearst's status

as a major participant in the publishing industry mitigates in

favor of a larger statutory damages award for purposes of

deterrence.  See, e.g., UMG Recordings, Inc. v. MP3.Com, Inc.,

No. 00 CIV. 472 JSR, 2000 WL 1262568, at *6 (S.D.N.Y. Sept. 6,

2000) ("[T]he defendant's size and financial assets are highly

relevant to arriving at the appropriate level of statutory

damages . . . .").  However, in light of my previous findings

regarding the lack of evidence that the Hearst organization as

a whole generally disregards the rights of copyright owners, I

conclude that a large statutory damages award is not necessary

to deter Hearst against future infringement.

Otto claims that there is a broad need for general

deterrence in infringement cases involving unauthorized use of

photographs, basing his argument on what he calls the

"flooding" of courts with copyright infringement cases.

1    However, there is no evidence regarding the frequency of

2    copyright infringement by other media organizations in the

3    record of this case.  Based on the record before me, I also do

4    not conclude that there is a general need for deterrence which

5    would justify higher statutory damages in this case than I

6    expect to award.

7          Finally, I must consider Hearst's cooperation in

8    providing evidence concerning the value of the infringing

9    material and the conduct and attitude of the parties.  I note

10   that Hearst has appeared in and defended this action and has

11   put forth evidence at trial of the value of a license for

12   Otto's photograph.  Beyond those limited facts, I have no basis

13   to evaluate the quality or extent of Hearst's cooperation in

14   providing evidence concerning the value of the infringing

15   material.  Similarly, beyond recognizing that various disputes

16   over conduct during discovery and settlement negotiations have

17   arisen between the parties over the course of this litigation,

18   I have no factual basis to evaluate the conduct and attitude of

19   the parties.  No evidence put forth at trial relates to this

20   factor which I have not already considered as part of my

21   statutory damages analysis.  I therefore find that both of

22   these factors are neutral.

23          Based on my evaluation of the factors described above,

24   I find that statutory damages in the amount of five times the

25   reasonable license fee of $100 are appropriate.  Because such

1     an award is less than the statutory minimum, I award Plaintiff

2     the statutory minimum of $750,000 -- sorry, $750.  Although

3     Otto has offered examples of cases in which plaintiffs have

4     been awarded $30,000 in statutory damages for copyright

5     infringement, those cases involved different circumstances than

6     those presented here.  Most importantly, the majority of those

7     cases involved defaults by defendants who failed to appear and

8     defend themselves.

9              My award of $750 is based on my evaluation of the

10    record as a whole, and my assessment of the factors that I

11    described above.  An award in this amount is also in accordance

12    with the trend in this Circuit to award a prevailing copyright

13    infringement plaintiff statutory damages in an amount that is a

14    single-digit multiple of a reasonable licensing fee.  See Mango

15    v. BuzzFeed, Inc., 356 F. Supp. 3d 368, 374 (S.D.N.Y. 2019)

16    ("[C]ourts in this Circuit commonly award, in cases of

17    non-innocent infringement, statutory damages of between three

18    and five times the cost of the licensing fees the defendant

19    would have paid."); Barcroft Media, Ltd., 297 F. Supp. 3d at

20    359; Michael Grecco Prods., Inc. v. Function(X) Inc., No. 18

21    CIV. 386 (NRB), 2019 WL 1368731, at *4-5 (S.D.N.Y. Mar. 11,

22    2019).  I believe that a multiplier greater than 7.5 times the

23    licensing fee, which would be required in order to bring the

24    award to a figure in excess of the $750 statutory minimum,

25    would be excessive in light of my evaluation of the facts of

J7J9OTTD

1   this case and applicable law.

2            V..   CONCLUSION

3            For the foregoing reasons, I find that damages should

4   be awarded to Plaintiff in the amount of $750.00.  Any

5   application for attorneys' fees in connection with this matter

6   must be submitted to the Court no later than August 2, 2019.

7   Any opposition to that application must be filed no later than

8   August 13, 2019.  And any reply must be filed no later than

9   August 16, 2019.  Counsel must present a sworn affidavit

10  describing the experience and qualifications of each

11  professional who billed time to the case, and attach

12  contemporaneous time records showing the amount billed by each

13  lawyer and the nature of the associated services.  The

14  affidavit must also show the range of fees charged by, or

15  authorized by a court with respect to, that lawyer over the

16  course of the last two calendar years.  The affidavit must set

17  forth any additional facts that are pertinent to the Court's

18  evaluation of counsel's requested fee award.

19           So, thank you very much, counsel.  That completes the

20  reading of my decision which was, if you're interested, about

21  twelve-and-a-half single-spaced pages.

22           Counsel, to the extent that the parties are able to

23  confer and agree upon an award of attorneys' fees and costs, I

24  would encourage you to engage in that conversation before

25  briefing commences to the extent you're unable to stipulate to

J7J9OTTD

1  a proper amount of such fees, which I don't anticipate based on

2  our discussions at the outset of the trial.  You should submit

3  your respective briefing to the Court on the schedule that I've

4  just described.

5          Good.  So anything else that we should take up now?

6  First, counsel for plaintiff?

7          Anything for plaintiff before we recess?

8          MR. FREEMAN:  Not for plaintiff.

9          THE COURT:  Good.  Thank you very much.

10          Counsel for defendant?

11          MR. BOYER:  No, your Honor.  Except just like to thank

12  the Court for its prompt attention to this case.  We note only

13  four calendar dates have passed since the trial.  So I just

14  wanted to note that we appreciate the prompt attention.  Thank

15  you.

16          THE COURT:  Thank you.  Happy to do so.  Thank you

17  all.

18          (Adjourned)

19

20

21

22

23

24

25