# Exhibit A

J7J9OTTD

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JONATHAN OTTO,

4                    Plaintiff,

5              v.                          17 CV 4712 (GHW)

6    HEARST COMMUNICATIONS, INC.,

7                    Defendant.
                                           Decision
8    ------------------------------x
                                           New York, N.Y.
9                                          July 19, 2019
                                           10:33 a.m.
10
     Before:
11
                        HON. GREGORY H. WOODS,
12
                                           District Judge
13

14                  APPEARANCES via Speakerphone

15   LIEBOWITZ LAW FIRM, PLLC
          Attorneys for Plaintiff
16   BY:   JAMES H. FREEMAN

17   NATHANIEL S. BOYER
     RAVI V. SITWALA
18        Attorneys for Defendant

19

20

21

22

23

24

25

J7J9OTTD

```
 1              (In chambers)
 2              THE COURT:  This is Judge Woods.  Do I have counsel
 3    for plaintiff on the line?
 4              MR. FREEMAN:  Yes, your Honor.
 5              THE COURT:  Good.  Thank you.  Can you please identify
 6    yourself for the record.
 7              MR. FREEMAN:  Yes.  Good morning, Judge.  James
 8    Freeman on behalf of plaintiff.
 9              THE COURT:  Good.  Thank you.  Do I have counsel for
10    defendant on the line?
11              MR. BOYER:  Yes, you do, your Honor.
12              THE COURT:  Good.
13              MR. BOYER:  This is Nathan Boyer of the Hearst
14    Corporation for defendant Hearst Communication, Inc., joined by
15    my colleague Ravi Sitwala, also of the Hearst Corporation.
16              THE COURT:  Good.  Thank you very much.
17              So, counsel, first let me thank you for joining this
18    conference.
19              I am going to be issuing my decision in this case
20    today.  I'm going to do so orally, as permitted by Rule 52.
21    I'm going to ask you to place your phones on mute and to
22    indulge me as I read through my decision here.  I'll let you
23    know when you should take your phones off of mute to the extent
24    it's not apparent to you.
25              So let's begin.
```

J7J9OTTD

1    I.   OVERVIEW.

2         Plaintiff Jonathan Otto ("Plaintiff" or "Otto") filed

3    this action against Defendant Hearst Communications Inc.

4    ("Defendant" or "Hearst"), alleging that Hearst's use of a

5    photograph taken by Otto in connection with a story which was

6    published on Esquire.com infringed Otto's copyright in the

7    photograph.  On December 10, 2018, I granted Otto's motion for

8    summary judgment on the issues of Hearst's liability for

9    copyright infringement and Hearst's affirmative defenses,

10   including its fair use defense.  Dkt. No. 85.  On July 15,

11   2019, I held a bench trial on the issues of whether Defendant's

12   infringement of Plaintiff's copyright was willful under 17

13   U.S.C § 504(c)(2) and the appropriate award of statutory

14   damages for Defendant's infringement.  Based on the evidence

15   and testimony presented at trial, I make the following findings

16   of fact and conclusions of law.

17        II.  FINDINGS OF FACT

18        A.  Hearst's Use of Otto's Photograph

19        Plaintiff Jonathan Otto is a Vice President of

20   Operations at Deutsche Bank.  Otto is not, and has never been,

21   a professional photographer and has never been in the business

22   of licensing photographs.  Hearst is a for-profit entity with a

23   significant presence in the publishing business.  Hearst

24   operates a diversified media business and employs more than

25   1,000 people.  Hearst Magazines Digital Media ("HMDM") is a

J7J9OTTD

branch of Hearst which is composed of 26 magazine websites,

including Esquire.com.

On June 10, 2017, Otto attended his friend's Kristen

Piatowski's wedding at the Trump National Golf Club in

Bedminster Township, New Jersey.  President Donald Trump made a

surprise appearance during the wedding reception.  When

President Trump entered the reception, Otto "just started

taking photos" with his iPhone.  Otto captured between

twenty-four and one hundred snapshots of President Trump at the

reception, some of which were created using the iPhone's

"burst" function.  One of the images that was part of an iPhone

"burst" was the photograph which is at issue in this

litigation, which depicts the President holding hands with the

bride.  The photograph was not staged.  A camera and two cell

phones are visible in the frame of the photograph.  One of the

cell phones features prominently in the lower right side of the

photograph, its screen capturing the image of the President and

the bride.  The parties stipulated that other people at the

wedding took photographs of the President.

After taking the photograph, Otto texted a copy of it

to another wedding guest named Sean Burke, who had asked Otto

to share the photograph with him.  Otto did not post the

photograph to social media and he did not provide the

photograph to any commercial news organizations at that time.

However, Laura Piatowski, a family member of the bride, posted

J7J9OTTD

the photograph to her Instagram account, @lauramp11.

Michael Sebastian, the Digital Director of Esquire.com, testified at trial.  The Court found his testimony to be fully credible.  Mr. Sebastian joined Hearst in July 2015 and has served as Digital Director of Esquire.com since May 2017.  As part of his testimony, Mr. Sebastian provided a summary of his experience working with Peter Wade, who held the position of weekend editor of Esquire.com from February 2016 to June 2017.  Mr. Wade left Esquire.com shortly after the events at issue in this litigation, but his departure was planned prior to June 11, 2017.  Mr. Sebastian testified that Mr. Wade left the company on good terms.  Mr. Sebastian also testified that Mr. Wade had substantial previous experience working as a writer and editor with various news and commentary websites and that he was not aware of any instance in which Mr. Wade had been accused of copyright infringement.  At the time of the events at issue in this case, Mr. Wade had been reporting to Mr. Sebastian for approximately one month.  However, Mr. Sebastian was acquainted with Mr. Wade prior to that period through Mr. Sebastian's role as News Director.  As an aside, counsel for Plaintiff emphasized during closing arguments the limited amount of time for which Mr. Wade worked for Mr. Sebastian.  However, I note that Mr. Wade had been in his role as Weekend Editor for approximately 16 months prior to the events underlying this action, and that there is no evidence of

1    any concerns regarding his compliance with the copyright laws

2    prior to the events at issue here.

3         On Sunday, June 11, 2017 at 10:00 a.m., Mr. Wade wrote

4    to Mr. Sebastian and pitched him a news story about President

5    Trump crashing weddings at his New Jersey golf course.  In his

6    message, Mr. Wade attached a photograph of President Trump from

7    the night of the wedding.  That image was not Otto's

8    photograph.  Instead, it was an image of the President posing

9    between the bride and groom.  At 10:01 a.m., Sebastian asked

10   Wade: "Is that a recent picture?"  At 10:02 a.m., Wade

11   responded: "yeah, it's from last night according to The Hill.

12   Trying to find original source.  Oh wow.  There are a bunch of

13   them," linking to Laura Piatowski's Instagram account.  At

14   10:06 a.m., Sebastian responded to Wade: "Let's start there."

15   Wade posted a "thumbs up" emoji in response.  These messages

16   were the only communications between Mr. Wade and Mr. Sebastian

17   on June 11, 2017 concerning the Trump wedding crashing article.

18   When Mr. Sebastian sent his "Let's start there" message, he did

19   so in part because he believed that the fact that photos of

20   President Trump crashing a wedding had surfaced on Instagram --

21   and that Trump clubs have advertised the President's

22   willingness to appear in such photos -- was notable.  Mr.

23   Sebastian believed that this article fit within the broader

24   commentary in the news media (including several prior articles

25   on Esquire.com) about the President's apparent desire for

J7J9OTTD

public adoration and publicity.  The Court does not have a
basis to conclude that Mr. Sebastian told Mr. Wade to "start
there" because Mr. Sebastian believed that Mr. Wade should take
the images from the Instagram account without considering
whether a license for the images was necessary.

At 10:41 a.m., Mr. Wade posted the completed
Esquire.com article entitled "President Trump is the Ultimate
Wedding Crasher," which displayed Otto's photograph.  Forty-one
minutes passed between the time Mr. Wade pitched the story to
Mr. Sebastian and the time that Otto's photograph was published
to the Esquire.com website.  Otto's photograph was the second
of three images in the article.  The first photograph in the
article immediately following the headline was the staged
photograph of the President with the bride and groom that Mr.
Wade had sent to Mr. Sebastian.  Footers below all three
photographs attributed them to Laura Piatowski's Instagram
account.  The article did not credit Otto as the photographer
or otherwise attribute the photograph to Otto.

Hearst did not seek Otto's permission to publish the
photograph and Otto never directly granted Hearst authorization
to copy the photograph or distribute copies of the image to the
public.  In fact, Hearst was not aware of Otto's claim of
ownership in the photograph before receiving the complaint in
this action.  Mr. Sebastian testified that he never saw Otto's
photograph or the text of the article before they were

J7J9OTTD

1    published, that he did not make any attempt to investigate the

2    identity of the copyright owner of the photograph and that he

3    did not conduct an analysis of whether inclusion of the

4    photograph in the article would be fair use.  Instead, he left

5    that determination in the hands of Mr. Wade.  Mr. Wade was not

6    called as a witness at trial, nor was he deposed.  As a result,

7    the Court is left with little evidence of Mr. Wade's mental

8    process when he decided to use Otto's photograph to illustrate

9    his article.  As I will describe in more detail later, without

10   any clear evidence to shed light on Mr. Wade's state of mind,

11   the Court does not conclude that Mr. Wade willfully infringed

12   Otto's copyright.

13        At the time of the publication of the article at issue

14   in this case, Hearst used a content management system (or

15   "CMS") to store information about published and unpublished

16   content from many of Hearst's websites, including Esquire.com.

17   Among the information collected by CMS is information about

18   photographs used in articles.  Indeed, in order for a

19   photograph to be published on one of Hearst's public-facing

20   websites, certain CMS fields must be completed with respect to

21   the image, specifically either the "Copyright" section or the

22   "Photographer Name" section.  Those fields are used to generate

23   an attribution line for the photograph.

24        Hearst editors can edit some, but not all of the

25   information about a photograph stored in CMS.  In the

1  "Copyright" field Hearst editors are only able to select from a

2  limited, pre-populated list of entries which represent common

3  sources for licensed photographs.  If the source of a

4  photograph is not included in the pre-populated list, the

5  editor must manually type an attribution line into the

6  "Photographer Name" field.  Mr. Sebastian testified that Hearst

7  editors will generally write the name of their source or

8  licensor in this field, even if that person is not the actual

9  photographer.  CMS also contains fields for "Limited Rights,"

10 "Syndication Rights" and "Image Rights."  Those fields are used

11 to tag images for possible re-use in a variety of contexts.

12 They must be populated using an established menu of options.

13 There is no option in CMS for an editor to select "Fair Use" as

14 the basis for a determination that a given image may properly

15 be published.

16        The Court was provided with exhibits showing

17 screenshots of CMS as it was completed with respect to Wade's

18 article.  They show that the "Copyright" field for Otto's

19 photograph was left blank and the "Photographer Name" field

20 lists "Instagram/@lauramp11."  A slide box has been toggled to

21 indicate "No" next to a query regarding "Limited Rights."  The

22 "Syndication Rights" field indicates "OK for syndication."  The

23 "Image Rights" field states "No Rights."  The "Image Rights"

24 field specifically refers to whether the image can be re-used

25 in a new article.  The "No Rights" selection within this field

J7J9OTTD

in the CMS system with respect to Otto's photograph indicates
that the photograph was not to be re-used in another Hearst
article.  The Court infers from this entry that Mr. Wade made a
determination that his basis for using the image in connection
with the article would not necessarily permit its use in other
Hearst works.  This is consistent with a possible determination
by Mr. Wade that his publication of the photograph was fair
use.

       At the time Hearst published Otto's photograph, Hearst
had the ability to view or use other photographs of President
Trump's attendance at the wedding.  Several third-party news
outlets published the photograph after apparently obtaining it
from Instagram.  Many similar images of President Trump at the
wedding also circulated on the internet.  Several third-party
news organizations published Otto's photograph.  Other
photographs of the President's attendance at the wedding have
been published.  Numerous news websites ran articles about
President Trump's appearance at the wedding and included
photographs and video other than, or in addition to, Otto's
photograph.

       B.   Hearst's Copyright Training Program and Policies
and History of Copyright Litigation

       Brooke Siegel, the Vice President of HMDM (and Mr.
Sebastian's boss), testified at length regarding HMDM's
approach to the licensing and protection of third-party

J7J9OTTD

content.  She testified credibly that HMDM publishes a

substantial volume of content, and, particularly, that it

publishes a high volume of images.  In particular, the 26

U.S.-based websites that she oversees publish, on average,

8,859 unique pieces of content and use 79,893 images each

month.  Almost every article published by HMDM contains some

photographs, graphics, videos, or GIFs, averaging nine images

in each piece of HMDM content.  This is merely a fraction of

the aggregate volume of content published by Hearst across all

of its media platforms.  Through its various domestic and

international platforms, Hearst publishes an immense volume of

content that frequently includes images.

        Ms. Siegel's unchallenged testimony, which the Court

accepts, described HMDM's respect for the intellectual property

rights of content creators.  She testified that, because it

respects intellectual property rights, Hearst pays a

substantial amount each year both for enterprise licenses with

Getty Images and the Associated Press for editorial use of

photographic content, and directly to photographers and content

creators to license content.  Her uncontested, and credited,

testimony, was that HMDM's practice is to only use content that

it believes it has the right to use because (i) it owns the

copyrights, or (ii) it has obtained a license or other

permission from the copyright owner or authorized licensing

agent, or (iii) the use would be a "fair use."  She testified

J7J9OTTD

1    that HMDM is generally conservative when it comes to "fair use"

2    decisions.  HMDM empowers its editorial teams to make fair use

3    decisions in appropriate circumstances consistent with the

4    training they receive.  Like Ms. Siegel, Mr. Sebastian

5    testified that editorial teams are empowered to make their own

6    decisions regarding the use of third-party content, including

7    making fair use decisions.  Mr. Sebastian testified that, in

8    situations in which his team would like to use media on

9    Esquire.com that is not available on Getty or the Associated

10   Press, they will investigate who owns the copyright for that

11   material and will then try to communicate with the copyright

12   owner to get permission to use the photograph.  Mr. Sebastian

13   also testified that his team is empowered to make

14   determinations regarding whether the use of a potentially

15   copyrighted work would be fair use.

16        In order to protect against the improper misuse of

17   others' copyrighted materials, HMDM does a number of things.

18   First, as Ms. Siegel testified, the company strives to hire and

19   promote employees and freelancers who are knowledgeable and

20   experienced with issues concerning rights clearance and

21   copyright law.  Second, to provide employees and freelancers

22   with information regarding copyright issues, Hearst conducts

23   in-house training programs, which I will describe in more

24   detail momentarily.

25        At the time of the publication of Wade's article, as

J7J9OTTD

now, Hearst employed in-house lawyers in the Office of General

Counsel who are knowledgeable about U.S. copyright law and

about licensing practices in the publishing industry.  Lawyers

from Hearst's Office of General Counsel make themselves

available regularly to answer questions by Hearst employees

about copyright issues.  Ms. Saketkoo, an attorney in the

Hearst Corporation Office of General Counsel, testified that

the position of her office is that it does not instruct Hearst

personnel to take certain actions, but rather, serves as a

resource for consultation and provides editors and writers with

the tools to make their own decisions.

        HMDM engages Hearst's Office of General Counsel to

provide editors with copyright training sessions.  These

sessions are provided by Hearst lawyers to HMDM's editorial

teams.  During these sessions, the lawyers address subjects of

copyright authorship and ownership, the licensing of

copyrighted content, and fair use.  They also answer the

attendees' questions.  The training sessions last from 90

minutes to two hours.  Ms. Siegel testified that she found the

information provided in those sessions to be informative,

interesting, and useful for editors confronting such questions.

Attendees at the training sessions are instructed to contact

the legal department if they have questions.  Mr. Sebastian

testified that the presentation materials are emailed to

participants after the presentations are given.  However, Ms.

J7J9OTTD

Saketkoo testified that training materials are not distributed after presentations.  Given her experience in conducting the copyright trainings, the Court credits Ms. Saketkoo's testimony on this point.  None of the witnesses employed by Hearst were aware of any written policies regarding fair use, other than the slides used during the training seminars, which were not presented to the Court.  However, as Ms. Saketkoo testified at trial, the Office of General Counsel provides contact information for lawyers in the office following the training sessions.

As a result of HMDM's hiring practices, legal training, and the availability of expert lawyers and senior editors for consultation, Ms. Siegel believed that the system in place at HMDM was adequate to provide her teams with the tools necessary to make good decisions regarding the use of third-party content, which, I understand to mean she believed it adequate to protect the legal rights of third-party content providers.

Hearst has been sued for copyright infringement in the past.  Ms. Saketkoo was able to identify four cases filed in this district between 2016 and 2017 that involved claims of copyright infringement against Hearst.  Plaintiff introduced Plaintiff's Exhibit 20, which is a docket sheet from this district.  That exhibit shows nine cases which may involve copyright infringement which were filed in this district

against Hearst between 2016 and November 9, 2017.  However, the

Court has no information regarding the nature of the specific

allegations in those cases or their merit.  With respect to

HMDM, other than this case, Ms. Siegel recalled only three

other instances of HMDM being sued for copyright infringement

since she joined the company in 2015.  She views that as a very

positive track record given that HMDM publishes approximately

80,000 images a month.

        C.   The Reasonable License Fee for Otto's Photograph

        The only revenue lost by Otto and the only expense

saved by Hearst as a result of Hearst's use of Otto's

photograph without a license is the amount of the reasonable

license fee that Hearst did not pay to Otto.  At trial, Hearst

offered the testimony of two expert witnesses who opined

regarding the amount of that reasonable license fee.  John G.

Plumpe is the managing director of Epsilon Economics and has

extensive experience in the valuation of intellectual property.

Eric Rachlis is a photography and licensing consultant who has

worked in the film and image licensing industry for almost 30

years.  I find that both experts were qualified to give

testimony regarding the value of a reasonable license fee for

Otto's photograph.

        As a preliminary matter, there was some contradicting

testimony offered at trial regarding the terms "stock,"

"editorial," and "commissioned" photography.  Mr. Plumpe

J7J9OTTD

identified only two categories of photographs:  "commissioned"

photographs, which are custom shots for the purchaser at the

purchaser's request, and "stock" photographs, which includes

all ready-to-use photographs available to be licensed.  I

understand that Mr. Plumpe was using the definitions of those

terms as they were used in internal documents he received from

Hearst, which varied somewhat from the use of those terms in

the market, as described by Hearst's other expert, Mr. Rachlis.

Mr. Rachlis distinguished between "stock" photographs and

"editorial" photographs.  According to Mr. Rachlis, a stock

photograph is a "generic image . . . used as a graphic or to

illustrate a concept."  Mr. Rachlis testified that Otto's

picture was not a stock photograph under his definition and

that his estimate of a reasonable licensing fee for Otto's

photograph was based on editorial photos available for license

on Getty Images.  I credit Mr. Rachlis' testimony on both of

those points.  However, I also find that under the definition

of stock photograph provided by Mr. Plumpe, Otto's photograph

was a stock photograph because it was not commissioned.  Based

on this analysis, I reject Plaintiff's contention that neither

expert's report was reliable because both experts improperly

categorized Otto's photograph as a stock photograph.  It is

clear that, while Mr. Plumpe adopted Hearst's language in

describing Otto's photograph as a stock photograph, he knew

that the relevant comparators were "editorial" images.  This is

demonstrated by his selection of relevant images as comparators

to evaluate the appropriate license fee, as I will describe in

just a moment.

         At trial, Mr. Plumpe testified regarding the licensing

fees that Hearst paid for the use of other single photographs

on Esquire.com from 2015 to 2017.  Mr. Plumpe reached his

conclusions after examining a spreadsheet maintained by Hearst

employees which tracked the images for which Hearst has paid an

individual fee to acquire the rights to use the photographs on

Esquire.com.  Mr. Plumpe identified a subset of thirteen

photographs licensed by Hearst from 2015 to 2017 that he

believed had elements in common with Otto's photograph,

specifically because they are non-staged images of President

Trump or other public figures, often among the general public.

Based on his evaluation of the license fees paid for those

photographs, Mr. Plumpe estimated that a reasonable license fee

for Otto's photograph would be $100.  Mr. Plumpe also testified

that based on his consideration of licenses available through

websites such as Getty Images, standard license fees for

photographs of Donald Trump, paparazzi photographs, and

celebrity sightings range from $175 to $575, depending on image

size.  However, Mr. Plumpe made clear that his $175 to $575

figure was based on his evaluation of licenses made available

for purchase by the general public, not the prices available to

major media companies like Hearst.

J7J9OTTD

1          Mr. Rachlis also calculated a range of potential

2     reasonable license fees for Otto's photograph based on the

3     public-facing Getty Images website.  Mr. Rachlis analyzed

4     photographs of recent images of President Trump and recent

5     paparazzi-type images of celebrities that were available for

6     digital use in an editorial-style article on a corporate

7     website or blog in the arts or entertainment industry.  Mr.

8     Rachlis noted that the cost of these licenses ranged from $108

9     to $126 for a three-month license and $162 to $178 for a

10    three-year license with up to five years of archival rights.

11    Mr. Rachlis also stated that certain factors affect the value

12    of a license, specifically:  (1) whether the use of the

13    photograph is commercial or editorial in nature (with

14    commercial uses garnering higher license fees); (2) whether the

15    license to use the photograph is exclusive or non-exclusive

16    (with exclusive licenses garnering higher fees); (3) the

17    uniqueness and quality of the photograph (with unique or high

18    quality photographs garnering higher license fees); (4) the

19    medium of the use, including whether it is in print or online

20    (with print uses garnering higher license fees); and (5) the

21    duration of the use (with longer durations garnering higher

22    license fees).  Based on the range of license fees he observed

23    on the Getty website and his evaluation of these five factors,

24    Mr. Rachlis concluded that a reasonable license fee for Otto's

25    photograph would be $125, assuming that Hearst did not use its

1  bargaining power as a large media company to negotiate a lower

2  rate.  However, Mr. Rachlis testified that large media

3  companies like Hearst are typically able to negotiate rates

4  that are significantly lower than those charged to the general

5  public, and if Hearst had used its substantial bargaining power

6  in the license negotiations, he would expect it to have

7  negotiated a license fee for Otto's photograph in the range of

8  $25 to $50.

9          I credit Mr. Rachlis' testimony that large media

10  companies are generally able to negotiate lower license fees

11  than those paid by the public.  I also credit his testimony

12  that the factors he articulated affect the value of a

13  reasonable license fee for any particular photograph.  Based on

14  my analysis of those factors, as well as my finding regarding

15  Hearst's significant bargaining power, I conclude that the

16  reasonable license fee for Otto's photo would be at the lower

17  end of the ranges articulated by Defendant's experts.  Otto's

18  photograph was used to illustrate a news story, and therefore

19  would have been licensed for an editorial use.  Because Otto's

20  photograph was used by other news outlets, any license

21  negotiated with Hearst would not have been exclusive.  Otto's

22  photograph is not unique -- indeed, other photographs of the

23  same event were displayed in the Esquire.com story -- nor is it

24  high quality.  It was not taken with professional camera

25  equipment and shows other cameras and phones in the foreground.

J7J9OTTD

1  I do not make any specific findings with respect to the

2  duration of time for which Hearst would have wanted to license

3  Otto's photo, other than to note that I expect that the

4  duration of the license would have been similar to the duration

5  of the licenses that Hearst negotiated for the thirteen

6  photographs identified by Mr. Plumpe, given the similarity of

7  those photographs to Otto's photograph and the purposes for

8  which they were used on the Esquire.com website.  I therefore

9  conclude that the most appropriate measure of a reasonable

10  license fee in this case is the amount actually paid for the

11  use of individual photographs similar to Otto's photograph.

12  This was the mechanism employed by Mr. Plumpe, which resulted

13  in his assessment that a reasonable license fee for Otto's

14  photograph was $100.

15      I note that Mr. Sebastian testified that licenses

16  acquired by Hearst for images used on Esquire.com typically

17  cost between $20 to $100 for an image of a public figure, such

18  as a celebrity or politician.  As a result, the $100 license

19  fee is at the high end of the spectrum of fees usually paid by

20  Hearst to license images of a public figure.  $100 is

21  substantially greater than the average of $43 and median of $35

22  paid by Hearst for licenses of stock photographs, as calculated

23  by Mr. Plumpe.  This average and median, however, may be

24  affected by the fact that Hearst categorized both "stock" and

25  "editorial" photographs as "stock" photographs.  This potential

J7J9OTTD

issue with this analysis is resolved by Mr. Plumpe's decision

to benchmark the license fee against a subset of equivalent

editorial images.  I believe that Mr. Plumpe's conclusion is

reasonable.  It is consistent with the direct evidence.  Based

on my assessment of the photograph under the analytical

framework provided by Mr. Rachlis, I conclude that a higher fee

is not warranted.  Consequently, I find that a reasonable

license fee for the photograph at issue in this case is $100.

      I should comment briefly on Plaintiff's argument that

I should value this image at $4,000 because there was evidence

that Hearst was willing to pay $4,000 for a particular

commissioned image.  I view that argument to be wholly

implausible.  First, this was not a commissioned photograph.

Second, it is not reasonable to ask me to value this image at

the value of what it would have cost had it been a commissioned

photograph.  There is no basis for me to speculate that Hearst

would have commissioned this photograph, much less that it

would have paid the highest possible amount for such a

photograph.  The argument that I should use $4,000 as a

benchmark is particularly frail when one considers this

photograph in the context of the factors described by Mr.

Rachlis -- this is not a professional photograph, it is not

high quality, it is not well-composed, it is not unique, and it

was not used exclusively by Hearst.  Quite simply not all

photographs are worth the same amount -- The Dutchess of Sussex

can expect to be paid more for a staged photograph of her child

than another new parent can expect for an iPhone photograph of

theirs.  The logic behind Plaintiff's argument -- that the

highest amount a person will pay for a given photograph is what

they should be expected to pay for any photograph -- is in my

view quite flawed.  In any event, I find that Plaintiff's

position regarding the valuation of the license is not

supported on this record.

I must also address the revenue received by Hearst as

a result of its use of Otto's photograph.  Hearst does not

charge for access to Esquire.com and did not charge for access

to the article alongside which Otto's photograph was displayed.

However, commercial advertisements were visible on the same

webpage where Otto's photograph was displayed.  Because the

article was not part of a sponsorship program, the only revenue

Hearst received from its publication of the article would have

derived from those programmatic ads.  These ads are served to

Hearst's websites through a series of online ad exchanges which

conduct split-second auctions for the ad space.  Hearst

receives only a fraction of a cent per page view from the

display of each programmatic ad on Esquire.com.  The most

revenue Hearst might have realized from the programmatic ads

that ran alongside the article is $148.99.

III.  LEGAL CONCLUSIONS

A.  Willfulness

J7J9OTTD

1          After establishing liability for copyright

2    infringement, a copyright owner may elect to recover either

3    statutory damages or actual damages and profits.  17 U.S.C. §

4    504(c)(1).  Here, Otto has elected to recover statutory

5    damages.  Joint Pre-Trial Order, Dkt. No. 102, at 18-21.  With

6    respect to any one infringing work, the Court may award

7    statutory damages between $750 and $30,000.  17 U.S.C. §

8    504(c)(1).  However, if the Court determines that the

9    infringement was willful, it may, in its discretion, enhance

10   the statutory damages award up to $150,000 per infringed work.

11   § 504(c)(2).  The burden falls on the copyright owner to prove

12   that the infringement is willful.  Id.

13          A copyright infringement is "willful" within the

14   meaning of § 504(c)(2) if the copyright owner shows "(1) that

15   the defendant was actually aware of the infringing activity, or

16   (2) that the defendant's actions were the result of 'reckless

17   disregard' for, or 'willful blindness' to, the copyright

18   holder's rights."  Island Software & Computer Serv., Inc. v.

19   Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005).  "[A]

20   willfully blind defendant is one who takes deliberate actions

21   to avoid confirming a high probability of wrongdoing and who

22   can almost be said to have actually known the critical facts.

23   [A] reckless defendant is one who . . . knows of a substantial

24   and unjustified risk of such wrongdoing."  Global-Tech

25   Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769-70 (2011).  "To

1    show willfulness, [a copyright owner is] not required to prove

2    [defendant's] actual knowledge that it was infringing.

3    Knowledge of infringement may be constructive rather than

4    actual." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d

5    996, 1010 (2d Cir. 1995). As a preliminary matter, Hearst

6    argues that this standard is incorrect because proof of

7    "constructive knowledge" is akin to a finding of negligence, a

8    mens rea lower than willfulness. See Erickson Prods., Inc. v.

9    Kast, 921 F.3d 822, 834 (9th Cir. 2019). However, the Second

10   Circuit in Knitwaves made clear that its reference to

11   constructive knowledge meant only that willfulness "need not be

12   proven directly but may be inferred from the defendant's

13   conduct." Knitwaves, 71 F.3d at 1010. The Second Circuit has

14   more recently confirmed that understanding. Island Software,

15   413 F.3d at 264 ("[A] plaintiff can still prove willfulness by

16   proffering circumstantial evidence that gives rise to an

17   inference of willful conduct.") (citing Knitwaves, 71 F.3d at

18   1010). In other words, a defendant's knowledge may be inferred

19   from his or her conduct. N.A.S. Import. Corp. v. Chenson

20   Enterprises, Inc., 968 F.2d 250, 252 (2d Cir. 1992).

21        The Court concludes that Hearst's infringement in this

22   case was not willful. The evidence in the record establishes

23   that no person at Hearst had actual knowledge that posting the

24   photograph on Esquire.com would infringe Otto's copyright.

25   Therefore, Otto was required to prove that Hearst acted with

J7J9OTTD

 1   willful blindness or reckless disregard.

 2             My conclusion rests very heavily on the burden of

 3   proof.  Plaintiff asks me to infer that, based on the limited

 4   time period between his pitch of the story to Mr. Sebastian and

 5   the story's posting on Esquire.com, Mr. Wade did not make any

 6   significant effort to investigate or contact the owner of the

 7   photograph, and that he must not have made a good faith

 8   determination that the use of the image constituted fair use.

 9   But it is at least equally possible for me to draw the

10   inference that before posting Otto's photograph on the

11   Esquire.com website, Mr. Wade did make a good faith

12   determination that use of the photograph in the article would

13   be fair use.  Supporting that inference is Mr. Sebastian's

14   testimony regarding Mr. Wade's experience as an editor, and Mr.

15   Sebastian's lack of knowledge of any concerns regarding Mr.

16   Wade's compliance with copyright law in the past, together with

17   the testimony of Ms. Siegel regarding the hiring practices of

18   HMDM generally, and her testimony regarding the effectiveness

19   of HMDM's training programs.  In addition, as noted above, on

20   the CMS system, the "No Rights" box was checked for "Image

21   Rights," supporting the conclusion that Mr. Wade made a

22   determination that the image could be used in the context of

23   his article, but no other.  That determination is consistent

24   with a determination of fair use.

25             As counsel has argued, fair use determinations are

fact specific.  I concluded at summary judgment that no

reasonable jury could conclude that Hearst's publication of

Otto's photograph was fair use.  But Mr. Wade was not a jury

making his determination with the benefit of precise legal

instructions and I think on these facts, he could reasonably

have believed in good faith that the use of the image was fair

use.  Because I find that it is just as likely that Mr. Wade

determined in good faith, based on his training, that no

license was necessary for the photograph as it is that Mr. Wade

recklessly disregarded or was willfully blind to Plaintiff's

ownership rights in the photograph, Plaintiff has not met his

burden of demonstrating that Mr. Wade's infringement was

willful.  See Agence France Presse v. Morel, 934 F. Supp. 2d

547, 570, reconsidered in part on other grounds, 934 F. Supp.

2d 584 (S.D.N.Y. 2013) ("Infringement is generally not willful

if a party reasonably and in good faith believes that its

conduct is innocent.").  I note that this conclusion is largely

a consequence of Plaintiff's decision not to depose Mr. Wade or

to put forth evidence at trial which would shed light on Mr.

Wade's mental state concerning the use of Plaintiff's

photograph.

        I also find that Mr. Sebastian's decision to delegate

determinations regarding fair use and the potential need for a

license to Mr. Wade was not willfully blind or reckless.  The

evidence at trial did not demonstrate that Mr. Sebastian was

J7J9OTTD

1    subjectively aware of a risk that Mr. Wade would infringe

2    Plaintiff's copyright.  To the contrary, Mr. Sebastian

3    testified that Mr. Wade had worked at Hearst for a substantial

4    period of time and that he was not aware of any instance in

5    which Mr. Wade had been accused of copyright infringement.  Mr.

6    Sebastian believed Mr. Wade had substantial experience in the

7    publishing industry.  Considering those facts in light of

8    Hearst's general practices regarding the hiring and training of

9    its employees and freelancers, together with the other facts

10   presented at trial, the Court does not infer that Mr. Sebastian

11   acted willfully.

12            In his closing argument, Plaintiff's counsel also

13   argued that Hearst has a general policy of willful blindness

14   towards copyright infringement with regard to photographs taken

15   from social media.  However, the evidence in the record does

16   not support this conclusion.  I have to decide the issues

17   presented here based on the evidence put forth at trial.  The

18   unrefuted testimony of Ms. Siegel, which I detailed previously,

19   describes Hearst as a company that is committed to the

20   protection of third-party content creators.  The evidence

21   presented here is that HMDM hires skilled people and provides

22   them with the tools that HMDM believes are necessary for them

23   to properly comply with the copyright law.  The company

24   provides regular training to employees and contractors.

25   Hearst's senior management -- as represented by the testimony

J7J9OTTD

of Ms. Siegel –– believes that Hearst's training and hiring

practices are effective protections against copyright

infringement.  Rather than establishing that Hearst has no

regard for copyrights, the evidence presented at trial was that

Hearst uses a huge volume of images regularly, and is subject

to copyright litigation with respect to only a small fraction

of the images that it uses.  I have to decide this case based

on the evidence presented, and there is a substantial volume of

essentially unrefuted evidence before the Court that Hearst and

HMDM have put in place a system that they reasonably believe

provides effective protection to copyright holders.

Lacking other evidence of willfulness, Plaintiff

points me to a number of facts about Hearst's practices and

argues that these facts provide a basis for me to draw an

inference of willfulness.  I do not believe those facts to be

sufficient to draw that conclusion.  For example, the fact that

Hearst lacks written policies containing its lawyers' advice on

fair use does not necessarily lead to the conclusion that

Hearst is unconcerned with the rights of copyright holders.

Instead, that fact can just as easily be explained by the

possibility that Hearst does not want to risk a potential

waiver of the attorney-client privilege by memorializing its

lawyers' advice in writing and disseminating that writing

widely.  And, again, the evidence presented is that the senior

management of Hearst believes that its practices are

J7J9OTTD

1   effective -- and they have presented data to illustrate the

2   reasonableness of their position.  The evidence presented at

3   trial shows, again, that only a small fraction of the images

4   used by Hearst and HMDM are the subject of copyright

5   litigation.  This does not support the conclusion that Hearst

6   is consciously avoiding compliance with copyright law

7            I understand that Plaintiff contends that the absence

8   of a tracking system for fair use determinations should drive

9   the Court to draw the inference that Hearst acted willfully.

10  However, I do not believe that to be the case.  Hearst's

11  decision not to include a field in CMS that would allow users

12  to track whether they made a fair use determination reveals

13  little about Hearst's mindset, at least in the absence of

14  evidence that Hearst considered and rejected such a system or

15  that tracking fair use determinations is a standard industry

16  practice.  Unlike counsel for Hearst, I can see how such a

17  check box might be helpful to support a defense of fair use in

18  the future, or to ensure that a conscious decision was made

19  regarding fair use.  But, even if Hearst's recordkeeping system

20  could be structured in an arguably better way, that does not

21  establish that they willfully infringed Plaintiff's copyright

22  in this case.  That position seeks to hold Hearst liable for

23  conduct that is far closer to negligence than to willfulness.

24            Nor does the Court conclude, having read Mr. Wade's

25  and Mr. Sebastian's communications surrounding the publication

J7J9OTTD

1  of the Trump wedding crashing article, that Mr. Sebastian

2  greenlighted Mr. Wade's use of Otto's photograph as soon as he

3  found out that the photograph was from Instagram.  The Court

4  interprets Mr. Sebastian's comment to mean what it says:

5  "Let's start there," not "That is all we need to know."

6         As an overarching comment, as I have already said, I

7  have to decide this case based on the evidence presented at

8  trial.  Arguments by counsel are helpful to direct me to the

9  proper inferences to draw from the evidence, but they are not

10  evidence.  The evidence admitted at trial is the evidence, and

11  inferences and arguments are ultimately bounded by it.  The

12  litigation position of Hearst with respect to fair use is not

13  evidence in the record at trial which I can use to evaluate

14  Hearst's state of mind.  I have specifically considered the

15  inferences that Plaintiff has asked me to draw from the

16  evidence, and I find that the evidence in the record does not

17  support the conclusion that Defendant was willfully blind or

18  otherwise willful based on my assessment of the record as a

19  whole.

20         However, I would like to pause momentarily to offer

21  some thoughts on the validity of Plaintiff's "corporate willful

22  blindness" theory as a whole.  Defendant has taken the position

23  throughout this litigation that "the willfulness inquiry stops

24  at a consideration of the act of infringement at issue and the

25  state of the mind of the person that took those actions."

1   Trial Transcript at 155:18-20.  Plaintiff has argued that

2   general evidence about Hearst's practices and policies is

3   relevant to the willfulness inquiry because it speaks to a

4   broad corporate mens rea of willful blindness.  There is no

5   question that the reference to willfulness in 17 U.S.C §

6   504(c)(2) is willfulness as to a specific act of infringement.

7   Similarly, it is clear that a corporation can be willfully

8   blind or reckless regarding the possibility of infringement.

9   See Global-Tech, 563 U.S. at 768.  However, as noted above,

10  willful blindness and recklessness require, respectively,

11  knowledge of a "high probability of" or a "substantial and

12  unjustified risk" of wrongdoing.  What is not clear is the

13  level of generality at which that risk should be defined, or --

14  put differently -- whether a corporation can be willfully blind

15  regarding a specific act of infringement if individuals within

16  the company consciously disregard a high probability that their

17  policies will lead to infringement generally.  I am not aware

18  of any cases in this Circuit addressing that issue and, in

19  light of the fact that it was not briefed by the parties and is

20  not necessary to my decision, I decline to address it now.  I

21  note, as well, that counsel for Plaintiff conceded during

22  closing argument that to prove willfulness, he needed to prove

23  it as to Mr. Wade or Mr. Sebastian.  Nevertheless, I have

24  addressed a broader theory of corporate willfulness, and

25  concluded that there is an insufficient basis to find

J7J9OTTD

1    willfulness at any level of the corporate defendant on this

2    record.

3

4          IV.   STATUTORY DAMAGES

5          "When determining the amount of statutory damages to

6    award for copyright infringement, courts consider: (1) the

7    infringer's state of mind; (2) the expenses saved, and profits

8    earned, by the infringer; (3) the revenue lost by the copyright

9    holder; (4) the deterrent effect on the infringer and third

10   parties; (5) the infringer's cooperation in providing evidence

11   concerning the value of the infringing material; and (6) the

12   conduct and attitude of the parties." Bryant v. Media Right

13   Prods., Inc., 603 F.3d 135, 144 (2d Cir. 2010); see also

14   Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 127 (2d Cir.

15   2014).  However, under Second Circuit law, a plaintiff seeking

16   statutory damages has no obligation to show actual damages or

17   losses.  See Psihoyos v. John Wiley & Sons, Inc., No. 11 CIV.

18   1416 JPO, 2012 WL 5506121, at *4 (S.D.N.Y. November 7, 2012),

19   affirmed, 748 F.3d 120, 127 (2d Cir. 2014).  I make the

20   following conclusions of law with respect to the factors

21   articulated in Bryant.

22         As previously discussed, I have determined that

23   Hearst's infringement was not willful.  I have also found that

24   the expenses saved by Hearst and the revenue lost by Otto as a

25   result of the infringement were the reasonable license fee of

J7J9OTTD

$100.  I have also determined that the maximum profits earned

by Hearst as a result of its use of Otto's photograph is

advertising revenue in the amount of $148.99.

As part of my analysis of statutory damages, I must

also consider the deterrent effect of the award on Hearst and

third parties.  "[S]tatutory damages are not meant to be merely

compensatory or restitutionary."  Yurman Design, Inc. v. PAJ,

Inc., 262 F.3d 101, 113-14 (2d Cir. 2001).  Instead, "[t]he

statutory award is also meant to discourage wrongful conduct."

Id. (quoting N.A.S. Import, 968 F.2d at 252).  Hearst's status

as a major participant in the publishing industry mitigates in

favor of a larger statutory damages award for purposes of

deterrence.  See, e.g., UMG Recordings, Inc. v. MP3.Com, Inc.,

No. 00 CIV. 472 JSR, 2000 WL 1262568, at *6 (S.D.N.Y. Sept. 6,

2000) ("[T]he defendant's size and financial assets are highly

relevant to arriving at the appropriate level of statutory

damages . . . .").  However, in light of my previous findings

regarding the lack of evidence that the Hearst organization as

a whole generally disregards the rights of copyright owners, I

conclude that a large statutory damages award is not necessary

to deter Hearst against future infringement.

Otto claims that there is a broad need for general

deterrence in infringement cases involving unauthorized use of

photographs, basing his argument on what he calls the

"flooding" of courts with copyright infringement cases.

J7J9OTTD

However, there is no evidence regarding the frequency of

copyright infringement by other media organizations in the

record of this case.  Based on the record before me, I also do

not conclude that there is a general need for deterrence which

would justify higher statutory damages in this case than I

expect to award.

          Finally, I must consider Hearst's cooperation in

providing evidence concerning the value of the infringing

material and the conduct and attitude of the parties.  I note

that Hearst has appeared in and defended this action and has

put forth evidence at trial of the value of a license for

Otto's photograph.  Beyond those limited facts, I have no basis

to evaluate the quality or extent of Hearst's cooperation in

providing evidence concerning the value of the infringing

material.  Similarly, beyond recognizing that various disputes

over conduct during discovery and settlement negotiations have

arisen between the parties over the course of this litigation,

I have no factual basis to evaluate the conduct and attitude of

the parties.  No evidence put forth at trial relates to this

factor which I have not already considered as part of my

statutory damages analysis.  I therefore find that both of

these factors are neutral.

          Based on my evaluation of the factors described above,

I find that statutory damages in the amount of five times the

reasonable license fee of $100 are appropriate.  Because such

J7J9OTTD

an award is less than the statutory minimum, I award Plaintiff

the statutory minimum of $750,000 -- sorry, $750. Although

Otto has offered examples of cases in which plaintiffs have

been awarded $30,000 in statutory damages for copyright

infringement, those cases involved different circumstances than

those presented here. Most importantly, the majority of those

cases involved defaults by defendants who failed to appear and

defend themselves.

My award of $750 is based on my evaluation of the

record as a whole, and my assessment of the factors that I

described above. An award in this amount is also in accordance

with the trend in this Circuit to award a prevailing copyright

infringement plaintiff statutory damages in an amount that is a

single-digit multiple of a reasonable licensing fee. See Mango

v. BuzzFeed, Inc., 356 F. Supp. 3d 368, 374 (S.D.N.Y. 2019)

("[C]ourts in this Circuit commonly award, in cases of

non-innocent infringement, statutory damages of between three

and five times the cost of the licensing fees the defendant

would have paid."); Barcroft Media, Ltd., 297 F. Supp. 3d at

359; Michael Grecco Prods., Inc. v. Function(X) Inc., No. 18

CIV. 386 (NRB), 2019 WL 1368731, at *4-5 (S.D.N.Y. Mar. 11,

2019). I believe that a multiplier greater than 7.5 times the

licensing fee, which would be required in order to bring the

award to a figure in excess of the $750 statutory minimum,

would be excessive in light of my evaluation of the facts of

J7J9OTTD

1    this case and applicable law.

2            V..   CONCLUSION

3            For the foregoing reasons, I find that damages should

4    be awarded to Plaintiff in the amount of $750.00.  Any

5    application for attorneys' fees in connection with this matter

6    must be submitted to the Court no later than August 2, 2019.

7    Any opposition to that application must be filed no later than

8    August 13, 2019.  And any reply must be filed no later than

9    August 16, 2019.  Counsel must present a sworn affidavit

10   describing the experience and qualifications of each

11   professional who billed time to the case, and attach

12   contemporaneous time records showing the amount billed by each

13   lawyer and the nature of the associated services.  The

14   affidavit must also show the range of fees charged by, or

15   authorized by a court with respect to, that lawyer over the

16   course of the last two calendar years.  The affidavit must set

17   forth any additional facts that are pertinent to the Court's

18   evaluation of counsel's requested fee award.

19           So, thank you very much, counsel.  That completes the

20   reading of my decision which was, if you're interested, about

21   twelve-and-a-half single-spaced pages.

22           Counsel, to the extent that the parties are able to

23   confer and agree upon an award of attorneys' fees and costs, I

24   would encourage you to engage in that conversation before

25   briefing commences to the extent you're unable to stipulate to

J7J9OTTD

1    a proper amount of such fees, which I don't anticipate based on

2    our discussions at the outset of the trial.  You should submit

3    your respective briefing to the Court on the schedule that I've

4    just described.

5              Good.  So anything else that we should take up now?

6    First, counsel for plaintiff?

7              Anything for plaintiff before we recess?

8              MR. FREEMAN:  Not for plaintiff.

9              THE COURT:  Good.  Thank you very much.

10             Counsel for defendant?

11             MR. BOYER:  No, your Honor.  Except just like to thank

12   the Court for its prompt attention to this case.  We note only

13   four calendar dates have passed since the trial.  So I just

14   wanted to note that we appreciate the prompt attention.  Thank

15   you.

16             THE COURT:  Thank you.  Happy to do so.  Thank you

17   all.

18             (Adjourned)

19

20

21

22

23

24

25